Doug Solomon (State Bar No. 042771995)
**JACKSON LEWIS P.C.**
200 Connell Drive, Suite 2000
Berkeley Heights, New Jersey 07922
Tel: (908) 795-2970
Email:  doug.solomon@jacksonlewis.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NEW JERSEY TRANSIT RAIL OPERATIONS, INC.,<br><br>                    Plaintiff,<br><br>v.<br><br>BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN.<br><br>                    Defendant. | Civil Action No. 2:24-cv-11102 |

## COMPLAINT

1.      Plaintiff, New Jersey Transit Rail Operations, Inc. ("NJTRO" or "Carrier") brings this civil action for temporary restraints and/or preliminary injunctive relief pursuant the Railway Labor Act ("RLA"), 45 U.S.C. § 151, *et seq.*, against Defendant Brotherhood of Locomotive Engineers and Trainmen ("BLET" or "Defendant").

2.      Plaintiff brings action seeking to temporarily and/or preliminarily restrain arbitration scheduled for January 9, 2025 regarding a major dispute between NJTRO and BLET pertaining to compensation of Plaintiff's locomotive engineers ("Engineers"), who are members of the BLET.

3.      Specifically, Plaintiff seeks court intervention to uphold the RLA's *status quo*

provisions, which mandate that the parties maintain the *status quo* (including not changing rates of pay) pending resolution of a major dispute over the terms of a successor collective bargaining agreement ("successor CBA") between NJTRO and BLET.  Plaintiff further seeks this Court's intervention because the dispute that BLET is seeking to arbitrate over is part of the major dispute that the parties are currently seeking to resolve through the RLA dispute resolution procedure, set forth in 45 U.S.C. § 159a.

4.       Proceeding with arbitration of the dispute while the parties are in the midst of seeking to voluntarily resolve the dispute through the RLA's major dispute resolution procedures would violate the RLA's *status quo* provisions set forth in 45 U.S.C. § 159a(h).  Accordingly, the Court must issue an Order temporarily and/or preliminarily restraining the arbitration from proceeding pending exhaustion of the dispute resolution procedures set forth in 45 U.SC. § 159a.

## PARTIES

5.       NJTRO is a public rail carrier providing commuter rail service within the meaning of the RLA, 45 U.S.C. § 151, First.  NJTRO maintains its principal place of business at 1 Penn Plaza East, Newark, New Jersey 07105.  (McGreal Dec. ¶ 3).

6.       NJTRO is a subsidiary of NJ Transit, ("NJT") a state-owned public transportation corporation created by the state legislature on July 17, 1979 under the New Jersey Public Transportation Act of 1979 ("NJPTA").  *N.J.S.A.* 27:25-1 *et seq*.

7.       NJT was created to acquire and operate public transportation services and facilities in New Jersey. *N.J.S.A.* 27:25-2. These services include rail transportation services, including operation of a railroad for the purpose of carrying passengers in New Jersey or between points in New Jersey and points in other states.  *N.J.S.A.* 27:25-3.

8.       The NJPTA made NJT an instrumentality of the State exercising public and

essential governmental functions of the State. *N.J.S.A.* 27:25-4.  While the NJPTA allocated NJT within the New Jersey Department of Transportation ("NJDOT"), the law states that NJT shall be independent of any supervision or control by NJDOT or any body or officer thereof.  *N.J.S.A.* 27:25-4(a).

9.    NJTRO now operates a commuter rail service through the State of New Jersey and serves as a vital link in the Northeast's transportation network, operating 12 commuter rail lines. Each weekday, NJTRO's 683 scheduled trains carry more than 205,000 passengers and operate on almost 1,000 miles of track with over 160 stations.  (McGreal Dec. ¶ 6).

10.    In Fiscal Year 2024, NJTRO's ridership exceeded 59 million passengers.  Weekday boarding levels at major hub stations include Newark Penn Station (16,106), Secaucus Junction (19,300), Hoboken Terminal (7,881), Newark Airport (4,578) and Princeton Junction (4,040). (McGreal Dec. ¶ 7).

11.    Defendant BLET is an unincorporated labor organization affiliated with the International Brotherhood of Teamsters.  The BLET is the exclusive bargaining "representative," of the Engineers employed by NJTRO as defined by 45 U.S.C. § 151, Sixth.  The Engineers represented by BLET operate NJTRO's trains in both passenger and yard service.  The BLET provides day-to-day representative services to the Engineers performing work in this judicial district.

**JURISDICTION AND VENUE**

12.     This Court has jurisdiction over the subject matter of this civil action under 28 U.S.C. §§ 1331, 1337, and 1367 because this matter raises a question under the RLA, 45 U.S.C. § 151, *et seq.*, a federal law.  Federal district courts have jurisdiction to issue injunctions temporarily restraining arbitration to enforce the requirements of the RLA.  *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 303-04, 312 (1989) ("*Conrail*").

13.     Venue in this Court is proper under 28 U.S.C. § 1391(b) because the parties reside in this judicial district and a substantial part of the events or omissions giving rise to these claims occurred within this judicial district.

**FACTUAL BACKGROUND**

14.     NJTRO serves the state of New Jersey and portions of the states of New York and Pennsylvania. It operates commuter rail services throughout New Jersey, connecting to major commercial and employment centers both within the state and in its two adjacent major cities, New York City and Philadelphia. Its operations include 12 commuter rail lines, over 160 stations, and nearly 1,000 miles of track. Overall ridership between July 1, 2023 and June 30, 2024 exceeded 59 million passengers. NJTRO employs approximately 4,500 unionized employees, between fifteen (15) different labor unions, including approximately 420 Engineers represented by the BLET. (McGreal Dec. ¶¶ 6-7).

15.     Between these fifteen (15) unions, NJTRO was a party to twenty-one (21) collective bargaining agreements ("CBA's") for the period of July 1, 2011 through December 31, 2019. (McGreal Dec. ¶ 8). Under the RLA, these agreements do not expire but become amendable after their end date, and requires the parties maintain the "*status quo*" (including making no changes to rates of pay) until such amendments are agreed upon in a successor CBA.

16.     The parties' CBA became amendable on January 1, 2020.  BLET served a notice on October 1, 2019 under Section 6 of the RLA to initiate collective bargaining. The Carrier served its Section 6 notice on November 27, 2019. (McGreal Dec. ¶ 11).

17.     Because the Parties remained unable to reach an agreement, BLET filed an application with the National Mediation Board ("NMB") for mediation on October 22, 2020. (McGreal Dec. ¶ 12).

18.     The Parties subsequently entered into mediation with a federal mediator assigned by the NMB, beginning on December 9, 2020.  The parties continued meeting with the federal mediator through May of 2024. (McGreal Dec. ¶ 12).

19.     While the BLET and NJTRO continued to negotiate during this period, on September 25, 2021, the International Association of Sheet Metal, Air, Rail, and Transportation Workers–Transportation Division ("SMART-TD") union, representing Conductors & Trainmen, were the first NJTRO union to sign and ratify a successor CBA covering the period of January 1, 2020 through June 30, 2024.  (McGreal Dec. ¶ 13).  Thereafter, by March 2022, all other NJTRO rail unions except the BLET − or approximately 91% of the rail workforce – agreed to successor CBAs for the same contract period and with the same pattern of settlement as SMART-TD. (McGreal Dec. ¶ 14).

20.     By March 2022, all NJTRO rail unions except the BLET had agreed to a successor CBA for the contract period from January 1, 2020, through June 30, 2024.  All successor CBAs that were agreed to by NJTRO's rail unions included an agreement to the same wage pattern as SMART-TD had agreed to for the contract period from January 1, 2020, through June 30, 2024. (McGreal Dec. ¶ 15).

21.     Throughout the mediation between the BLET and NJTRO, NJTRO has offered the

BLET the same pattern of settlement, including wage increases, that was agreed to by all other

NJTRO rail unions.   To date, however, no agreement has been reached between the parties, as

BLET has consistently rejected these offers from NJTRO. (McGreal Dec. ¶ 16).

22.     On June 21, 2024, the NMB, in accordance with Section 5, First of the RLA, urged

the Parties to submit their dispute over the terms of the successor CBA to voluntary arbitration as

provided in Section 8 of the RLA. However, the Parties both rejected the NMB's proffer of

arbitration. (McGreal Dec. ¶ 20).

23.     On June 24, 2024, consistent with Section 5, First of the RLA, the NMB notified

the parties that they were released from mediation and could engage in self-help should a

Presidential Emergency Board ("PEB") not be established by July 25, 2024. (McGreal Dec. ¶ 21).

24.     On July 2, 2024 — during the 30-day cooling off period following the parties

release from mediation — the Carrier, in accordance with Section 9a of the RLA, asked President

Biden to establish a PEB to investigate and issue a report and recommendations regarding the

major dispute. (McGreal Dec. ¶ 22).

25.     On July 24, 2024, President Biden issued an Executive Order creating Presidential

Emergency Board 251 ("PEB 251") in accordance with 45 U.S.C. § 159a(c)(1) effective July 25,

2024. (McGreal Dec. ¶ 23).

26.     The creation PEB 251 imposed a *status quo* period on the parties for an additional

120 days, until November 21, 2024 as per 45 U.S.C. § 159a(c)(1).

27.     On August 23, 2024, PEB 251 issued a Report to the President with

recommendations for settlement.  (McGreal Dec. ¶ 24).  The PEB Report is not binding upon the

parties but is meant to provide the parties with a recommendation for settlement.

28.     One of the recommendations of PEB 251 expressly relates to the maintenance of

the 10.4% differential between BLET's Engineers and the wages of SMART-TD Conductors and

Trainmen.  PEB 251 directly addresses the "Conductor/Engineer Differential" on page 39 of its

Report to the President and expressly recommends: "Cents per hour increase if necessary to

maintain the 10.4% differential between the engineers' rate and the conductors' rate."  (McGreal

Dec. ¶ 24; Exhibit D).

29.     The fact that PEB 251 included the reference to the 10.4% differential with

Conductors as part of the proposed settlement is significant because it demonstrates that this issue

is part of the major dispute that remains a continuing subject of negotiations between the Parties

as they try to resolve this dispute without a work stoppage through the mandated resolution

procedures set forth in 45 U.S.C. § 159a.

30.     The parties continued to negotiate following the issuance of PEB 251 but were

unable to reach an agreement.  Accordingly, at the request of NJTRO, on November 21, 2024,

President Biden issued an Executive Order creating a second PEB (PEB 252) in accordance with

45 U.S.C. § 159a(e). (McGreal Dec. ¶ 26).

31.     The Executive Order ("EO") creating PEB No. 252 prohibits any changes to the

*status quo* (including changes to rates of pay) between the parties.  The Executive Order of

President Biden orders the parties as follows: "***As provided by section 9A(h) of the RLA, from the***

***time the request to establish the Board is made until 60 days after the Board submits its report***

***to the President, the parties to the controversy shall make no change in the conditions out of***

***which the dispute arose except by agreement of the parties***." 45 U.S.C. § 159a(h).

32.     PEB 252 effectively extends the *status quo* period for an additional 120 days until

on or about March 21, 2025.

33.     In correspondence dated November 29, 2024, the NMB set forth the schedule of

the parties pertaining to PEB 252, including the requirement that NJTRO and BLET must (i) participate in pre-hearing mediation with PEB 252 Chairman Jaffe on December 18 and 19, 2024, (ii) submit "final offers for settlement" to PEB 252 on or before December 21, 2024, (iii) participate in hearings before PEB 252 on January 5 through 7, 2025, and (iv) participate in Post Hearing meetings at NMB's offices in Washington, DC between January 10 through 12, 2025, all in the hopes of resolving the dispute before the PEB issues its Report to the President on or about January 20, 2025.

34.     Pursuant to 45 U.S.C. § 159a(f), the parties are now required to participate in pre-hearing mediation with Chairman Jaffe and the parties on or about December 18 and 19, 2024, and submit "final offers for settlement" to PEB 252 on or before December 21, 2024. (McGreal Dec. ¶ 39; Exhibit L).

35.     Following submission of final offers the Parties must then participate in hearings before PEB 252 on January 5 through 7, 2025, and participate in Post Hearing meetings at NMB's offices in Washington, DC between January 10 through 12, 2025, in the hopes of resolving the dispute before the PEB issues its Report to the President on or about January 20, 2025 setting forth its selection of the most reasonable final offer in accordance with 45 U.S.C. § 159a(g). (McGreal Dec. ¶ 39; Exhibit L).

36.     Following the Report to the President by PEB 252, the parties will have 60 days until approximately March 21, 2025 to resolve the dispute before either party may use self-help (i.e. BLET will have the right to strike on or about March 22, 2025).

37.     Throughout the entire process described above, and for 60 days after PEB 252 issues its Report to the President, the RLA prohibits either party from making any change "in the conditions out of which the dispute arose." 45 U.S.C. § 159a(h).

**The BLET Seeks Arbitration over 10.4% Differential**

38.    Notwithstanding the RLA's *status quo* requirements, 45 U.S.C. § 159a(h), which were included President Biden's EO creating PEB 252, and notwithstanding the fact that the 10.4% differential issue is an issue that is squarely within the major dispute before PEB 252, the BLET is inappropriately seeking to arbitrate the 10.4% differential issue through the contractual arbitration process.

39.    On October 27, 2021, the BLET raised its on property claim ("Grievance") regarding the 10.4% differential. (McGreal Dec. ¶ 27). While the Carrier denied the claim, in a letter dated January 17, 2022, BLET notified NJTRO that the matter would proceed to Special Board of Arbitration 940 ("SBA 940"). (McGreal Dec. ¶ 31).

40.    On September 13, 2024, the NMB approved funding for SBA 940 to proceed to arbitration. (McGreal Dec. ¶ 32). One of the matters before SBA 940 is the BLET's claims pertaining to the 10.4% differential. This is the same issue that was part of the issues before PEB 251, was part of PEB 251's recommendations for settlement, (McGreal Dec. ¶ 24; Exhibit D), and is now before PEB 252 with pre-hearing mediation set to be held on December 18 and 19, 2024, hearings before PEB 252 set to commence January 5 through 7, 2025, and Post Hearing meetings at NMB's offices in Washington, DC between January 10 through 12, 2025. (McGreal Dec. ¶ 39; Exhibit L).

41.    On September 17, 2024, Plaintiff requested that the NMB hold the arbitration in abeyance pending resolution of the Parties' major dispute regarding the successor CBA. (McGreal Dec. ¶ 33; Exhibit G).

42.    On September 19, 2024, the NMB declined to hold the arbitration of the 10.4% differential issue in abeyance based on the fact that the NMB's role in arbitration under the RLA

is only a ministerial one limited to docketing cases, creating Special Boards of Adjustment upon request of the parties, and compensating neutral arbitrators. (McGreal Dec. ¶ 34; Exhibit H; 45 U.S.C. § 153).

43.     On September 20, 2024, Plaintiff made the same objection to Michael Phillips, who had been designated as the neutral member on SBA 940.  Arbitrator Phillips is also Chair of SBA 940.  (McGreal Dec. ¶ 35; Exhibit I).

44.     On October 6, 2024, Arbitrator Phillips advised he would not hold the arbitration of the 10.4% differential in abeyance because he felt the NMB's correspondence from September 13, 2024 required him to "conduct the hearing within 120 days of the date of assignment" and he saw no reason to deviate from the NMB's instruction.  (McGreal Dec. ¶ 36; Exhibit J).

45.     On October 9, 2024, Carrier sent an e-mail message to Arbitrator Phillips where it noted its objection to holding a hearing before SBA 940 on the 10.4% differential issue based on the fact that arbitration is not the correct forum to decide a major dispute.  (McGreal Dec. ¶ 37; Exhibit K).

46.     Over the objections of NJTRO, Arbitrator Phillips, as Chair of SBA 940, has set January 9, 2025 as the date for the arbitration concerning the 10.4% differential dispute. (McGreal Dec. ¶ 38).

47.     The BLET's arbitration claim seeks a daily "penalty allowance" of eight (8) hours straight time pay, per day, for each engineer, for every day that the Carrier allegedly failed to implement a 10.4% hourly wage differential between the BLET's engineers and SMART-TD's conductor rate of pay while the Parties were engaged in bargaining over the terms and conditions of the successor CBA.  (McGreal Dec. ¶ 28).

48.     If BLET's requested relief is granted, it would provide BLET Engineers with a

windfall penalty payment that would cost Plaintiff an amount estimated at over $63 million for the time period from July 1, 2020 to October 27, 2021. If Plaintiff were required to apply those penalty payments through December 31, 2024, the estimated cost to Plaintiff would be over $227 million. (McGreal Dec. ¶ 29).

49.    To put the potential cost of what BLET is seeking to obtain in arbitration of the Grievance in perspective, the total cost for Rail Labor salaries for all unionized employees at NJTRO in FY-2024 was $419 million. Thus, an award SBA 940 that results in $227 million in penalty payments would require a payment by NJTRO that is over 54% of its entire FY-2024 rail labor costs. (McGreal Dec. ¶ 30).

50.    In prior rounds of bargaining, the Parties' maintained a consistent practice of first engaging in the negotiation process to completion, inclusive of an agreement on wage increases, before implementing any changes to the *status quo*, including the implementation of wage increases. It was only once the Parties reached a final agreement that any wage increases were implemented for the BLET (or for any other rail union). While the wage increases have always been implemented retroactive to the same effective date as the SMART-TD's Conductors' wage increases, the BLET wages were never increased before BLET had agreed to a successor CBA. (McGreal Dec. ¶ 17). Even in instances where SMART-TD's conductors agreed to a successor CBA prior to the BLET, the BLET's Engineers still retroactively received a wage increase that would maintain the 10.4% wage differential with SMART-TD Conductors to same date that SMART-TD's wage increase was effective. However, NJTRO did not increase BLET wages until *after* a final agreement was reached. (McGreal Dec. ¶ 18).

51.    Waiting until a voluntary agreement between the Parties is reached on a successor CBA prior to implementing any wage increases is consistent with the fact that wage discussions

are part of a "major" dispute and cannot be changed until they are resolved through a voluntary agreement between the Parties in accordance with the RLA's required dispute resolution procedures.

52.     While negotiating a successor CBA, the BLET now seeks to violate the RLA and forgo its requirement that the parties negotiate terms of a successor agreement before implementing any changes to the *status quo* (including increases to pay rates). Instead, the BLET seeks to submit the 10.4% differential issue to compulsory arbitration before completing the required processes designed to promote voluntary settlement of successor CBAs, and during the time when the Parties are squarely within the RLA's *status quo* period.

53.     Defendant seeks to gain an advantage in the negotiations for a successor CBA by means that are prohibited by the RLA. Defendant seeks significant compensation and wage increases to be implemented both retroactively and prospectively without Plaintiff's voluntary agreement. This unlawful change to the *status quo*, in violation of the RLA, 45 U.S.C. § 159a(h), would irreparably harm Plaintiff's bargaining position and its ability to compromise for a voluntary settlement moving forward.

54.     Absent temporary and/or preliminary restraints, SBA 940 will move forward to arbitration on January 9, 2025, during the pendency of PEB 252. PEB 252 will hold hearings on January 5 through 7, 2025, and will then issue its Report to the President on or before January 20, 2025.

55.     This Court must step in to enjoin SBA 940's arbitration of the 10.4% differential dispute, which is already part of the dispute pending before PEB 252 and subject to the RLA major dispute resolution process. The *status quo* provisions under the RLA, and as set forth in the EO creating PEB 252, will run through approximately March 21, 2025. Accordingly, the 10.4%

differential issue must be addressed by the Parties pursuant to the major dispute process under the RLA, and not through an arbitration award that would impact the *status quo* during this crucial time period.

## COUNT I (Violation of the RLA's Prohibition Against Violating the *Status quo* During Major Disputes)

56.     Plaintiff realleges and incorporates by reference as if fully set forth herein the allegations of paragraphs 1 through 55 above.

57.     When a "major" dispute arises, the RLA requires the parties to undergo a lengthy process of bargaining, mediation, Presidential Emergency Boards, and cooling off periods. 45 U.S.C. §§ 155, 156 and 159a.  Until they have exhausted those procedures, the parties are obligated to maintain the *status quo* (including no changes to rates of pay), and the district courts have subject-matter jurisdiction to enjoin a violation of the *status quo* pending the outcome of the RLA major dispute resolution procedures. See, *Conrail*, 491 U.S. at 302-03.

58.     Plaintiff and Defendant are engaged in a major dispute over the terms and conditions of employment for Engineers under a successor CBA.  The current CBA became amendable on January 1, 2020 and negotiations for a successor CBA have not been resolved.  The key issue in the major dispute between the parties is compensation for the BLET Engineers, including wage increases.

59.     Because the parties did not accept the recommendations of PEB 251, a second Presidential Emergency Board, PEB 252, has been established. PEB 252 will hold hearings on January 5 through 7, 2025 in an effort to resolve the major dispute over the terms of a successor CBA (including the dispute over compensation and wage increases for the BLET's Engineers).

60.     One of the issues before PEB 252 is the 10.4% differential between BLET's engineers and the conductors in SMART-TD, an issue that was also squarely before PEB 251.  Accordingly,

wage increases, including the 10.4% differential, is an issue that is clearly part of the major dispute which is currently being collectively bargained.

61.    However, instead of appropriately seeking these salary increases through the major dispute resolution process and collective bargaining, as required by the RLA, the BLET seeks an impermissible and unlawful advantage in the resolution of the Parties' major dispute by pursuing compulsory arbitration in SBA 940 in the interim, thereby seeking an award changing the *status quo* – including the unilateral implementation of additional compensation and a new wage rate.

62.    Notwithstanding the RLA's *status quo* provisions and mandate for "major" disputes to be resolved through the established major dispute process, Defendant still seeks to proceed with the arbitration hearing before SBA 940 on January 9, 2025.  A ruling from the Arbitrator in Defendant's favor would result in an arbitration award that provides compensation and retroactive and prospective increases to Engineers' rates of pay in direct violation of the RLA *status quo* requirements.

63.    With respect to the *status quo* provisions that are specific to the creation of a second PEB, the RLA expressly provides as follows:

> **From the time a request to establish a board is made under subsection (e) until 60 days after such board makes its report under subsection (g), no change, except by agreement, shall be made by the parties in the conditions out of which the dispute arose.**

45 U.S.C. § 159(h) (emphasis added).

64.    Similarly, in the November 21, 2024 EO establishing PEB 252, President Biden reiterated the requirements set forth in Section 9a(h) of the RLA as follows:

> **Maintaining Conditions.  As provided by section 9A(h) of the RLA, from the time the request to establish the Board is made until 60 days after the Board submits its report to the President, the parties to the controversy shall make no change in the conditions out of which the dispute arose except by agreement**

**of the parties.**

65.    In the arbitration hearing scheduled before SBA 940 on January 9, 2025, the BLET seek a change in the conditions out of which the dispute arose.  The BLET is asking SBA 940 to award both compensation and a *new wage increase* to the BLET's Engineers without completing the collective bargaining process through to resolution, as required by the RLA.

66.    Any such change violates the *status quo*, as required by both the RLA and President Biden's EO creating PEB 252.

67.    Based on the foregoing, this Court must find that injunctive relief that temporarily and/or preliminarily enjoins Defendant from proceeding to arbitration over the 10.4% differential issue is appropriate.  Absent a resolution of the major dispute through a voluntary agreement between NJTRO and BLET for a successor CBA, the temporary and/or preliminary restraints should enjoin the arbitration during the pendency of PEB 252 and extend until 60 days after PEB 252 makes its Report to the President of the United States (which will be on or about March 21, 2025), in accordance with 45 U.S.C. § 159a(g).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff asks for judgment against Defendant and respectfully pray that the Court, as appropriate:

A.    Issue injunctive relief:

1. Enjoining SBA 940, Defendant, and their officers, agents, representatives, and members, and anyone acting in concert with the Defendant, from arbitrating the 10.4% differential dispute that is currently scheduled for arbitration before SBA 940 on January 9, 2025.  The injunction should apply during the pendency of PEB 252 and until either: (a) NJTRO and BLET resolve the major dispute through a voluntary agreement for a successor CBA, or (b) 60 days after PEB 252 issues its Report to the President, i.e., on or about March 21, 2025, whichever comes sooner;

2. Requiring Defendant continue the *status quo,* as well as their obligation and requirement to continue the negotiation process; and

3. Granting appropriate temporary and preliminary injunctive relief against Defendant, if necessary.

B.  Award NJTRO such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated:  December 12, 2024.

/s/      *Doug Solomon*

Doug Solomon (State Bar No. 042771995)
David I. Solomon (State Bar No. 244262017)
**JACKSON LEWIS P.C.**
200 Connell Drive, Suite 2000
Berkeley Heights, New Jersey 07922
Tel: (908) 795-2970
Email:  doug.solomon@jacksonlewis.com

*Attorneys for Plaintiff*
New Jersey Transit Rail Operations Inc.

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

Pursuant to L. Civ. R. 11.2, the undersigned counsel for Plaintiffs hereby certifies that

this matter in controversy is not the subject of any action pending in any court but is subject to

arbitration in SBA 940 between the Parties.

Respectfully submitted,

Dated:  December 12, 2024.                    /s/      ***Doug Solomon***                        _

Doug Solomon (State Bar No. 042771995)
David I. Solomon (State Bar No. 244262017)
**JACKSON LEWIS P.C.**
200 Connell Drive, Suite 2000
Berkeley Heights, New Jersey 07922
Tel: (908) 795-2970
Email:  doug.solomon@jacksonlewis.com

*Attorneys for Plaintiff*
New Jersey Transit Rail Operations Inc.

4920-2004-0710, v. 1