Doug Solomon (State Bar No. 042771995)
**JACKSON LEWIS P.C.**
200 Connell Drive, Suite 2000
Berkeley Heights, New Jersey 07922
Tel: (908) 795-2970
Email: doug.solomon@jacksonlewis.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY TRANSIT RAIL OPERATIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN <br><br> Defendant. | Civil Action No. 2:24-cv-11102 |

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINTS AND PRELIMINARY INJUNCTIVE RELIEF

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ............................................................................. 4

**STATEMENT OF FACTS** .................................................................................... 4

**ARGUMENT** ........................................................................................................ 12

    A.    **Legal Standard for Granting Injunctive Relief** ........................................ 12

        1.    **Plaintiff is Likely to Prevail on the Merits of Their Claims** ........... 12

            a.    Plaintiff is Likely to Succeed on the Merits Because Permitting SBA 940 To Decide the 10.4% Differential Dispute Will Violate The Railway Labor Act's *Status Quo* Provisions. .............................................. 13

            b.    Plaintiff is Likely to Succeed on the Merits Because Permitting SBA 940 To Decide the 10.4% Differential Dispute Will Violate The Executive Order's *Status Quo* provisions. ....................................................... 17

            c.    The 10.4% Differential Is Part of the Major Dispute Pending Between the Parties. ........................................................................................... 18

        2.    **Plaintiffs Will Suffer Irreparable Harm Absent Equitable Relief** ......... 21

            a.    Allowing Arbitration in SBA 940 is a Direct Violation of RLA and Executive Order. .................................................................................. 21

            b.    Permitting SBA 940 to Proceed on the 10.4% Differential Issue Will Drastically Increase the Likelihood of a Strike by BLET……………...……22

        3.    **Granting the Requested Relief Will Not Result in Greater Harm to BLET** ................................................................................................ 26

        4.    **The Public Interest Would be Served by the Requested Relief.** .................... 27

**CONCLUSION** .................................................................................................... 28

ii

# TABLE OF AUTHORITIES

**Cases**

*Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999) ........................................ 9

*Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299 (1989) ........................................ 10

*Detroit & T. S. L. R. Co. v. United Transp. Union*, 396 U.S. 142, 150 (1969) ...................... 12, 20

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988) ............. 9

*Kongtcheu v. Secaucus Healthcare Ctr., LLC*, 2:13-cv-1856, 2014 U.S. Dist. LEXIS 74151, at *4  (D.N.J. May 30, 2014) ........................................................ 9

*Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) ........................................ 9

*Railroad Trainmen v. Terminal Co.*, 394 U.S. 369 (1969) ........................................................ 10

*Railway Clerks v. Florida E. C. R. Co.*, 384 U.S. 238, 246 (1966) ............................................ 18

**Statutes**

45 U.S.C. § 151 ........................................................................................................ 1

45 U.S.C. § 151a .......................................................................................... 22, 23, 24

45 U.S.C. § 155 ....................................................................................................... 10

45 U.S.C. § 156 ....................................................................................................... 10

45 U.S.C. § 159a .............................................................................................. passim

## PRELIMINARY STATEMENT

Plaintiff New Jersey Transit Rail Operations, Inc. ("NJTRO" or "Carrier"), seeks temporary restraints and preliminary injunctive relief against Defendant, Brotherhood of Locomotive Engineers and Trainmen, ("BLET" or "Defendant") to preserve the *status quo* by asking the court to temporarily enjoin the arbitration proceeding scheduled for January 9, 2025 pending resolution of the major dispute between the parties. NJTRO seeks court intervention to uphold the Railway Labor Act's ("RLA") (45 U.S.C. § 151 *et seq.*) *status quo* provisions, which mandate that the parties maintain the *status quo* pending resolution of a major dispute over the collective bargaining agreement between NJTRO and BLET.

NJTRO and BLET are parties to an expired Collective Bargaining Agreement ("CBA") and have been progressing through the major dispute resolution procedures required by the RLA. The BLET is seeking, through arbitration, the imposition of substantial penalties against NJTRO for not raising its members wages while those very same wages were the subject of collective bargaining and the mandatory status quo provisions of the RLA. Compelling arbitration over this issue instead of seeking to resolve the issue through RLA major dispute resolution procedure (including participation in the Presidential Emergency Board ("PEB")), violates the RLA, and will cause irreparable and immediate injury, loss, and damage to NJTRO, its ridership, and the citizens of New Jersey, New York, and Pennsylvania, for which there is no adequate remedy at law.

## STATEMENT OF FACTS

NJTRO is a public rail carrier providing commuter rail service within the meaning of the RLA, 45 U.S.C. § 151, First,  (McGreal Dec. ¶ 3), and is a subsidiary of NJ Transit, ("NJT") a state-owned public transportation corporation created by the state legislature on July 17, 1979 under the New Jersey Public Transportation Act of 1979 ("NJPTA").  *N.J.S.A.* 27:25-1 *et seq.* (McGreal Dec. ¶ 5).  NJT was created to acquire and operate public transportation services and facilities in New Jersey. *N.J.S.A.* 27:25-2. These services include rail transportation services, including operation of a railroad for the purpose of carrying passengers in New Jersey or between

points in New Jersey and points in other states.  *N.J.S.A.* 27:25-3.

The NJPTA made NJT an instrumentality of the State exercising public and essential governmental functions of the State. *N.J.S.A.* 27:25-4.  While the NJPTA allocated NJT within the New Jersey Department of Transportation ("NJDOT"), the law states that NJT shall be independent of any supervision or control by NJDOT or any body or officer thereof.  *N.J.S.A.* 27:25-4(a).

NJTRO now operates a commuter rail service through the State of New Jersey and serves as a vital link in the Northeast's transportation network, connecting to major commercial and employment centers both within the state and in its two adjacent major cities, New York City and Philadelphia. NJTRO operates 12 commuter rail lines.  Each weekday, NJTRO's 683 scheduled trains carry more than 205,000 passengers and operate on almost 1,000 miles of track with over 160 stations.  (McGreal Dec. ¶ 6). In Fiscal Year 2024, NJTRO's ridership exceeded 59 million passengers.  Weekday boarding levels at major hub stations include Newark Penn Station (16,106), Secaucus Junction (19,300), Hoboken Terminal (7,881), Newark Airport (4,578) and Princeton Junction (4,040).  (McGreal Dec. ¶ 7).  Additionally, NJTRO employs approximately 4,500 unionized employees, including approximately 420 locomotive engineers ("Engineers") represented by BLET.  (McGreal Dec. ¶ 8).

NJTRO unionized employees are covered by 21 collective bargaining agreements ("CBAs") entered into between the NJTRO and 15 different labor unions, including BLET. (McGreal Dec. ¶ 9).  Each of these CBAs were effective for the period of July 1, 2011 through December 31, 2019. (McGreal Dec. ¶ 10).  Under the RLA, these agreements do not expire but become amendable after their end date, and requires the parties maintain the *status quo* until such amendments are agreed upon. Accordingly, the Parties' CBA first became amendable on January

1, 2020.  The Defendant served a notice on October 1, 2019 under Section 6 of the RLA to initiate collective bargaining. The Carrier served its Section 6 notice on November 27, 2019.  (McGreal Dec. ¶ 11).

Having failed to reach agreement, BLET filed an application with the National  Mediation Board ("NMB") for mediation on October 22, 2020.   The Parties subsequently entered into mediation with a federal mediator beginning on December 9, 2020 and continued meeting with the federal mediator through May of 2024.  (McGreal Dec. ¶ 12).

While the BLET and NJTRO continued to negotiate during this period, on September 25, 2021, the International Association of Sheet Metal, Air, Rail, and Transportation Workers– Transportation Division ("SMART-TD") union, representing Conductors & Trainmen, were the first to sign and ratify a new collective bargaining agreement covering the period of January 1, 2020 through June 30, 2024. (McGreal Dec. ¶ 13).   Thereafter, all of the other NJTRO rail unions except the BLET − or approximately 91% of the rail workforce – adopted the same settlement as SMART-TD. (McGreal Dec. ¶ 14). By March 2022, all the other NJTRO rail unions except the BLET − or approximately 91% of the rail workforce – agreed to successor CBAs for the same contract period and with the same pattern of settlement as SMART-TD.

By March 2022, all NJTRO rail unions except the BLET had agreed to a successor CBA for the contract period from January 1, 2020, through June 30, 2024.  All successor CBAs that were agreed to by NJTRO's rail unions included an agreement to the same wage pattern as SMART-TD had agreed to for the contract period from January 1, 2020, through June 30, 2024. (McGreal Dec. ¶ 15). NJTRO has consistently offered the BLET the same pattern of settlement that was agreed to by all other NJTRO rail unions, including wage increases that would maintain the Engineers' 10.4% wage differential as compared to SMART-TD's Conductors' revised salary.

These offers have been consistently rejected by the BLET.

On June 21, 2024, the NMB, in accordance with Section 5, First of the RLA, urged the Parties to submit the dispute over the terms of a successor CBA to voluntary arbitration as provided in Section 8 of the RLA. However, the Parties both rejected the NMB's proffer of arbitration. (McGreal Dec. ¶ 20; Exhibit A). On June 24, 2024, the NMB served notice that NJTRO and BLET were released from mediation and could engage in self-help should a Presidential Emergency Board ("PEB") not be established by July 25, 2024, consistent with Section 5, First of the RLA. (McGreal Dec. ¶ 21; Exhibit B).

Thereafter, on July 2, 2024 — during the 30-day *status quo* period — the Carrier, in accordance with Section 9a of the RLA, asked the President to establish an emergency board to investigate and issue a report and recommendations regarding the dispute. (McGreal Dec. ¶ 22).

On July 24, 2024, President Biden granted NJTRO's request and created PEB 251, effective July 25, 2024. (McGreal Dec. ¶ 23; Exhibit C). The creation of this PEB imposed a *status quo* period for an additional 120 days, until November 21, 2024. PEB 251 issued its non-binding Report and recommendations for settlement on August 23, 2024. (McGreal Dec. ¶ 24; Exhibit D). One of the recommendations in PEB 251 included maintaining the 10.4% differential, which is an issue that remains a part of the major dispute between the parties. Specifically, on page 39 of the Report to the President, PEB 251 directly addresses the "Conductor/Engineer Differential" and expressly recommends: "***Cents per hour increase if necessary to maintain the 10.4% differential between the engineers' rate and the conductors' rate***." (McGreal Dec. ¶ 24; Exhibit D).

Because the PEB Report is not binding upon the parties but is meant to provide the parties with a recommendation for settlement, this recommendation and issue is a continuing subject of negotiations between the Parties as they try to resolve this major dispute without a work stoppage.

Accordingly, the Parties continued to negotiate following the issuance of PEB 251 but were unable to reach an agreement. Ultimately, at the request of NJTRO, President Biden issued an Executive Order ("EO") for the creation of a second PEB ("PEB 252") on November 21, 2024. (McGreal Dec. ¶ 26; Exhibit E). In doing so, the EO states:

> *As provided by section 9A(h) of the RLA, from the time the request to establish the Board is made until 60 days after the Board submits its report to the President, the parties to the controversy shall make no change in the conditions out of which the dispute arose except by agreement of the parties*.

(McGreal Dec. ¶ 26; Exhibit E).

This EO extended the *status quo* period for an additional 120 days until on or about, March 21, 2025.  Pursuant to the NMB's November 29, 2024 correspondence regarding the PEB 252 schedule, NJTRO and BLET must participate in pre-hearing mediation with PEB 252 Chairman Ira Jaffe and the parties on or about December 18 and 19, 2024.  The Parties must then submit "final offers for settlement" to PEB 252 on or before December 21, 2024, and participate in hearings before PEB 252 on January 5 through 7, 2025.  After the hearing, the Parties must participate in Post Hearing meetings at NMB's offices in Washington, DC between January 10 and 12, 2025 in the hopes of resolving the dispute before the PEB issues its Report to the President on or about January 20, 2025. In its Report to the President, PEB 252 will set forth its selection of the most reasonable final offer in accordance with 45 U.S.C. § 159a(g). (McGreal Dec. ¶ 39; Exhibit L).

Following the Report to the President by PEB 252, the parties will have 60 days until approximately March 21, 2025 to resolve the dispute before either party may use self-help (i.e. BLET will have the right to strike on or about March 22, 2025). (McGreal Dec. ¶ 40). Throughout the entire process described above, and for 60 days after PEB 252 issues its Report to the President,

the RLA prohibits either party from making any change "in the conditions out of which the dispute arose." 45 U.S.C. § 159a(h).

Notwithstanding the *status quo* requirements set forth in the RLA and EO, and notwithstanding the fact that the 10.4% differential issue is an issue that is squarely part of the "major" dispute before PEB 252, the BLET is unlawfully seeking to bypass the RLA's required process in order to arbitrate the 10.4% differential issue through the contractual arbitration process.

On October 27, 2021, BLET entered its claim on the property ("Grievance") regarding the 10.4% differential and seeking a daily "penalty allowance" of eight (8) hours straight time pay per day for each locomotive engineer for every day that the Carrier's failed to implement a 10.4% hourly wage differential between the locomotive engineer and conductor rate of pay while the parties were engaged in bargaining over the terms and conditions of the amendable CBA. (McGreal Dec. ¶¶ 27-28). If BLET's requested relief is granted, it would provide BLET Engineers with a windfall penalty payment that would cost Plaintiff an amount estimated at over $63 million for the time period from July 1, 2020 to October 27, 2021. (McGreal Dec. ¶ 29). This would amount to $150,000 per Engineer if divided evenly among the 420 Engineers. If Plaintiff were required to apply those penalty payments through December 31, 2024, the estimated cost to Plaintiff would be over $227 million (or over $540,000 per Engineer)! (McGreal Dec. ¶ 29). To put the potential cost of what BLET is seeking to obtain in arbitration of the Grievance in perspective, the total cost for Rail Labor salaries for all unionized employees at NJTRO in FY-2024 was $419 million. Thus, an award SBA 940 that results in $227 million in penalty payments would require a payment by NJTRO that is over 54% of its entire FY-2024 rail labor costs. (McGreal Dec. ¶ 30).

While the Carrier denied the appeal of this Grievance, The BLET notified the Carrier in a letter dated January 17, 2022 that the matter would proceed to the Special Board of Adjustment 940 ("SBA 940"). (McGreal Dec. ¶ 31). On September 13, 2024, the NMB approved funding for SBA 940 to proceed to arbitration to hear and decide four different disputes between the Parties. (McGreal Dec. ¶ 32; Exhibit F).  One of the four matters before SBA 940 is the BLET's Grievance pertaining to the 10.4% differential.  This is the same issue that was part of the issues before PEB 251, was part of PEB 251's recommendations for settlement, (McGreal Dec. ¶ 24; Exhibit D), and is now before PEB 252 with hearings before set to commence on January 5, 2025.  (McGreal Dec. ¶ 39; Exhibit L).

While this Court is the appropriate entity to hold the arbitration proceeding in abeyance during the pendency of the RLA dispute resolution procedures set forth in 45 U.S.C. § 159a, on September 17, 2024, Plaintiff requested that the NMB hold the arbitration proceeding in abeyance pending resolution of the successor CBA between the parties.  (McGreal Dec. ¶ 33; Exhibit G). By correspondence dated September 19, 2024, the NMB declined to do so based on the fact that their role in arbitration under the RLA in 45 U.S.C. §§ 153 is only a ministerial one that is limited to docketing cases, creating Special Boards of Adjustment upon the parties' request and compensating neutral arbitrators.  (McGreal Dec. ¶ 34; Exhibit H).  On September 20, 2024, Plaintiff made these same objections to Michael Phillips, who had been designated as the neutral member on SBA 940.  (McGreal Dec. ¶ 35; Exhibit I).  On October 6, 2024, however, Arbitrator Phillips advised he would not hold the arbitration in abeyance because NMB's correspondence dated September 13, 2024 required him to "conduct the hearing within 120 days of the date of assignment" and he saw no reason to deviate from the NMB's instruction.  (McGreal Dec. ¶ 38; Exhibit J).

On October 9, 2024, Carrier sent correspondence to Arbitrator Phillips where it noted its objection to holding a hearing before SBA 940 on the 10.4% differential issue based on the fact that arbitration is not the correct forum to decide a major dispute.  (McGreal Dec. ¶ 37; Exhibit K).  Over the objections of NJTRO, Arbitrator Phillips, as Chair of SBA 940, has set January 9, 2025 as the date for the arbitration concerning the 10.4% differential dispute. (McGreal Dec. ¶ 38).

One of the chief matters before SBA 940 is the BLET's claims pertaining to the 10.4% differential.   This is the same issue that was before PEB 251, was part of PEB 251's recommendations for settlement, and is now before PEB 252 – with hearings before that Board to be held January 5 through 7, 2025. Meanwhile, over the Carriers' objections, SBA 940's arbitration is scheduled to begin on January 9, 2025.

In prior rounds of bargaining, the Parties' maintained a consistent practice of first engaging in the negotiation process to completion, inclusive of an agreement on wage increases, before implementing any changes to the *status quo*, including the implementation of any wage increases. Historically, it was only once the Parties reached a final agreement that any wage increases were implemented for the BLET or any other union.   While the wage increases have always been implemented retroactive to the same effective date as the SMART-TD wage increases, the BLET wages were never increased before BLET had agreed to a successor CBA.  (McGreal Dec. ¶ 17). Even in instances where SMART-TD's conductors agreed to a successor CBA prior to the BLET, the BLET's Engineers still received a wage increase that would maintain the 10.4% wage differential with SMART-TD Conductors retroactive to same date that SMART-TD's wage increase was effective. However, NJTRO did not increase BLET wages until *after* a final agreement was reached.  (McGreal Dec. ¶ 18).  This was a consistent practice in keeping with the fact that wages have always been part of a "major" dispute and must only be resolved through the

11

RLA's processes.

In this round of bargaining, however, the BLET is seeking to use compulsory arbitration before SBA 940 to resolve the dispute over the 10.4% differential issue, rather than resolving that issue through the RLA's required major dispute resolution process.  BLET seeks to have the arbitrator award Engineers additional compensation and a pay increase in violation of the RLA's *status quo* provisions, and without the need for BLET to follow the statutorily required bargaining and major dispute resolution procedures.  Arbitration over the 10.4% differential issue is currently scheduled before SBA 940 beginning January 9, 2025, and will occur during the pendency of PEB 252.

Both the RLA *status quo* provisions and the express terms of the EO creating PEB 252 prohibit any change in the terms and conditions of employment, including wage rates, while PEB 252 is pending, and through the cooling off period that runs through approximately March 21, 2025. Therefore, injunctive relief is necessary to allow for resolution of 10.4% differential by the parties pursuant to the major dispute process under the RLA, and not through an arbitration proceeding that would impact the *status quo* during this crucial period of time.

## ARGUMENT

### A.  Legal Standard for Granting Injunctive Relief

In the Third Circuit, the standard for issuance of a temporary restraining order is the same as the standard for issuance of a preliminary injunction. See *Kongtcheu v. Secaucus Healthcare Ctr., LLC*, 2:13-cv-1856, 2014 U.S. Dist. LEXIS 74151, at *4 (D.N.J. May 30, 2014) (citing *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988)). A party seeking a temporary restraining order or a preliminary injunction "must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is

denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citing, *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999)).  An immediate temporary restraining order ("TRO") and/or a preliminary injunction is appropriate in this case.

### 1.  Plaintiff is Likely to Prevail on the Merits of Their Claims

Plaintiff is likely to prevail on the merits because allowing the 10.4% differential issue to proceed to arbitration is a direct violation of the RLA's *status quo* provisions and would expressly violate President Biden's EO creating PEB 252.  The 10.4% differential issue is one of the issues directly in dispute between the parties in negotiations over a successor CBA, which the parties are currently seeking to resolve through the RLA's dispute resolution procedures.  Allowing an arbitrator to award a wage increase or monetary compensation to BLET engineers during the course of the pending PEB 252, or before the end of the 60-day cooling off period following PEB 252's Report to the President would directly violate the RLA and contravene the RLA's purposes. The Court must temporarily enjoin SBA 940 from proceeding in order to uphold the tenets of the RLA and to protect Plaintiff and NJTRO ridership from the potential havoc that could result from unlawful deviation from the *status quo*.  Instead, the Court must Order the parties to maintain the *status quo* pending resolution of PEB 252 and through the 60-day cooling off period that follows the PEB 252 Report.

### a.  Plaintiff is Likely to Succeed on the Merits Because Permitting SBA 940 To Decide the 10.4% Differential Dispute Will Violate The Railway Labor Act's *Status Quo* Provisions.

When a major dispute arises between a carrier and a rail union, the RLA requires the parties undergo a lengthy process of bargaining and mediation. 45 U.S.C. §§ 155 and 156. Until they have exhausted those procedures, the parties are obligated to maintain the *status quo*,. District courts

have subject-matter jurisdiction to enjoin a violation of the *status quo* pending the outcome of the procedures. *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 302-02 (1989). The RLA's major-dispute procedures and *status quo* requirement were concisely stated in *Railroad Trainmen v. Terminal Co.*, 394 U.S. 369 (1969):

> The Act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services sua sponte if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens 'substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President,' who may create an emergency board to investigate and report on the dispute. § 10. **While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo*.** §§ 2 Seventh, 5 First, 6, 10.

*Id.* at 378 (emphasis added).

The RLA also includes special procedures for public rail carriers providing commuter rail service, which is applicable to Plaintiff. 45 U.S.C. § 159a. These procedures set forth the process for resolving the terms of a successor CBA when no agreement has been reached following direct negotiations and mediation, and where the proffer of arbitration pursuant to 45 U.S.C. § 155, First has been refused by either party. In such circumstance, the RLA requires the President, upon request of either party, to create a Presidential Emergency Board to investigate issue a report on the dispute. 45 U.S.C. § 159a(c). That provision makes clear:

> **For purposes of this subsection, the period during which no change, except by agreement, shall be made by the parties in the conditions out of which the dispute arose shall be 120 days from the date of the creation of such emergency board.**

45 U.S.C. § 159a(c)(1).

If no settlement is reached by the end of the 120-day period beginning on the date of the creation of the first PEB, any party to the dispute may request that the President create a second PEB.  45 U.S.C. § 159a(e).  Within 30 days after creation of the second PEB, the parties to the dispute shall submit their final offers for settlement to the second PEB.  45 U.S.C. § 159a(f).  Within 30 days of the submission of final offers, the second PEB shall submit a report to the President setting forth its selection of the most reasonable offer.  45 U.S.C. § 159a(g).  This provision of the RLA further provides as follows:

> From the time a request to establish a board is made under subsection (e) until 60 days after such board makes its report under subsection (g), *no change, except by agreement, shall be made by the parties in the conditions out of which the dispute arose.*

45 U.S.C. § 159a(h).

When reviewing the RLA's requirements regarding the maintenance of the *status quo*, the U.S. Supreme Court has explained that,

> since disputes usually arise when one party wants to change the *status quo* without undue delay, the power which the Act gives the other party to preserve the *status quo* for a prolonged period will frequently make it worthwhile for the moving party to compromise with the interests of the other side and thus reach agreement without interruption to commerce.

*Detroit & T. S. L. R. Co. v. United Transp. Union*, 396 U.S. 142, 150 (1969).

Ultimately, neither party may change the *status quo* with respect to existing agreements without first filing a Section 6 notice, and must maintain the *status quo* until the collective bargaining process is complete. See, *id*.

NJTRO and BLET are in the midst of the RLA's major dispute resolution procedures. Having failed to reach agreement through direct negotiations or mediation, the parties are currently going through the dispute resolution procedures described in 45 U.S.C. § 159a:

- On June 24, 2024, the parties both rejected the NMB's proffer of arbitration that had been offered to them on June 21, 2024. (McGreal Dec. ¶ 21).

- On June 24, 2024, the NMB notified the parties that they were released from mediation and could engage in self-help should a PEB not be established by July 25, 2024. (McGreal Dec. ¶ 21).

- On July 24, 2024, President Biden issued an Executive Order creating PEB 251 in accordance with 45 U.S.C. § 159a(c). (McGreal Dec. ¶ 23; Exhibit C).

- On August 23, 2024, PEB 251 issued a Report to the President with recommendations for settlement.  To date, those recommendations have not led to an agreement between the parties. (McGreal Dec. ¶ 24; Exhibit D).

- On November 21, 2024, President Biden issued an Executive Order creating a second Presidential Emergency Board (PEB 252) in accordance with 45 U.S.C. § 159a(e). (McGreal Dec. ¶ 26; Exhibit E).

- On November 29, 2024, NMB issued a letter scheduling the PEB 252 process. This letter requires that the parties (McGreal Dec. ¶ 39; Exhibit L):

    o participate in pre-hearing mediation with Chairman Jaffe and the parties on or about December 18 and 19, 2024;

    o submit final offers for settlement to PEB 252 by December 21, 2024;

    o participate in hearings before PEB 252 on January 5 through 7, 2025; and

    o participate in Post Hearing meetings at NMB's offices in Washington, DC between January 10 through 12, 2025.

- On or about January 20, 2025, PEB 252 will submit a Report to the President setting forth its selection of the most reasonable offer in accordance with 45 U.S.C. §§ 159a(g). (McGreal Dec. ¶ 39; Exhibit L).

- Following the Report to the President by PEB 252, the parties will have 60 days until approximately March 21, 2025 to resolve the dispute before either party may use self-help (i.e. BLET will have the right to strike beginning on or about March 22, 2025).

- Throughout the entire process described above and until 60 days after the Report of PEB 252 is issued, 45 U.S.C. § 159a(h) prohibits either party from making any change "in the conditions out of which the dispute arose."

Contrary to the RLA's *status quo* requirements, the BLET is now seeking to have SBA 940

decide upon and implement a change to the *status quo* during the clearly defined *status quo* period

set forth in 45 U.S.C. §§ 159a(h).  The 10.4% differential dispute is one of the issues that the Parties are seeking to resolve through the RLA's major dispute resolution process and are expected to address in PEB 252.  It is not just that Plaintiff prefers to resolve the dispute this way.  Rather, it is a legal requirement that the dispute be resolved through the RLA negotiation process, including submitting the dispute to PEB 252 and awaiting the PEB 252 Report to the President. To the extent that a party to those negotiations -  here the BLET – seeks to ignore those legal requirements and aims to have the *status quo* changed through other means such as through arbitration, the Court must temporarily and/or preliminarily enjoin such efforts and Order the parties to maintain the *status quo* for the duration of PEB 252, and through the 60-day cooling off period that follows PEB 252's Report to the President.  During that timeframe, the parties will endeavor to resolve the major dispute, including issue over the 10.4% differential, through direct negotiations.

Both parties have been legally precluded from making any changes to the *status quo* since Section 6 Notices were filed in October 2019.  Since that time, both parties were required to resolve their dispute over the successor CBA, including the issue of the 10.4% differential, through the RLA's major dispute resolution procedures described above.  The *status quo* is still applicable and will continue until the collective bargaining process is completed, either by a voluntary agreement, or upon expiration of the 60-day period following the issuance of PEB 252's Report to the President, i.e. March 21, 2025.  Plaintiff is therefore likely to prevail on the merits because the Court is required to intervene to ensure that an arbitration proceeding does not decide the 10.4% differential issue, which is part of a major dispute and can only be resolved through the RLA's resolution procedures set forth in 45 U.S.C. §§ 159a.

> **b.** Plaintiff is Likely to Succeed on the Merits Because Permitting SBA 940 To Decide the 10.4% Differential Dispute Will Violate The Executive Order's *Status Quo* provisions**.**

Not only is Plaintiff likely to prevail as a result of the Court's obligation to ensure that the RLA's *status quo* provisions are enforced, but also because the Court must enforce the terms of the Executive Order that created PEB 252.  The November 21, 2024 Executive Order signed by President Biden expressly states as follows:

> Sec. 3.  Maintaining Conditions. As provided by section 9A(h) of the RLA, from the time the request to establish the Board is made until 60 days after the Board submits its report to the President, the parties to the controversy ***shall make no changes in the conditions out of which the dispute arose except by agreement of the parties***.

(McGreal Dec. ¶ 26; Exhibit E) (emphasis added).

Accordingly, the Executive Order issued by President Biden creating PEB 252 expressly prohibits the parties from making any changes to the conditions out of which the dispute arose without an agreement of the parties.  By proceeding to arbitration on January 9, 2025 over the 10.4% differential, the BLET is obviously seeking to disregard the EO's prohibition and have SBA 940 implement changes to the *status quo* without agreement by the parties as to a new CBA.  The Court must reject Defendant's attempt to violate the terms of the EO and issue temporary and preliminary restrains to ensure that this arbitration does not proceed during the *status quo* period.

An Order from this Court requiring the parties to comply with the RLA's *status quo* provisions and the EO's express prohibition on changing work conditions until 60 days after PEB 252 submits its report to the President is essential to ensure that the purpose of the RLA is carried out.  Plaintiff is extremely likely to prevail here given that the Court is obligated to protect the rights of Plaintiff and commuters in NJ, NY, and PA from having the BLET subvert the RLA and the Executive Order by unlawfully impacting the *status quo* through arbitration of the 10.4% differential dispute.

     c.    <u>The 10.4% Differential Is Part of the Major Dispute Pending Between the Parties.</u>

Any arguments by Defendant that the 10.4% differential issue is not part of the major dispute between the parties must be soundly rejected. The 10.4% differential issue is undeniably an issue that has and continues to be subject to the parties' collective bargaining process. It was an issue that was clearly before PEB 251. Following the hearings held in August 2024, PEB 251 issued its Report to the President dated August 23, 2024, which included a direct reference to the 10.4% differential in its recommendations for settlement, stating:

> We also recommend that the engineers receive a cents per hour increase over and above the pattern settlement, retroactive to the effective date of this contract, if necessary to maintain the 10.4% differential between the conductor and the engineer rates that has been agreed to by the Parties for over 40 years pursuant to the Letter of Agreement dated December 29, 1982 and modified June 18, 2018.

(McGreal Dec. ¶ 24; Exhibit D).

The 10.4% differential is one that continues to be subject to negotiations between the Parties. While the Parties have not reached an agreement since the issuance of the PEB 251 Report to President, negotiations continue as the Parties progress toward PEB 252. Final offers are due to PEB 252 on December 21, 2024, and Plaintiff intends to include a proposal that relates to how the 10.4% differential should be resolved. That proposal will be among the issues subject to a hearing before PEB 252 on January 5 through 7, 2025 and will be a subject of PEB 252's Report to the President, which will include a recommendation for settlement. Once the PEB 252 Report is issued on or before January 20, 2024, the parties will have a 60-day period within which to continue to negotiate and seek to reach an agreement on the collective bargaining agreement, which includes resolution of the 10.4% differential issue.

The BLET will attempt to argue that the 10.4% differential is a separate issue that can be treated as a "minor" dispute and can be determined by an arbitrator without improperly impacting

the negotiations for a new collective bargaining agreement. That argument must be rejected by the Court because the 10.4% dispute has already been directly included as a major dispute to be negotiated between the Parties, as indicated in PEB 251's Report, and will be included as an issue subject to a hearing before PEB 252. Upon issuance of PEB 252's Report to the President, the 10.4% differential issue will further remain an issue that must appropriately be resolved through negotiation between the Parties during the 60-day period following issuance of the PEB 252 Report where the *status quo* must continue. The BLET should not be permitted to subvert the statutorily required process for resolving major disputes through the PEB and negotiation process by having SBA 940 rule upon the 10.4% differential, thereby changing the *status quo* between the Parties prior to the expiration of the RLA's 60-day cooling off period.

Based on the foregoing, this Court must issue temporary and/or preliminary restraints that prohibit Defendant from proceeding with the scheduled January 9, 2025 arbitration. The Court's Order must hold the proceedings in SBA 940 in abeyance pending resolution of the major dispute. The Court must take these actions because Plaintiff is likely to prevail on the merits of its claim that allowing the arbitration to proceed would violate the RLA's *status quo* requirements and the express terms of President Biden's EO creating PEB 252. Therefore, the Court Order must require the Parties maintain the *status quo* on the 10.4% differential until the Parties reach a voluntary agreement for a successor CBA, or for a period of 60 days after PEB 252 issues its Report to the President, i.e., March 21, 2025, whichever comes sooner, as required by the RLA. Only then would the Parties be able to complete the negotiation process required for such major disputes without an improper and unlawful change to the *status quo* negatively impacting those negotiations.

### 2. **Plaintiffs Will Suffer Irreparable Harm Absent Equitable Relief**

Absent an Order from this Court temporarily restraining the arbitration proceeding pending resolution of the major dispute between the parties (which includes the 10.4% differential dispute as a component), Plaintiff will suffer irreparable harm by having the *status quo* impacted in violation of the RLA and the EO creating PEB 252 during the crucial time period leading up to a potential strike by the BLET on March 22, 2025. The results of a strike would be irreparable to NJ Transit and to its many customers and passengers that rely upon NJT trains to commute throughout New Jersey and into New York and Pennsylvania.

### a. Allowing Arbitration in SBA 940 is a Direct Violation of RLA and Executive Order.

In discussing the RLA, the U.S. Supreme Court has recognized "a final and crucial aspect of the Act was the power given to the parties and to representatives of the public to make the exhaustion of the Act's remedies an almost interminable process." *Detroit & T. S. L. R. Co.*, 396 U.S. at 149. See, *Railway Clerks v. Florida E. C. R. Co.*, 384 U.S. 238, 246 (1966), (holding "the procedures of the Act are purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute."). A central tenet of these long and drawn out procedures is maintenance of the *status quo* while those procedures are ongoing. If a party is permitted to disregard the *status quo* and obtain an increase in compensation or rates of pay without the other party's agreement, it would irreparably harm the RLA's dispute resolution process for parties seeking to negotiate a successor CBA.

An award on the 10.4% differential dispute by SBA 940 would unlawfully change both Parties' positions and leverage in bargaining for resolution of any agreement to resolve the major dispute. There is a reason that the RLA prohibits changes like this from occurring during the *status quo* period. That is because the RLA recognizes the irreparable harm that is caused by changes to

21

the *status quo* prior to the parties' reaching a successor agreement or prior to the conclusion of the 60-day period following the issuance of the second PEB's Report to the President. That irreparable harm is inherent in the *status quo* provisions set forth in 45 U.S.C. § 159a(h).

If this Court does not temporarily and/or preliminarily restrain the arbitration of the 10.4% differential issue, it would completely disregard the RLA's *status quo* provisions by allowing SBA 940 the discretion to impose an increase to Engineers' rates of pay and compensation during the pendency of PEB 252, and while the issue of the 10.4% differential is being negotiated by the parties through the RLA's dispute resolution procedures set forth in 45 U.S.C. § 159a. Increasing the pay rate for Engineers and providing them with additional compensation at exactly the time where the parties are supposed to be exhausting the RLA's procedures for negotiating the terms of the successor agreement would irreparably harm Plaintiff by providing the Engineers with an increase to compensation prior to reaching an agreement with Plaintiff over the terms of the successor CBA, which necessarily includes an agreement concerning wage increases. The imposition of this unilateral increase in compensation for BLET's Engineers will reduce or eliminate the hope that reason and practical considerations will provide, in time, a compromise that resolves the dispute.

> b. Permitting SBA 940 to Proceed on the 10.4% Differential Issue Will
> Drastically Increase the Likelihood of a Strike by BLET.

If Defendant were to obtain the retroactive and prospective wage increases and/or additional compensation sought through arbitration prior to the conclusion of bargaining for a successor agreement, the Parties will be significantly less likely to reach a compromise, thereby increasing the risk of Defendant engaging in a strike once the 60-day cooling off period ends on March 22, 2025 without an agreement being reached. Any arbitration award from SBA 940 that provides Engineers with significant compensation and/or retroactive and prospective wage

increases while the parties are still engaged in negotiations for a successor CBA would eliminate or drastically reduce the amount of money NJTRO has available to fund the successor CBA with BLET. Without these additional funds, resolving the dispute over the terms of the successor CBA will become difficult or impossible to resolve.

Currently, the penalties sought by Defendant in the arbitration proceeding scheduled for January 9, 2025 are estimated to amount to a cost to NJTRO of **over $63 million for the time period from July 1, 2020 to October 27, 2021. (McGreal Dec. ¶ 29).** If Plaintiff were required to apply **those penalty payments through December 31, 2024, the estimated cost to Plaintiff would be over $227 million. (McGreal Dec. ¶ 29).** For reference, the total cost for Rail Labor salaries for all unionized employees at NJTRO in FY-2024 was $419 million. **(McGreal Dec. ¶ 30).** A **$227 million** Award during the crucial period where NJTRO and BLET are seeking to resolve the underlying major dispute prior to March 22, 2025 (at which time the BLET members are lawfully permitted to strike should there be no agreement) would cost NJTRO **over 54% of its entire FY-2024 rail labor costs, (McGreal Dec. ¶ 30), thereby** irreparably harming NJTRO's ability to fund a settlement with the BLET to avoid any such potential strike.

Moreover, if Engineers receive significant compensation and/or retroactive and prospective wage increases from SBA 940, they will have little or no incentive to compromise with NJTRO to resolve the dispute over the successor CBA. The additional compensation sought by BLET would make the Engineers whole, or well beyond whole, even if they were to engage in a lengthy strike beginning on or about March 22, 2025. The $63 million in penalty payments that the BLET is seeking for the period of time through October 27, 2021 would amount to $150,000 per Engineer when divided equally between 420 Engineers. That sum would be over $540,000 per Engineer if NJTRO needed to pay the penalty payment through December 31, 2024. Thus,

allowing SBA 940 to proceed regarding the 10.4% differential, an issue that is before PEB 252, and was previously part of the recommendations of PEB 251, will undoubtedly cause irreparable harm that adversely impacts the lives of millions of residents in New Jersey and throughout the northeast should the BLET decide to strike following the *status quo* period on March 22, 2025.

The situation here can be compared to the carrier's actions in *Detroit & T. S. L. R. Co*. There, the carrier attempted to implement new work assignments during the RLA's status quo period. The Union filed its Section 6 notice seeking to amend the parties' CBA "to forbid the railroad from making any outlying assignments." Id. The parties' major dispute over the successor CBA proceeded to mediation before the NMB. While the dispute was still in mediation, the carrier posted a notice unilaterally implementing the new work assignments. The Union petitioned the district court to enjoin the carrier from establishing outlying assignments on the ground that the status quo provision of § 6 of the Railway Labor Act forbids a carrier from taking unilateral action altering "rates of pay, rules, or working conditions" while the dispute is pending before the National Mediation Board." *Id.* at 146-47. The lower court granted the union's request for injunctive relief, holding that, "the status quo requirement of § 6 prohibited the [carrier] from making outlying assignments even though there was nothing in the parties' collective agreement which prohibited such assignments." *Id.* at 147. In affirming the lower court's holding, the U.S. Supreme Court found:

> the dispute over the railroad's establishment of the [new] Trenton assignments arose at a time when actual working conditions did not include such assignments. It was therefore incumbent upon the railroad by virtue of § 6 to refrain from making outlying assignments at Trenton or any other place in which there had previously been none, regardless of the fact that the railroad was not precluded from making these assignments under the existing agreement.

396 US at 154. The Supreme Court's decision demonstrates without debate that courts must step in and enjoin any attempt by either party to a major dispute when the party seeks to change the status quo while the dispute over a successor CBA is still pending. Notably, the Supreme Court recognized that "it could hardly be expected that the union would sit idly by as the railroad rushed to accomplish the very result the union was seeking to prohibit by agreement... Because the railroad prematurely resorted to self-help, the primary goal of the  [RLA] came very close to being defeated." *Id.* at 154.

Similarly, here the BLET is attempting to utilize SBA 940 to justify the unilateral implementation of substantial compensation and retroactive and prospective wage increases that the Carrier has been desperately attempting to negotiate through the RLA major dispute resolution procedures. Moreover, an award from SBA 940 unilaterally resolving the 10.4% differential issue would remove the flexibility that the Parties currently have regarding options for a settlement on the terms of a successor CBA.  For example, the parties currently have the potential for BLET to trade off retroactive wages in exchange for higher prospective wage increases as a potential means of resolving the dispute over Engineers' compensation and wages increases.  That option for resolution would no longer be possible if SBA 940 awards retroactive wage increases sufficient to maintain the 10.4% differential prior to the parties reaching a settlement on the terms of a successor CBA.  Thus, by removing flexibility of the Parties through a change to the *status quo*, allowing SBA 940 to proceed to arbitration drastically increases the likelihood of a strike by BLET.  Such interference in the negotiation process, which drastically increases the likelihood of a crippling work stoppage, is contrary to the purposes of the RLA, which was expressly created to avoid any interruption to commerce, or to a Carrier's operations, and to provide for prompt and orderly settlement of contract disputes over rates of pay. 45 U.S.C. § 151a.

c. <u>A strike by BLET would irreparably harm NJTRO's ridership.</u>

As set forth above, if this Court does not grant the injunctive relief requested, the likelihood of a strike by BLET will increase dramatically. The residents comprising the ridership of NJTRO in New Jersey, New York, and Pennsylvania face being immediately and irreparably harmed if the BLET were to go on strike. A strike would shut down NJTRO's trains and leave the 205,000 passengers that use NJTRO's trains each weekday without a way to get to and from their jobs. This would imminently endanger the general welfare of residents by not only interrupting economic stability, but also by preventing the availability of safe, efficient, and timely travel for multiple purposes.

A strike effects critical healthcare workers who use the system and would be left without any way to get to their jobs. It would foreseeably endanger the health and welfare of residents that normally use NJTRO's trains to travel during adverse weather conditions, or who travel through areas with higher criminal activity. It would also leave residents who are desperate to get to work vulnerable to higher and potentially excessive charges by private transportation services, which might be their only option for travel. Ultimately, in numerous contexts, residents that utilize NJTRO's trains as a means of transportation would be subject to irreparable and immediate harm if the BLET is not temporarily and/or preliminarily restrained from proceeding to arbitration over the 10.4% differential dispute with SBA 940.

Defendant should not be permitted to contravene the intent of the RLA to seek an improvement to its bargaining leverage for a successor CBA through impermissible arbitration of a major dispute that would change the *status quo*. Thus, failing to temporarily and/or preliminarily restrain the arbitration from going forward would result in significant irreparable harm to Plaintiff and commuters that regularly rely upon NJTRO's train service.

Based on the foregoing, the Court must find that absent an Order temporarily and/or preliminarily enjoining Defendant from arbitration of the 10.4% differential issue (currently scheduled for January 9, 2025) until the parties reach a successor agreement, or until the 60-day cooling off period following the issuance of the PEB 252 Report to the President expires on March 21, 2025, whichever comes sooner, Plaintiff and its ridership in NJ, NY and PA that rely upon commuter rail service provided by NJTRO's trains will be irreparably harmed. As the Court explained in *Detroit & T. S. L. R. Co.*, the RLA was passed "to encourage collective bargaining by railroads and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce." 396 US at 148; See also, 45 U.S.C. § 151a.

    **3.**  <u>Granting the Requested Relief Will Not Result in Greater Harm to BLET</u>

Granting preliminary relief results in no harm to BLET. How the 10.4% differential is applied is an issue that is extremely likely to be resolved in negotiations for a successor CBA between the Parties. That issue remains a major dispute that is currently before PEB 252. To resolve the parties major dispute over a successor CBA, the parties would sign an agreement that would almost certainly detail the agreed upon application of the 10.4% differential. That is the legally appropriate forum for resolution of the 10.4% differential dispute. BLET will not be harmed by the requested relief being granted because they have the ability to demand in negotiations whatever resolution they deem fair and reasonable as it relates to the 10.4% differential. They will not be compelled to agree to anything that they don't voluntarily agree to. Being compelled to comply with the law and resolve the 10.4% differential issue through the mandatory RLA dispute resolution procedures set forth in 45 U.S.C. § 159a cannot be considered "harm" for purposes of the criteria for granting injunctive relief. This Court granting a temporary and/or preliminary injunction to enjoin the arbitration of the 10.4% differential dispute pending the mandatory RLA procedures for resolving major disputes would therefore not result in any harm whatsoever to Defendant or its Engineers.

4. __The Public Interest Would be Served by the Requested Relief__.

It is in the public interest for federal laws, such as the RLA, to be upheld. Here, absent a temporary injunction pending resolution of the major dispute, the RLA's *status quo* provisions will be violated, which is contrary to the interests of the public. The expressly stated purposes of the RLA are to "avoid any interruption to commerce or to the operation of any carrier engaged therein" and "to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions."  45 U.S.C. § 151a.  It certainly serves the public interest for these express purposes of the RLA to be upheld.

The arguments set forth in Section 2 above concerning "irreparable harm" also support Plaintiff's position that the public interest would be served by granting the requested relief.  Absent a TRO and/or preliminary injunction, those citizens of New Jersey, New York, and Pennsylvania that rely upon NJTRO's trains to commute to and from work could be greatly impacted.  Some of these individuals have jobs that involved critical health care.  The impact of a potential strike will have a significant and negative impact on jobs and the economy, and may will also involve critical health care concerns of those that rely upon NJTRO's transportation system.  A strike by the BLET would shut down NJTRO's trains and endanger the general welfare of citizens by interrupting the availability of safe travel in a timely manner, often through unsafe circumstances (e.g., adverse weather conditions and isolated areas with exposure to criminal activity).  Such an interruption will leave citizens of the state subject to usurious surcharges by private substitute transportation services, which may be their only means of transportation.

Therefore, granting the temporary and/or preliminary relief requested is essential for the stated purposes of the RLA to be upheld and is clearly in the public interest.  The requested relief would ensure that Defendant is not able to unlawfully change the *status quo* as to the 10.4%

differential during the pendency of PEB 252 or during the 60 days after issuance of the PEB 252 Report to the President. This is a crucial period of time where the parties will be seeking to resolve their successor CBA, including resolution of the 10.4% differential. By granting the requested relief and issuing an Order enjoining SBA 940 from proceeding on the 10.4% differential arbitration during this crucial period, this Court will ensure that the *status quo* is not disturbed during this critical period of time leading to the date that the BLET has the right to strike on or about March 22, 2024, thereby reducing the likelihood of a strike by BLET overall. Thus, by requiring maintenance of the *status quo*, the Court would further the public's interest in avoiding interruption to commerce and providing for prompt and orderly settlement of the dispute over the successor CBA. 45 U.S.C. § 151a.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that this Court grant its motion for a temporary restraining order and/or preliminary injunctive relief against Defendant that enjoins SBA 940 and Defendant from proceeding with the 10.4% differential arbitration scheduled January 9, 2025 before SBA 940. Instead, the parties must be ordered to maintain the *status quo* pending resolution of PEB 252 and through the 60-day cooling off period to March 21, 2025 that follows issuance of PEB 252's Report to the President. Plaintiff is entitled to this relief because: (i) Plaintiff has a likelihood of success on the merits since allowing the arbitration to proceed would result in an unlawful change in the *status quo* during a period of time when such changes are expressly prohibited by the RLA, 45 U.S.C. § 159a(h), and the terms of the Executive Order creating PEB 252; and (ii) absent an Order temporarily and/or preliminarily restraining the arbitration pending PEB 252 and through the 60 days after the PEB 252 Report to the President to March 21, 2025, Plaintiff will suffer irreparable harm; and (iii) because granting the requested relief will not result in greater harm to Defendant than the significant, irreparable and imminent harm to NJTRO and citizens of New Jersey, New York, and Pennsylvania if the relief is not

granted, and (iv) because it is in the public interest for the 10.4% differential arbitration to be held in abeyance while the parties seek to resolve the dispute over the collective bargaining agreement through PEB 252 and for the 60 days after PEB 252 issues a Report to the President.

Respectfully submitted,

Dated:  December 12, 2024.          /s/    *Doug Solomon*

Doug Solomon (State Bar No. 042771995)
David I. Solomon (State Bar No. 244262017)
**JACKSON LEWIS P.C.**
200 Connell Drive, Suite 2000
Berkeley Heights, New Jersey 07922
Tel: (908) 795-2970
Email:  doug.solomon@jacksonlewis.com

*Attorneys for Plaintiff*
New Jersey Transit Rail Operations Inc.

4929-9397-1462, v. 1