## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY TRANSIT RAIL OPERATIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN <br><br> Defendants. | Civil Action No. 2:24-cv-11102 |

## DECLARATION OF PATRICK MCGREAL

I, Patrick McGreal, do hereby affirm and state as follows:

1.      I am over 18 years of age. I have personal knowledge of, and am competent to testify to, the matters stated in this Declaration. I am submitting this Declaration voluntarily and of my own free will, without fear or threat of reprisal or promise of any benefit.

2.      I am the Deputy General Manager of Labor Relations & Administration for New Jersey Transit Rail Operations, Inc. ("NJTRO").

3.      NJTRO is a public rail carrier providing commuter rail service within the meaning of the Railway Labor Act ("RLA") and maintains its principal place of business at 1 Penn Plaza East, Newark, New Jersey 07105.

4.      As the Deputy General Manager of Labor Relations and Administration, I am deeply involved with all aspects of collective bargaining on behalf of NJTRO.  This includes working with Rail Operations leadership and Counsel to prepare Carrier's proposals and respond to union proposals, as well as developing bargaining strategies throughout the collective bargaining process.  With respect to the BLET negotiations during this round of bargaining for a

1

successor Collective Bargaining Agreement ("CBA"), I was involved and at the bargaining table during mediation before the NMB mediator, and present as a representative during Presidential Emergency Board ("PEB") 251. I am currently involved in assisting Counsel with preparation of the Carrier's final offer, which must be submitted to PEB 252 by December 21, 2024.

5.      NJTRO is a subsidiary of NJ Transit ("NJT"), a state-owned public transportation corporation created by the state legislature on July 17, 1979 under the New Jersey Public Transportation Act of 1979 ("NJPTA").

6.      NJTRO's operates a commuter rail service throughout the State of New Jersey and serves as a vital link in the Northeast's transportation network, operating 12 commuter rail lines. Each weekday, NJTRO's 683 scheduled trains carry more than 205,000 passengers and operate on almost 1,000 miles of track with over 160 stations.

7.      In Fiscal Year 2024, NJTRO's ridership exceeded 59 million passengers. Weekday boarding levels at major hub stations include Newark Penn Station (16,106), Secaucus Junction (19,300), Hoboken Terminal (7,881), Newark Airport (4,578) and Princeton Junction (4,040).

8.      NJTRO employs approximately 4,500 unionized employees, including approximately 420 locomotive engineers, who are represented by the Brotherhood of Locomotive Engineers and Trainmen ("BLET" or "Defendant").

9.      NJTRO's unionized employees are covered by 21 collective bargaining agreements ("CBAs") entered into between the NJTRO and 15 different labor unions, including BLET.

10.     Each of NJTRO's CBAs were effective for the period of July 1, 2011 through December 31, 2019, and became amendable on January 1, 2020.

11.     In anticipation of bargaining, the BLET served a notice on the BLET on October 1, 2019 under Section 6 of the RLA to initiate collective bargaining. The Carrier served its Section 6

notice (contract proposals) on November 27, 2019.

12.     BLET subsequently filed an application with the National Mediation Board ("NMB") for mediation on October 22, 2020 and began mediation with NJTRO on December 9, 2020 through May 2024.

13.     While the BLET and NJTRO continued to negotiate during this period, on September 25, 2021, the International Association of Sheet Metal, Air, Rail, and Transportation Workers–Transportation Division ("SMART-TD") union, representing Conductors & Trainmen, were the first to sign and ratify a new collective bargaining agreement covering the period of January 1, 2020 through June 30, 2024.

14.     Thereafter, by March 2022, all the other NJTRO rail unions except the BLET − or approximately 91% of the rail workforce – agreed to successor CBAs for the same contract period and with the same pattern of settlement as SMART-TD.

15.      By March 2022, all NJTRO rail unions except the BLET had agreed to a successor CBA for the contract period from January 1, 2020, through June 30, 2024.  All successor CBAs that were agreed to by NJTRO's rail unions included an agreement to the same wage pattern as SMART-TD had agreed to for the contract period from January 1, 2020, through June 30, 2024.

16.     NJTRO has consistently offered the BLET the same pattern of settlement that was agreed to by all other NJTRO rail unions, including wage increases that would maintain the Engineers' 10.4% wage differential as compared to SMART-TD's Conductors' revised salary. These offers have been consistently rejected by the BLET.

17.     The Parties' have always maintained a consistent practice of first engaging in the negotiation process to completion, inclusive of an agreement on wage increases, before implementing any changes to the *status quo*, including the implementation of wage increases.

Historically, it was only once the Parties reached a final agreement that any wage increases were implemented for the BLET or any other union. While the wage increases have always been implemented retroactive to the same effective date as the SMART-TD wage increases, the BLET wages were never increased before BLET had agreed to a successor CBA.

18.     Even in instances where SMART-TD's conductors agreed to a successor CBA prior to the BLET, the BLET's Engineers still retroactively received a wage increase that would maintain the 10.4% wage differential with SMART-TD Conductors to same date that SMART-TD's wage increase was effective. However, NJTRO did not increase BLET wages until *after* a final agreement was reached.

19.     At no time has NJTRO ever increased BLET wage rates before reaching a finalized successor CBA with the BLET, regardless of any new increase that may have already been agreed to with SMART-TD. In those situations, NJTRO did not increase BLET wages until *after* the BLET finalized its agreement with the Carrier for a successor CBA.

20.     On June 21, 2024, the NMB urged the Parties to submit their dispute over the terms of the successor CBA to voluntary arbitration. A copy of the NMB's proffer of arbitration is attached hereto as **Exhibit A.**

21.     On June 24, 2024, after both parties rejected the NMB's proffer of binding arbitration, the NMB notified the Parties that they were released from meditation and could engage in self-help should a Presidential Emergency Board ("PEB") not be established by July 25, 2024. A copy of the NMB's June 24, 2024 letter releasing the Parties from mediation is attached hereto as **Exhibit B.**

22.     On July 2, 2024, the Carrier, in accordance with Section 9a of the RLA, requested President Biden to establish a PEB to investigate and issue a report and recommendations in order

to assist the Parties in resolving the dispute over the successor CBA.

23.    On July 24, 2024, President Biden granted the Carrier's request and created PEB 251, effective July 25, 2024. A copy of President Biden's Executive Order creating PEB 251 is attached hereto as **Exhibit C.**

24.    On August 23, 2024, PEB 251 issued its non-binding Report and recommendations for settlement.  This Report is attached hereto as **Exhibit D.**

25.    The parties both rejected portions of PEB 251's recommendations and continued to negotiate but were unable to reach an agreement on the terms of a successor CBA.

26.    At the request of NJTRO, President Biden issued an Executive Order which created a second PEB (PEB 252) on November 21, 2024. This Executive Order is attached hereto as **Exhibit E.**

27.    During this period, the BLET had also been processing an on-property claim ("Grievance") regarding the 10.4% differential.  The issues contained within the Grievance are simultaneously also at issue before PEB 252.  This Grievance was submitted to the Carrier on October 27, 2021.

28.    This Grievance seeks a daily "penalty allowance" of eight (8) hours straight time pay per day for each locomotive engineer for every day that the Carrier allegedly failed to implement a 10.4% hourly wage differential between the locomotive engineer and conductor rate of pay while the parties were engaged in bargaining over the terms and conditions of the amendable CBA.

29.    If the relief requested in the BLET's Grievance is awarded, it would, provide BLET Engineers with a windfall payment estimated to cost the Carrier $63 million for the time period from July 1, 2020 to October 27, 2021.  If NJTRO was required to apply those penalty payments

through December 31, 2024, the estimated cost to Plaintiff would be over $227 million.

30.     To put the potential cost of what BLET is seeking to obtain in arbitration of the Grievance in perspective, the total cost for Rail Labor wages for all unionized employees at NJTRO in FY-2024 was $419 million.  Thus, an award from Special Board of Adjustment 940 ("SBA 940") that results in $227 million in penalty payments would require a payment by NJTRO that is over 54% of its entire FY-2024 rail labor costs.  The $227 million cost is only for the penalty payments sought by BLET and does not even consider the cost to NJTRO for providing retroactive or prospective wage increases to the BLET as a result of negotiations for the successor CBA.

31.     On January 17, 2022, after the Carrier denied the Grievance, the BLET requested that the matter proceed to arbitration.

32.     On September 13, 2024, the NMB issued a letter approving funding for and assigning the Grievance to be arbitrated by SBA 940. A copy of this September 13, 2024 letter is attached hereto as **Exhibit F.**

33.     On September 17, 2024, NJTRO, through its attorney, requested that the NMB hold the arbitration proceeding in abeyance pending resolution of the successor CBA between the parties.  A copy of this September 17, 2024 correspondence is attached hereto as **Exhibit G.**

34.     By correspondence dated September 19, 2024, the NMB responded to NJTRO that it declined to take any action based on the fact that their role in arbitration under the RLA is merely ministerial, limited to docketing cases, creating Special Boards of Adjustment upon the parties' request and compensating neutral arbitrators.  A copy of this September 19, 2024 correspondence is attached hereto as **Exhibit H.**

35.     NJTRO then made these same objections, through its attorney, to Michael Phillips, who had been designated as the neutral member of SBA 940 on September 20, 2024.  A copy of

this September 20, 2024 correspondence is attached hereto as **Exhibit I.**

36.    On October 6, 2024, Arbitrator Phillips responded to advise that he would not hold the arbitration in abeyance. A copy of Arbitrator Phillips' October 6, 2024 correspondence is attached hereto as **Exhibit J.**

37.    On October 9, 2024, in an e-mail to Arbitrator Phillips, Carrier noted its objection to holding a hearing before SBA 940 on the 10.4% differential issue based on the fact that arbitration is not the correct forum to decide a major dispute.  A copy of this October 9, 2024 correspondence is attached hereto as **Exhibit K.**

38.    Over the objections of NJTRO, Arbitrator Phillips, as Chair of SBA 940, has set January 9, 2025 as the date for the arbitration concerning the 10.4% differential dispute.

39.    Pursuant to the NMB's November 29, 2024 correspondence regarding the PEB 252 schedule, NJTRO and BLET must participate in pre-hearing mediation with Chairman Jaffe and the parties on or about December 18 and 19, 2024, submit "final offers for settlement" to PEB 252 on or before December 21, 2024, participate in hearings before PEB 252 on January 5 through 7, 2025, and participate in Post Hearing meetings at NMB's offices in Washington, DC between January 10 through 12, 2025 in the hopes of resolving the dispute before the PEB issues its Report to the President on or about January 20, 2025. A copy of this November 29, 2024 correspondence is attached hereto as **Exhibit L.**

40.    If SBA 940 were to proceed, it would cause immediate and irreparable harm to NJTRO and the 205,000 passengers that travel on NJTRO's 683 scheduled trains every weekday. Any SBA 940 award of the relief requested by BLET would directly violate the RLA and the Executive Order creating PEB 252 by unlawfully changing the *status quo* while the parties are still engaged in the RLA's dispute resolution process.  This would drastically increase the likelihood

7

of a strike by the BLET's Engineers following the 60-day cooling off period (on or about March 22, 2025) for several reasons.

41.     An award of significant compensation and/or wage increases for Engineers while the parties are still engaged in negotiation for a successor CBA would eliminate or drastically reduce the amount of money NJTRO has available to it to fund the successor CBA with BLET. Without these additional funds, resolving the dispute over the successor agreement will become difficult or impossible to resolve without a strike by BLET.

42.     In addition, if Engineers receive significant compensation and/or retroactive and prospective wage increases from SBA 940, they have little or no incentive to compromise with NJTRO to resolve the dispute over the terms of the successor CBA.  The additional compensation would help make Engineers whole (or well beyond whole) even if they were to engage in a lengthy strike beginning on or about March 22, 2025.

43.     Moreover, an award from SBA 940 unilaterally resolving the 10.4% differential issue removes flexibility of the parties in terms of options for settlement on the terms of the successor CBA, such as the potential for BLET to trade off retroactive wage increases in exchange for higher future wage increases.  That option is not possible if retroactive wage increases have already been awarded by SBA 940.

44.     Finally, the ridership of NJTRO in New Jersey, New York, and Pennsylvania will be immediately and irreparably harmed if the BLET were to go on strike.  A strike would shut down NJTRO's trains and leave the 205,000 passengers that use NJTRO's trains each weekday without a way to get to and from their jobs.  This would imminently endanger the general welfare of citizens by interrupting the availability of safe, efficient, and timely travel.  A strike would leave some critical healthcare workers without any way to get to their jobs; it would endanger the health

and welfare of citizens that normally use NJTRO's trains to travel during adverse weather conditions, or in isolated areas that expose those citizens to criminal activity. It would also leave citizens desperate to get to work vulnerable to usurious surcharges by private transportation services, which might be their only option. Ultimately, citizens that utilize NJTRO's trains as a means of transportation would be subject to irreparable and immediate harm if the BLET is not temporarily and/or preliminarily restrained from proceeding to arbitration over the 10.4% differential dispute with SBA 940.

45. Absent an injunction blocking SBA 940 from deciding the 10.4% differential issue following the January 9, 2025 arbitration hearing, NJTRO and its ridership throughout New Jersey, New York and Pennsylvania will be irreparably harmed by allowing a change to the *status quo* (payment of compensation and a new wage increase applied retroactively and prospectively for Engineers) despite that very issue being a significant part of the parties' dispute over the successor CBA, which is currently pending before PEB 252. Any change to the *status quo* at this time, in the final months before BLET's Engineers can lawfully strike, especially a change that provides the Engineers with substantial compensation and wage increases, would cause irreparable harm, and would violate both the letter and spirit of the RLA and President Biden's Executive Order, which are designed to avoid potential interruptions to service, and would drastically reduce NJTRO's flexibility to resolve the dispute without a strike.

I declare, under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of December, 2024.

Patrick McGreal

4916-6778-0869, v. 1

9

# EXHIBIT A



# NATIONAL MEDIATION BOARD

1301 K St NW, Suite 250E
Washington, DC, 20005

June 21, 2024

**<u>SENT VIA E-MAIL & U.S. MAIL</u>**

Kevin S. Corbett, CEO and President
New Jersey Transit
1 Penn Plaza, East
Newark, NJ 07105

Edward A. Hall, National President
Brotherhood of Locomotive Engineers and Trainmen
7061 East Pleasant Valley Road
Independence, Ohio 44131

**Re:   NMB Case Number: A-13965**
**<u>New Jersey Transit Rail Operations, Inc. & BLET</u>**

**Craft or Class: Locomotive Engineers, Assistant Engineers &
Locomotive Engineer Trainees**

Mr. Corbett and Mr. Hall:

On October 22, 2020, the Brotherhood of Locomotive Engineers and Trainmen (BLET), by its duly authorized representative, made an application in accordance with the provisions of the Railway Labor Act for the services of the National Mediation Board (Board) in the following dispute:

"Rates of Pay, Rules, and Working Conditions"

Despite the Board's best efforts to bring about an amicable settlement through mediation, the parties have failed to reach agreement disposing of the above-described dispute.

In accordance with Section 5, First, of the Railway Labor Act, the National Mediation Board therefore now requests and urges that you enter into an agreement to submit the controversy to arbitration as provided in Section 8 of the Act.

**Page 2**
**NMB Case No. A-13965**
**June 21, 2024**

      Your written reply is requested by **12:00 p.m. (EDT), June 24, 2024**. The absence of prompt, unconditional acceptance or rejection of the proffer by **12:00 p.m. (EDT), June 24, 2024** will be considered a rejection of the proffer.

      By direction of the NATIONAL MEDIATION BOARD.

X ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

Christopher Beebe
Director of Mediation Services, NMB

cc:   Deirdre Hamilton, Chair, NMB
      Linda Puchala, Member, NMB
      Loren Sweatt, Member, NMB
      Gerry McGuckin, Supervisory Mediator, NMB
      Anthony M. Tosi, Supervisory Mediator, NMB

# EXHIBIT B



# NATIONAL MEDIATION BOARD

1301 K St NW, Suite 250E
Washington, DC, 20005

June 24, 2024

**SENT VIA E-MAIL & OVERNIGHT MAIL**

Kevin S. Corbett, CEO and President
New Jersey Transit
1 Penn Plaza, East
Newark, NJ 07105

Edward A. Hall, National President
Brotherhood of Locomotive Engineers and Trainmen
7061 East Pleasant Valley Road
Independence, Ohio 44131

      Re:   **NMB Case Number:  A-13965**
              **<u>New Jersey Transit Rail Operations, Inc. & BLET</u>**
              **Craft or Class:  Locomotive Engineers, Assistant Engineers, & Locomotive Engineer Trainees**

Mr. Corbett and Mr. Hall:

In response to our letter addressed jointly to your respective Carrier and Organization dated June 21, 2024, we have been advised by an electronic letter dated June 21, 2024 from Edward A. Hall, National President, Brotherhood of Locomotive Engineers and Trainmen that the Organization declines, in writing, to arbitrate the question in the above-captioned case. New Jersey Transit did not respond to the Notice of Proffer.

As provided by the Railway Labor Act, if arbitration at the request of the Board shall be refused by one or both parties, the Board shall at once notify both parties in writing that its mediatory efforts have failed and for thirty days thereafter, unless in the intervening period the parties agree to arbitration, or

**Page 2**
**NMB Case No. A-13965**
**June 24, 2024**

an emergency board shall be created,  no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose.

Accordingly, it is the judgement of our Board that all practical methods provided in the Railway Labor Act for our adjusting the dispute have been exhausted, without effecting a settlement.

In these circumstances, notice is hereby served on behalf of the Board that its services (except as provided in Section 5, Third, in Section 9a, and in Section 10 of the Act) have been terminated this day under the provisions of the Railway Labor Act.  Accordingly, unless the parties subsequently settle this dispute, or an emergency board is established, nonviolent self-help would be available commencing **12:01 a.m. EDT, Thursday, July 25, 2024**.

By direction of the NATIONAL MEDIATION BOARD.

X _____

Christopher Beebe
Director of Mediation Services, NMB

cc:    Deirdre Hamilton, Chair, NMB
       Linda Puchala, Member, NMB
       Loren Sweatt, Member, NMB
       Gerry McGuckin, Supervisory Mediator, NMB
       Anthony M. Tosi, Supervisory Mediator, NMB
       Maria-Kate Dowling, General Counsel, NMB
       Angela Heverling, Associate General Counsel, NMB
       Brian Wilton, General Counsel, NJT
       Patrick McGreal, Senior Director of Labor Relations, NJT
       Mark Wallace, First Vice President, BLET
       Tom Haas, Local Chairman, BLET/NJT GCA
       Don Melhorn, BLET
       Tom Roth, Consultant, BLET

# EXHIBIT C

EXECUTIVE ORDER

- - - - - - -

ESTABLISHING AN EMERGENCY BOARD TO INVESTIGATE
A DISPUTE BETWEEN NEW JERSEY TRANSIT RAIL OPERATIONS
AND ITS LOCOMOTIVE ENGINEERS REPRESENTED BY THE
BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN

A dispute exists between the New Jersey Transit Rail Operations and its Locomotive Engineers represented by the Brotherhood of Locomotive Engineers and Trainmen.

The dispute has not heretofore been adjusted under the provisions of the Railway Labor Act, as amended, 45 U.S.C. 151-188 (RLA).

A party empowered by the RLA has requested that the President establish an emergency board pursuant to section 9A of the RLA (45 U.S.C. 159a).

Section 9A(c) of the RLA provides that the President, upon such request, shall appoint an emergency board to investigate and report on the dispute.

NOW, THEREFORE, by the authority vested in me as President by the Constitution and the laws of the United States, including section 9A of the RLA, it is hereby ordered as follows:

Section 1.  Establishment of Emergency Board (Board).
There is established, effective 12:01 a.m. eastern daylight time on July 25, 2024, a Board composed of a chair and two other members, all of whom shall be appointed by the President to investigate and report on the dispute.  No member shall be pecuniarily or otherwise interested in any organization of railroad employees or any carrier.  The Board shall perform its functions subject to the availability of funds.

Sec. 2.  Report.  The Board shall report to the President with respect to the dispute within 30 days of its creation.

Sec. 3.  Maintaining Conditions.  As provided by section 9A(c) of the RLA, for 120 days from the date of the

C0002

2

creation of the Board, no change in the conditions out of which the dispute arose shall be made by the parties to the controversy, except by agreement of the parties.

Sec. 4. Records Maintenance. The records and files of the Board are records of the Office of the President and upon the Board's termination shall be maintained in the physical custody of the National Mediation Board.

Sec. 5. Expiration. The Board shall terminate upon the submission of the report provided for in section 2 of this order.

THE WHITE HOUSE,

July 24, 2024.

C0003

# EXHIBIT D

# REPORT

## to

# THE PRESIDENT

## by

# EMERGENCY BOARD

# NO. 251

SUBMITTED PURSUANT TO

EXECUTIVE ORDER DATED JUNE 24, 2024 ESTABLISHING AN EMERGENCY BOARD
TO INVESTIGATE A DISPUTE BETWEEN NEW JERSEY TRANSIT RAIL OPERATIONS
AND THE BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN

AND SECTION 9a OF THE RAILWAY LABOR ACT, AS AMENDED

_____

(National Mediation Board Case No. A-13965)

_____

**WASHINGTON, D.C.**
**AUGUST 23, 2024**

Washington, D.C.
August 23, 2024

The Honorable Joseph R. Biden, Jr.
President of the United States
The White House
Washington, D.C. 20500

Dear Mr. President:

Pursuant to Section 9a of the Railway Labor Act, as amended, and by Executive Order dated July 24, 2024, you established an Emergency Board, effective 12:01 AM, Eastern Daylight Time, July 25, 2024, to investigate a dispute between New Jersey Transit Rail Operations and its Locomotive Engineers represented by the Brotherhood of Locomotive Engineers and Trainmen.

Following its investigation of the issues in dispute, including both hearings and meetings with the parties, the Board now has the honor to submit its Report to you setting forth our recommendations for equitable resolution of the dispute between the parties.

The Board acknowledges with thanks the assistance of Angela Heverling and Andres Yoder of the National Mediation Board, who rendered invaluable counsel and aid to the Board throughout the proceedings.

Respectfully submitted,

_____
Elizabeth C. Wesman, Chairman

_____
Barbara C. Deinhardt, Member

_____
Lisa Salkovitz Kohn, Member

ii

## TABLE OF CONTENTS

I. CREATION OF THE EMERGENCY BOARD ................................................................ 1

II. PARTIES TO THE DISPUTE ...................................................................................... 1

    A.    New Jersey Transit Rail Operations ....................................................................... 1

    B.    Brotherhood of Locomotive Engineers and Trainmen ........................................... 2

III. HISTORY OF THE DISPUTE .................................................................................... 2

IV. ACTIVITIES OF THE EMERGENCY BOARD ........................................................ 6

V. DISCUSSION AND RECOMMENDATIONS .............................................................. 6

    A.    The Carrier's Proposal ........................................................................................... 6

    B.    The Organization's Proposal .................................................................................. 7

    C.    The Carrier's Position ............................................................................................ 7

    D.    The Organization's Position ................................................................................. 17

    E.    Recommendations of the Board ........................................................................... 23

VI. SUMMARY OF RECOMMENDATIONS .................................................................. 39

VII. CONCLUSION ........................................................................................................ 40

APPENDIX A—EXECUTIVE ORDER ......................................................................... 41

# I. CREATION OF THE EMERGENCY BOARD

Presidential Emergency Board No. 251 ("PEB" or "Board") was established by the President pursuant to Section 9a of the Railway Labor Act ("RLA"), as amended, 45 U.S.C. §151 *et seq.* including §159a, and by Executive Order dated July 24, 2024. The Board was created to investigate and report its findings and recommendations regarding a dispute between New Jersey Transit Rail Operations ("NJTRO" or "Carrier") and its Locomotive Engineers represented by the Brotherhood of Locomotive Engineers and Trainmen ("BLET" or "Organization"). A copy of the Executive Order is attached as Appendix A.

The President appointed Elizabeth C. Wesman, of Camas, Washington, as Chairman of the Board; and Barbara C. Deinhardt, of Brooklyn, New York and Lisa Salkovitz Kohn, of Chicago, Illinois as Members. The National Mediation Board ("NMB") appointed Angela Heverling, Esq. and Andres Yoder, Esq. as Special Counsel to the Board.

# II. PARTIES TO THE DISPUTE

## A. New Jersey Transit Rail Operations

New Jersey Transit Rail Operations is a commuter rail system with its principal offices in Newark, New Jersey. It is a subsidiary of the New Jersey Transit Corporation ("NJT") and an instrumentality of the State of New Jersey. NJT, the parent, is the nation's largest statewide public transportation provider, and the third largest provider of bus, rail and light rail transit. NJT operates bus, rail and light rail transit systems through its subsidiary organizations: (1) NJTRO; (2) NJT Bus Operations, Inc., (3) NJT Mercer, Inc.; and (4) NJT Morris. NJT is governed by a seven-person board appointed by the State Governor, who has veto power over NJT Board actions.

NJTRO connects between major points in New Jersey, connects to points in New York State, and connects to Philadelphia, Pennsylvania. Its operations include 12 commuter rail lines, over 160 stations, and nearly 1000 miles of track. Overall ridership between July 1, 2023 and June 30, 2024 exceeded 59 million passengers. NJTRO employs approximately 4500 unionized employees, including approximately 485 locomotive engineers.

### B.  <u>Brotherhood of Locomotive Engineers and Trainmen</u>

The Brotherhood of Locomotive Engineers and Trainmen is a labor organization headquartered in Independence, Ohio. It has more than 51,500 members nationwide and represents approximately 485 locomotive engineers who are employed by NJTRO. Of the roughly 485 engineers employed by NJTRO, the vast majority, over 80% as of December 2022, are paid the top wage rate as fully qualified engineers. The rest are paid lower rates as trainees and assistant engineers. BLET also represents locomotive engineers at many other commuter railroads, including Peninsula Corridor Joint Powers Board (Caltrain) and Southern California Regional Rail Authority (Metrolink), Metro-North Commuter Railroad (MNCR or Metro-North), Long Island Rail Road (LIRR), Massachusetts Bay Transportation Authority (MBTA), Southeastern Pennsylvania Transportation Authority (SEPTA), Port Authority Trans-Hudson Corporation (PATH), and Maryland Transit Administration (MARC).

### III. HISTORY OF THE DISPUTE

NJTRO and BLET are parties to a collective bargaining agreement that became amendable on January 1, 2020. The Organization served a notice on October 1, 2019 under Section 6 of the RLA to initiate collective bargaining. The Carrier served its Section 6 notice on November 27, 2019. The Parties conferred on March 16, 2020 and August 6, 2020, in the midst of the pandemic.

However, having failed to reach agreement, BLET filed an application with the NMB for mediation on October 22, 2020 and the Parties subsequently entered into mediation with the NMB, beginning on December 9, 2020.

NJTRO and BLET continued meeting with an NMB mediator over 20 times through May of 2024. During that period, the Organization asked the NMB for a release from mediation on December 3, 2021 and again on August 18, 2022, but the Carrier opposed each request and the Organization's requests were denied by the NMB. The Parties were unable to come to an agreement, but in a final session in May, 2023, BLET accepted NJTRO's proposal on two issues that remained open at that time, leaving wages as the final issue in dispute between the Parties. The Organization again requested a release from mediation by the NMB on June 17, 2024.

On June 21, 2024, the NMB, in accordance with Section 5, First of the RLA, urged the Carrier and the Organization to agree to submit their collective bargaining dispute to arbitration as provided in Section 8 of the RLA. The Parties rejected the NMB's proffer of arbitration.

On June 24, 2024, the NMB, under Section 5, First of the RLA, served notice that NJTRO and BLET were released from mediation. Accordingly, the Parties were required to maintain the status quo for 30 days, until July 25, 2024, at which time self-help (e.g., strike, lockout, unilateral implementation) would become available to the parties.

Section 9a(c)(1) of the RLA sets forth special procedures for commuter rail service and provides that any party to a dispute that is not adjusted under the other procedures of the RLA or the Governor of the state through which the service that is subject the dispute is operated may request that the President establish an emergency board. On July 2, 2024—during the 30-day status quo period—the Carrier, in accordance with Section 9a of the RLA, asked the President to establish an emergency board to investigate and issue a report and recommendations regarding the dispute.

3

Under Section 9a of the RLA, the creation of such an emergency board would impose a status quo period for an additional 120 days, until November 21, 2024.

On July 24, 2024, the President granted NJTRO's request and created this PEB, effective July 25, 2024.

Significant to this dispute is the history of NJTRO's negotiations during this time period with the 14 other organizations representing its commuter rail employees. In addition to the agreement between NJTRO and BLET, NJTRO was a party to 20 other labor agreements with those 14 other organizations. Like the agreement between NJTRO and BLET, all of those agreements became amendable on January 1, 2020, and NJTRO and those organizations began separate negotiations during the same time frame. Between September 25, 2021 and February 10, 2022, while NJTRO and BLET were in mediation with the NMB, NJTRO reached memoranda of understanding ("MOUs") with all 14 of the other organizations. Each MOU covers the period from January 1, 2020 through June 30, 2024. The wage provisions of these MOUs are identical. The dates of those MOUs, the organizations associated with them, and the number of employees covered by the MOUs are listed in the table below:

|   | Date | Union | Employees Covered |
|---|------|-------|-------------------|
| 1 | 9/25/21 | American Railway and Airline Supervisor's Association–Maintenance of Way ("ARASA–MOW") & American Railway and Airline Supervisor's Association–Maintenance of Equipment ("ARASA–ME") | 191 |
| 2 | 9/25/21 | Brotherhood of Railway Carmen ("BRC") | 351 |
| 3 | 9/25/21 | International Association of Sheet Metal, Air, Rail, and Transportation Workers–Mechanical ("SMART–Mechanical") | 86 |

| 4 | 9/25/21 | International Association of Sheet Metal, Air, Rail, and Transportation Workers–Transportation Division ("SMART–TD") & International Association of Sheet Metal, Air, Rail, and Transportation Workers–Yardmasters ("SMART–Yardmasters") | 1,465 |
|---|---|---|---|
| 5 | 9/25/21 | International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers ("IBB") | 6 |
| 6 | 9/25/21 | National Conference of Firemen and Oilers ("NCFO") | 88 |
| 7 | 9/25/21 | Transport Workers Union of America ("TWU") | 203 |
| 8 | 9/25/21 | Transportation Communications Union ("TCU") | 438 |
| 9 | 10/21/21 | International Brotherhood of Electrical Workers ("IBEW") Local #1573 | 45 |
| 10 | 10/29/21 | International Association of Machinists and Aerospace Workers ("IAM") | 179 |
| 11 | 11/22/21 | Brotherhood of Railroad Signalmen ("BRS") | 175 |
| 12 | 11/24/21 | Brotherhood of Maintenance of Way Employees Division ("BMWE") | 361 |
| 13 | 2/2/22 | IBEW System Council No. 7 | 481 |
| 14 | 2/10/22 | American Train Dispatchers Association ("ATDA") | 67 |
| | | Total | 4136 (90%) |

Shortly after those 2020-2024 agreements were ratified, 11 of these 14 organizations also separately reached agreement with the Carrier for contracts covering the period from July 1, 2024 to June 30, 2027.

## IV. ACTIVITIES OF THE EMERGENCY BOARD

Following a preliminary videoconference, the Board issued an organizational letter on July 26, 2024 in which the ground rules for the Board's procedures were set forth. The ground rules set a deadline of August 1, 2024 for the Parties to file pre-hearing submissions with the Board. Hearings on the dispute were held on August 5, 6, and 7, 2024 in Newark, New Jersey. Both Parties were represented by counsel and had a full and fair opportunity to present oral and documentary evidence and argument. At the conclusion of the hearings on August 7, 2024, the Board met informally with the Carrier and with the Organization in an attempt to facilitate a settlement of the dispute. On several occasions thereafter, the Chair communicated by email and telephone with the Parties separately. Although these efforts were unsuccessful, the Board benefitted from the Parties' candor during these meetings. The Board appreciates the Parties' courtesy and cooperation through the hearings and these informal discussions.

The Board then convened in a series of Executive Sessions by videoconference in order to reach consensus regarding its recommendations and to prepare and finalize this Report.

## V. DISCUSSION AND RECOMMENDATIONS

### A.  The Carrier's Proposal

| Effective Date | Increase |
|---|---|
| 7/1/2020 | 2.00 % |
| 7/1/2021 | 2.25 % |
| 1/1/2022 | 2.25 % |
| 7/1/2022 | 2.50 % |
| 7/1/2023 | 3.00 % |
| Amendable Date: June 30, 2024 | |

Nominal wage rates increase by 12.0%, uncompounded, over a 4½-year term, from January 1, 2020 to June 30, 2024.

6

The Carrier also proposed several other changes to the Agreement, including an additional holiday (Juneteenth), revisions to the existing health and welfare benefits, and a change in electronic communications policy and bereavement leave, changes that were accepted by the Organization and that are therefore neither in dispute nor discussed here. In addition, the Carrier had required the other organizations to agree to one work rule change that would ameliorate the impact of the increase. The Organization here agreed to one such work rule change. The Parties also agreed that any increases would be retroactive to January 1, 2020.

B. **The Organization's Proposal**

The Organization's wage proposal before this Board is identical to the Carrier's proposal, with the exception of a "wage equity adjustment" effective December 31, 2022 and a 7½-year contract duration:

| Effective Date | Increase |
|---|---|
| 7/1/2020 | 2.00 % |
| 7/1/2021 | 2.25 % |
| 1/1/2022 | 2.25 % |
| 7/1/2022 | 2.50 % |
| 12/31/2022 | 15.36 % |
| 7/1/2023 | 3.00 % |
| 7/1/2024 | 3.00 % |
| 7/1/2025 | 3.00 % |
| 7/1/2026 | 3.00 % |
| Amendable Date: July 1, 2027 | |

Nominal wage rate increase of 36.36%, uncompounded, over a 7½-year term from January 1, 2020 to June 30, 2027.

C. **The Carrier's Position**

According to the Carrier, the only issue remaining open before this Board is wages. As noted above, the Carrier proposes increases of 2%, effective July 1, 2020; 2.25%, effective July 1,

7

2021; 2.25% effective January 1, 2022; 2.5%, effective July 1, 2022; and 3%, effective July 1, 2023, or 12% over the contract term ending June 30, 2024. These are the increases and timing provided in the settlements that the Carrier reached with 14 of the 15 organizations representing its railroad employees. Those agreements were reached in separate negotiations with each organization, the first agreement having been signed in September 2021 and the last in February 2022. Those agreements cover 93% of the organizations and 90% of the represented employees. They include a 12% wage increase over the term of the agreements, and changes to holidays, bereavement time, retroactivity, email communication, elimination of paper checks, and health benefits. BLET is the lone holdout.

In contrast, the BLET proposal, to add to the Carrier's proposed increases an equity adjustment of 15.36% on December 31, 2022, would result in a 27.36% increase over the 2020-2024 term. The Carrier observes that the BLET-proposed equity adjustment could trigger an obligation to implement higher wage increases for 12 of the 14 other organizations that entered into "me, too" agreements with NJTRO during the course of the 2020-2024 round of negotiations, resulting in far higher labor costs than the 12% pattern for the contract term.

The Carrier contends that BLET should not be permitted to deviate from the internal pattern that has been established by NJTRO and 14 of the 15 NJTRO unions for the 2020-2024 term. The Carrier claims that there has been a consistent history of pattern bargaining between NJTRO and its organizations dating from 1996. The agreements covering the periods of July 1, 1996 through June 30, 2001; July 1, 2001 through June 30, 2004; July 1, 2004 through June 30, 2011; July 1, 2011 through December 31, 2019 (following PEBs 248 and 249); and the agreement with 14 of 15 of its unions covering the period January 1, 2020 through June 30, 2024, all contained identical wage modifications for all covered employees.

The Carrier observes that the historic importance of following pattern settlements in the railway industry is the result of efforts to achieve labor peace with the members of numerous labor organizations working closely together on the same property. Following pattern settlements serves to promote labor stability and harmonious labor relations, avoids discriminatory treatment among various crafts, and assures organizations that the agreements are fair and reflect the best outcome for all parties—all critical to preventing service disruptions to the public and the attendant dire consequences to the economy.

As PEB 116 observed, in considering competing proposals where the carriers had proposed the extension of pattern terms accepted by unions representing 80% of their employees to the remaining 20% of the workforce, "The pattern plan offers the best hope of preventing discriminatory treatment among the various crafts," and "Earlier pattern plans have proven their worth as stabilizing influences." (PEB 116 at 13) PEB 116 recommended adoption of the pattern wage increases.

More recently, PEB 231 recommended wage increases consistent with the internal pattern of settlement followed by all other unions and organizations on the carrier's property, finding that "[t]he breaking of an internal pattern of wage settlement by the last Organization in a long line of settlements could indeed adversely impact upon [the Carrier's] relationship with its other bargaining units." The Board in PEB 231 also recognized that such a deviation from the established pattern might negatively impact the morale of employees in those other bargaining units upon their realization that the holdout organization had achieved a better result than they had, or might spur other organizations to use the pattern-breaking settlement as a "springboard" to seek increased benefits or add compelling external parity arguments in the next round of negotiations, all adversely affecting the continuity and stability of employment and the public interest. (PEB 231

9

at 8) Similarly, in PEB 246, the Board recommended wage increases "based on adherence to the internal pattern of settlement followed by all other unions on [the Carrier's] property." (PEB 246 at 11)

The Carrier strongly asserts that over the years it has strived to develop and sustain a culture of trust and camaraderie at the railroad, with fair and equitable decisions and honest and open communication with its organizations and employees. The Carrier emphasizes that these tenets are a core part of its relationships with the organizations and their members and ultimately benefit the public that they all serve.

The Carrier believes that the deviation from the pattern as sought by BLET would undermine its efforts to foster labor peace and operational efficiency in an atmosphere of mutual respect and trust. The Carrier warns that breaking the pattern for one holdout organization would hinder future voluntary settlements, encourage organizations to engage in "leap-frogging" in negotiations because no organization would want to compromise first, lower employee morale, and destabilize relations between NJTRO and its unions and among the organizations themselves. The Carrier also warns that this Board's failure to honor an existing pattern could have consequences extending beyond this property to the parties throughout the railroad industry that have relied on pattern settlements to ensure labor peace.

The Carrier contends that although some PEBs have recognized that special circumstances may warrant looking beyond a pattern to find an equitable settlement in the interest of equity and fairness to a particular class or group of employees, they have generally placed the burden on the organization to demonstrate a particular inequity or other grounds to justify overriding the deference accorded to a settlement pattern. However, BLET has failed to justify any deviation from the pattern at NJTRO, the Carrier asserts.

The Carrier also disputes BLET's basic position that its proposed equity adjustment is justified by external disparities between NJTRO engineer wages and engineer wages on other commuter rail properties. The Carrier finds BLET's economic analysis flawed on many levels.

First, the Carrier challenges the validity of BLET's comparisons with out-of-state transit lines, observing that each carrier's history and context matters in evaluating their wage packages. Even if comparisons are to be made, the Carrier contends that BLET has erred by considering as comparable Caltrain and Metrolink, both operating in a California economy and market far different from New Jersey. By considering the California carriers along with six additional top commuter rail carriers located closer to NJTRO territory—Metro-North, LIRR, MBTA, SEPTA, PATH, and MARC—BLET concluded that the engineers' average base wage rate at these eight major commuters would exceed the NJTRO engineers' base wage rate under the Carrier proposal by 13.4% as of July 2023 and by 14.5% as of July 2024.

However, Caltrain and Metrolink pay significantly higher rates than most of the other carriers in this group, and BLET's inclusion of them in the comparator group inappropriately inflates the "disparity" between the average rate for engineers at comparable carriers and the NJTRO rate, the Carrier contends. When the California carriers are removed from consideration, the Carrier calculates that the percentage increases proposed by the Carrier are roughly comparable to the increases on PATH, SEPTA, LIRR and Metro-North for the overlapping years that those carriers have agreements. In fact, the Carrier's 12% proposal for 2020-2024 is higher than PATH's 10.25% increases for the same period, and in the first two years, 2020 and 2021, the Carrier's proposed 4.25% in increases is identical to the increases at Metro-North for that period. LIRR has no agreement after June 15, 2023, but up to that point, NJTRO's proposed increases of 9% exceed LIRR's increases of 8.32%. Thus, the Carrier argues, BLET has failed to demonstrate that there is

11

an inequitable disparity between NJTRO engineers and engineers at comparable commuter lines, and certainly no inequity with other railroads so great that it must be resolved with a 15.36% adjustment.

The Carrier also asserts that BLET has failed to demonstrate a real wage loss out of step with other NJTRO employees that would justify an equity adjustment of 15.36%. While BLET bases its claim in part on the effects of inflation and increases in the cost of living, those factors have affected all NJTRO employees, regardless of their organization, title or rank. Thus, the shared impact of inflation and cost of living increases does not justify a special adjustment increase to engineers over the 12% general wage increase accepted by all other organizations.

Further, NJTRO disputes the inflation measure utilized by BLET. Using the nationwide CPI-W, BLET concluded that the Carrier's proposal would result in a real wage loss for engineers of 6.1% by July 2024, while the equity adjustment would result in a real wage increase of 8.3% by that time. The Carrier argues strenuously that it is inappropriate to use the nationwide CPI-W as a measure of cost-of-living changes that impact NJTRO employees, because that broad economic statistic fails to capture the financial circumstances in the places where NJTRO engineers live, work, and shop. The Carrier's comparison using the CPI-W for the New York-Newark-Jersey City, NY-NJ-PA region demonstrates a real wage loss under the Carrier proposal of only 2.3% by July 2024 (3.8% by July 2027), and a real wage gain under the BLET equity adjustment proposal of 12.7% (11% by July 2027). From this, the Carrier concludes that the impact of its proposal on engineers' real wages is not as deleterious as BLET suggests and does not justify deviating from the pattern wage settlement to award BLET an excessive equity adjustment of 15.36%.

Although not asserting an inability to afford the Organization's proposed wage increase, the Carrier does claim that meeting its demands would seriously burden its rail operations and pose

a risk of service cuts and other cost-saving measures that would directly impact both employees and customers. Roughly 90% of NJT's budget goes toward operational services, including bus, rail, light rail, and associated police, system safety and technology. At NJTRO, labor and fringe benefits make up approximately 60% of its expenses. As a result, NJT and NJTRO can do little to lower costs without impacting service levels. According to the Carrier, under its pattern proposal, its labor and fringe benefit costs would increase by $30.3 million over the term of the 2020-2024 contract. But BLET's proposed equity adjustment would increase labor and fringe benefit costs by $61.4 million—$31.1 million  over the increase in costs that would follow the Carrier's own proposal. None of that $31.1 million variance was funded for FY21 to FY25.

The Carrier warns that this raises the serious possibility of significant service and other cuts to meet the resulting budget demands, both during the 2020-2024 contract term and beyond. The Carrier's parent NJT, as a public corporation within the New Jersey Department of Transportation, must meet a variety of operating budget requirements and restrictions set by the State's budget process. The State's Constitution requires that the State operate under a balanced budget that must be adopted by the State Legislature and signed by the Governor by June 30. Only when the budget is approved can NJT determine its state funding for its fiscal year, which begins July 1.

That state funding is augmented by fares, turnpike tolls, other operating income, and funding sources like the now-expired COVID stimulus funds. In FY25, the $158.6 million gap between those baseline revenues and budget expenses was bridged by fare increases, the elimination of discount passes, increased ridership, increased ad and sponsorship income, enhanced fare enforcement, and investment income. Between FY21 and FY25, the NJT bus, rail and light rail operations weathered the plunge in ridership during the pandemic and the slow

13

recovery thereafter. Even in FY24, NJT ridership overall was only 76% of pre-COVID levels, and NJTRO's farebox revenue was only 71% of pre-COVID levels. Although there has been steady recovery in farebox revenues since COVID, the Carrier notes that rail (NJTRO) ridership has recovered significantly more slowly than bus ridership. NJT predicts that ridership overall will reach 97% of pre-COVID levels during FY27.

Another factor in NJTRO's current budgeting is the upcoming termination of federal COVID stimulus funds by the end of FY25. Various COVID 19 relief grants provided NJT over $4.4 billion from FY20 through FY25, and NJT will exhaust the final $750 million of those funds in FY25. NJT is hopeful that proceeds from the recently-enacted Corporate Transit Fee (CTF) will replace a good part of that funding, but the Fee has not been legislatively earmarked for use just by NJT. NJT and the Carrier will have to wait for the next budgeting round to learn whether its portion of the Corporate Transit Fee proceeds will suffice to close that post-COVID funding gap in FY 26.

Even beyond the COVID stimulus funding and the Corporate Transit Fee, NJT faces great variability in its funding from year to year. Operating funding decreased almost 4% between FY19 and FY25, driven primarily by the severe reduction in the State operating subsidy from FY22 onward, a reduction in funding from the Clean Energy Fund, the elimination of state preventive maintenance funding in FY22, and the reduction of federal preventive maintenance funding beginning in FY24. On the positive side, the legislature created the Corporate Transit Fee in FY24, which is intended to fund NJT's capital projects and provide matching funds for capital projects. However, as noted, the CTF is not a constitutionally-dedicated funding source. It is subject to allocation among various modes of transportation and to repeal by the legislature, and in fact, NJTRO received no CTF funds for FY25. The amount of CTF funding available to NJTRO is

subject to economic variations. In addition, the Fee is set to sunset entirely at the end of 2028. The CTF therefore presents a risk as well as an assurance to NJT, including NJTRO. Further demonstration of the shifting sands of the NJT budget is that the Department of Transportation has retained a consultant to review Department operations, including NJT, and determine how to reduce costs by hundreds of millions of dollars over the next two fiscal years.

In sum, adopting the BLET proposal would increase NJTRO's labor costs over the NJTRO proposal by $31.1 million for the period from FY21 and FY25. NJT does not have either surplus or discretionary funding to cover this additional cost, nor does it have borrowing authority for this type of additional expense. The Carrier concludes that with labor and fringe benefits accounting for 90% of NJTRO's operating costs, the cost-cutting measures required to enable the Carrier to fund that increase would most likely require significant cuts in staff and in services.

Another factor has been raised that the Carrier contends undermines BLET's asserted entitlement to break the negotiated pattern—the "me, too" agreements between the Carrier and 12 of the other organizations reached during their bargaining for the 2020-2024 agreements. The Carrier's "me, too" agreements provide that "[i]n the event the Carrier reaches subsequent agreements with other unions, in the current round of bargaining, which provide for superior provisions on [wages and other enumerated benefits]," the Carrier must offer to the signatory unions "an option…for equivalent treatment on such matters." The equity adjustment proposed by BLET, as a "superior provision" on wages, could arguably trigger the Carrier's obligations under the "me, too" agreements to offer to the 12 signatory unions the same 15.36% adjustment or an exchange of valuable work rules equivalent to the monetary value of the BLET equity adjustment, retroactive to the proposed December 31, 2022 effective date of the BLET adjustment. The Carrier protests that the extraordinary burden of this even potential added across-the-board increase in

15

labor costs further demonstrates that the BLET's proposed deviation from the established 2020-2024 pattern is unjustified.

The Carrier also argues that to grant BLET wages and benefits above the pattern of agreements would reward "bad acts," referring to a concerted job action in June 2022 when some BLET members marked off over the new Juneteenth holiday accepted by all other organizations in the pattern agreement. The job action resulted in the shutdown of the entire system during the 2022 Juneteenth weekend and was ultimately permanently enjoined by federal court acting upon an agreement of the parties. As part of the settlement, BLET agreed to pay $70,000 to NJTRO. In addition, the former BLET General Chairman was discharged for having encouraged the job action, a discharge subsequently upheld by Special Board of Adjustment No. 940, in its Award No. 383. The Carrier insists that this bad faith should not be rewarded by a recommendation of a contract richer than the pattern agreement.

Finally, although BLET has asserted that this Board's mandate includes the contract years 2024 through 2027, the Carrier maintains that the Board's jurisdiction is limited to the 2020 through 2024 term. NJTRO and the other organizations agreed on a "second contract" closely following the ratifications of their 2020-2024 agreements. While NJTRO did make the same offer of a second contract to BLET late in their unsuccessful negotiations, and BLET did accept the proposed increases over the longer term, the Carrier contends that because the Section 6 notices referred only to a proposal for 2020-2023 and subsequent communications and negotiations until July 2023 only expanded the contract duration to 2024, the only open issue properly before this Board is the dispute over an agreement for the 2020-2024 term.

The Carrier further notes that even were this Board to consider recommending a 7½-year contract term, the equity adjustment remains unjustified and unwarranted. Under a contract term

extending through June 30, 2027, the increased costs of the 2022 equity adjustment would be compounded over three more years beyond 2024, for BLET and possibly for the 12 organizations with "me, too" agreements, further enhancing the burden on the Carrier's budget and risking the need for service cuts to the detriment of the general public as well as NJTRO employees. The Organization has failed to justify any deviation from the pattern that would result in such dire consequences.

### D. **The Organization's Position**

BLET objects to the Carrier's assertion that the engineers must accept without deviation the wage proposal agreed to by the other organizations, given that, as the exclusive bargaining representative of the locomotive engineers, BLET has the right and the obligation to negotiate on their behalf. NJTRO's refusal to bargain over wages has been the true roadblock to reaching an agreement in these negotiations.

The Organization does not contest the Carrier's characterization of the agreement signed by the other organizations as a pattern. It does not contest that the pattern should be considered by this Board as one factor in determining a fair and reasonable resolution of this dispute. It asserts, however, that PEB precedent does not require an unfailing adherence to such a pattern. As PEB 178 observed:

> To begin with, though true that the "pattern" agreement has in the past been sustained, it is not true that the past Emergency Boards have either readily accepted it or seen it as the one clearly determinative consideration before them. To the contrary, the Emergency Board literature reflects a considerable struggle on the conflict, between the Carriers' plea for adherence to the pattern, on the one hand, and the plea by one Union or another that it has the right to bargain for itself and cannot be expected slavishly to follow what another Union has bargained, on the other.

(PEB 178 at 6)

Even PEB 186, cited by the Carrier in support of deference to pattern bargaining, concluded that an organization may demonstrate "an inequity or a rational and convincing basis for a changed wage structure" to persuade a Board to depart from the established pattern. (PEB 186 at 8)

Further, BLET points to the acknowledgment by the Board in PEB 211 that a pattern should not be followed automatically, but must be considered in the light of other key factors:

> In considering the wage issues before us, the Board recommends the application of the aggregate BRAC settlement, but distinguishes the adjustments needed to develop a fair and equitable wage package. The BRAC is not readily adaptable to the crafts before us. We must make recommendations based on the distinctive features of each craft. Strict adherence to the BRAC structure would not only result in wage inequities and inconsistencies but would also create an infeasible wage configuration. Our recommending the basic BRAC pattern would be tantamount to a decision without judgement.

(PEB 211 at 11)

The more contemporary PEB 243 once again found that a pattern must be evaluated against other wage determinant factors and not followed blindly:

> The parties devoted considerable attention to debating whether the UTU settlement does or does not establish a "pattern" that the Board should follow. However, we need not and do not resolve that issue. Rather, we find it sufficient to consider the UTU Agreement for what it unquestionably is: relevant evidence of what the Carriers and one independent Organization agreed was a fair and equitable settlement.
>
> Precisely how relevant the UTU settlement is as an internal comparator cannot be stated in absolute terms. It must be weighted as one component among many and assessed in the context of the unique combination of facts and circumstances that the Carriers and Organizations find themselves in at this point.
>
> Certainly, as can be seen in the discussion that follows, the UTU agreement is important and provides some guidance for our assessments. But, as can also be gleaned from our recommendations, we do not find it appropriate to apply it in lockstep fashion in this case.

(PEB 243 at 17)

18

In further support of its position, the Organization cites the observations made by a former chair of the National Railway Labor Conference, Charles Hopkins, Jr., in testimony before PLBs 194 and 195 as a Carrier witness:

> In my judgment, [certain exceptions to the pattern principle] would not be inconsistent with [the pattern] in principle or as it has been practiced over the years. We have dealt with inequities, usually those claimed by a union, one union group or another. But on occasions, unfortunately infrequent occasions, we have dealt with inequities that the carriers were experiencing.

(PEBs 194 and 195, Transcript at 293, ll. 9-15)

> Before leaving any discussion of the pattern principle, I do want to return to the point made earlier that the pattern principle does not prohibit a party – either carrier or organization – from pointing out that some special circumstance justifies a deviation from the pattern. This is only common sense. Changes over the years, both within and without the industry, may bring about unbalanced wage relationships of one sort or another that warrant rectification. It is essential that the parties be free to correct such a situation without it being considered as part of the pattern, and therefore applicable to all crafts. After all, if such were the case, an inequity would not be corrected but compounded by spreading it in unwarranted fashion.

(PEBs 194 and 195, Carriers' Ex. 1 at 2)

BLET also points out that, despite the Carrier's protests to the contrary, exceptions have been made to the tradition of pattern bargaining on this property in order to recognize and accommodate particular concerns specific to a single organization. Even in the most recent round of bargaining preceding the present one, bargaining that resulted in the 2011 to 2019 contract, following PEBs 248 and 249, there was general adherence to a pattern. However, the Sheet Metal Air Rail Transportation (SMART) organization, which represents the conductors at NJTRO, bargained for and received certification or "cert" pay. Thus, while other organizations all agreed to the same wage increases, SMART alone achieved cert pay in addition to the pattern of wage increases accepted by the other organization.

In the present case, BLET urges the Board to recognize that the established pattern, even though signed by the 14 other NJTRO organizations, cannot reasonably be applied to their agreement. The Organization contends that it has more than adequately shown that there is an obvious and untenable disparity between what NJTRO engineers earn and what engineers earn at comparable commuter rail carriers. As a demonstration of this contention, the Organization has presented comparative evidence of engineers' wages at NJTRO and at the other major commuter railroads. As of July 2024, under the Carrier's proposal, the engineers at NJTRO would be paid $6.70 below the average for the other major commuter rail carriers.

For subsequent years, should the contract be extended to the 7½-year period, the disparity would grow even greater. NJTRO's proposal results in an increasingly worse disparity between NJTRO engineer wages and those of all the comparators except SEPTA between 2003 and 2025, a disparity rising from $2.59 per hour in 2003 to $7.44 per hour by July 1, 2025. Thus, BLET contends, NJTRO's proposal exacerbates rather than resolves this obvious ongoing inequity.

In response to the Carrier's objection to comparing NJTRO's engineers to their peers in, e.g., California, the Organization points out that even regional (New York Metro/Newark/Jersey City) comparisons reveal an increasing disparity between NJTRO engineers and the more geographically proximate comparators.

On the other hand, the Organization's proposed 2022 equity adjustment would increase the NJTRO engineers' rate to within 11 cents of the average. BLET contends that such an equity increase is fair, reasonable, and necessary in order to prevent NJTRO engineers from falling even farther behind the comparator commuter rail line engineers.

BLET notes that among the comparable commuter railroads, NJTRO's per unit labor costs are the second lowest. NJTRO ranks third in productivity among the six major passenger roads in

the U.S., the third lowest unit cost, the second lowest unit labor cost, and the lowest labor ratio (total labor cost as a percent of total operating expense). These factors also support the Organization's claim for an adjustment to ensure engineer wages commensurate with wages on those other properties.

The Organization argues that because the wages of the other organizations at NJTRO do not show the same marked disparity compared to other commuter railroads that BLET wages do, they are not likely to face the increased attrition rates or reduction in recruitment that BLET anticipates if this inequity is allowed to continue. Thus, this factor is unique to BLET.

The Organization also asserts another basis for rejecting the pattern settlement. According to the Organization, in light of the latest projections of the expected rate of inflation, the NJTRO's proposal would result in a loss of real wages of 0.9% per year, with a total loss of real wages of 6.8% over 7½ years. Such a cut would represent an erasure of the real wage gains since 2015, as recommended by PEBs 248 and 249 and achieved in the last agreement. BLET's proposal, on the other hand, would result in a 1.0% per year real wage increase, for a total of 7.5% over 7½ years.

The Organization urges this Board to also consider recent settlements reached pursuant to PEB 250 and settlements at Caltrain, MBTA, Keolis (operator of Virginia Railways Express), and Amtrak. Wage increases negotiated in those settlements ranged from 4.4% per year in the National Freight Agreements to 7.1% per year at Caltrain, compared with 2.8% per year proposed by NJTRO. Wages for workers elsewhere in the economy have also increased by 4% to 7% per year.

The Organization maintains as well that NJTRO is financially able to support equitable employee compensation for the engineers. Specifically, the Carrier proposal for BLET wage increases would cost $49.7 million over the entire 7½ years of the contract. Total cost of the BLET proposal would be $95.5 million over that 7½ years. The difference in cost is $45.8 million. BLET

21

argues that of the entire net cost of their proposal, $24.7 million would accumulate through FY25, including the proposed retroactive equity adjustment effective December 31, 2022. BLET asserts that that expense, even if unfunded, would have no perceptible impact on either the NJTRO or New Jersey State budgets. The Organization points out that on June 28, 2024, the governor of New Jersey signed a state budget for FY25 that includes $3.0 billion for New Jersey Transit (NJT). NJTRO is only 28% of the NJT budget, and the number of engineers represents a mere 3.5% of New Jersey Transit total employment.

The Organization acknowledges that early in the bargaining in 2020, the Parties were faced with a looming fiscal crisis as a result of the pandemic. However, federal funds were made available to support public transportation. The last payment from the federal government for COVID-19 relief–$749.3 million–is scheduled to be made to NJT in FY25, but in 2024, the State enacted a Corporate Transit Fee to be allocated to NJT. As a result, the Organization asserts, NJTRO is in a very strong financial position, even compared with other commuter railroads across the country. The BLET proposal does not, according to the Organization, impose an excessive burden on the finances of such a fiscally secure carrier.

For all of the above reasons, therefore, the Organization urges this Board not to apply without deviation the terms of the pattern settlement reached with the Carrier's 14 other organizations. The Organization dismisses the Carrier's concerns regarding the anticipated consequences of failure to follow the pattern. It points out that the Carrier has not offered any evidence to support its speculative claims that deviating from the pattern would cause instability, encourage a leap-frogging of one union over the other, or cause low morale among those organizations who settled earlier rather than later. Moreover, BLET points out that it is the sole representative of the locomotive engineers and it is inappropriate for the Board to reject its

22

legitimate equity requests based upon what "might happen" to the attitudes and morale of the other organizations within NJTRO.

At bottom line, BLET asks that the Board respect the Organization's requests that it not adhere blindly to the concept of pattern, as the Carrier proposes. Rather, it urges that the extraordinary inequity between NJTRO engineers and their peers on comparable commuter rails requires the present Board to make an exception to the general concept of deference to pattern agreements. Thus, the Board should recommend that NJTRO accept the wage equity adjustment sought by BLET and bring its members into line with engineers performing identical service on comparable commuter railroads.

Finally, as to the issue of the contract duration, BLET is not unwilling to extend the duration of its contract with NJTRO in the interest of labor/management stability. It maintains, however, that it will do so only if an equity raise is granted as requested, so that its membership does not continue to fall behind in real wage rates with respect to engineers performing identical service on comparable commuter railroads. This can only come about, BLET concludes, if the Board truly adheres to the spirit of the preceding PEBs and finds that BLET has shown legitimate bases upon which to vary from the pattern the NJTRO is proposing and distinguish it from the other organizations apparently adhering to the current pattern of wage increases over the period of their contracts.

## E.  **Recommendations of the Board**

Our charge is to craft for the Parties a potential path toward a mutually acceptable resolution of this protracted and difficult dispute. The Parties have made our job both easier and more difficult with their excellent and comprehensive presentations. Following our careful review

of the submissions, exhibits, witness testimony, and arguments, we make the following recommendations.

A threshold question that arose in the course of the hearing concerns the scope of our authority related to the duration of the contract. The Carrier argues that the duration discussed in negotiations and submitted to the NMB mediator was a 4½-year contract with an amendable date of July 1, 2024. That, the Carrier argues, is the limit of this Board's authority. The Organization, on the other hand, argues that on July 24, 2023, during mediation, the Carrier made a proposal for a 7½-year agreement, with 3% increases in each of the last three years, an additional holiday (Veterans Day) and an additional sick day, and an amendable date of July 1, 2027. (This was a proposal that had been presented to the other organizations soon after the ratifications of the 2020-2024 agreements and has now been accepted by 11 of those organizations.) BLET immediately— an hour later—accepted that revised proposal, with the exception of its continued proposal for the 15.36% wage equity adjustment. Thus, the Organization asserts that this Board may make recommendations for the full 7½-year period.

PEB 231 was faced with a similar issue. It found that the dispute before it had evolved beyond the issues in the original Section 6 notices, including a proposal for additional years in the contract. That Board wrote:

> While the 'dispute' initially may have been confined to the proposals contained in the Section 6 notice, the dispute evolved with the negotiations and mediation process. The [Railway Labor] Act's definition of "dispute" includes changes in rates of pay, rules or working conditions not adjusted by the parties in conference. 45 USC Sec 155, First. In the Board's view, the "dispute" which has become the subject of this Board included a range of proposals proffered at different times during the negotiation process, including each of the issues presented to the Board. Therefore, the Board will address each of the issues raised by the parties. … As previously noted, the Board concludes that it does indeed have authority to make a recommendation for a period covering six years. Moreover, the Board concludes that the present circumstances make it advisable to do so. If the Agreement were for a period of only three years in length [as recommended by the Carrier], the new

amendable date would be on or about July 14, 1997, less than a year from now. ...The parties need only look to the time and effort they have already expended on these negotiations to reveal the truth of this observation. The parties now need a substantial period of labor peace. Were it necessary for them to engage formally in a new round of negotiations covering the period from 1997 through 2000, it would likely be disruptive to sound labor relations and create renewed instability in the parties' relationship.

(PEB 231 at 3-4, 6)

We similarly find that we have the authority to make recommendations based on the last proposals from each party, as proffered during the negotiation/mediation process, including the 7½-year contract term proposal from the Carrier, accepted by the Organization. And we similarly conclude that it is advisable here to recommend the longer contract. The contract first under consideration by the Parties had an amendable date of July 1, 2024, a date that has now come and gone. If that contract term were now accepted, the Parties would be required to immediately begin the negotiation process anew, with all of its attendant instabilities and tensions. We find that is not in the interest of labor peace and we decline to so recommend. Our recommendation is for a 7½-year contract, with an amendable date of July 1, 2027.

The essential dispute before us differs from disputes considered by many prior Emergency Boards. There is only one provision in dispute—the 15.36% equity wage adjustment. The issue underlying that dispute is simple to posit, but difficult to resolve. As discussed above, the Carrier argues that because over 90% of the NJTRO's unionized workforce agreed to a single contract, that agreement undeniably constitutes a pattern and the Board should recommend that the Organization adopt that pattern without deviation. The Organization does not contest the assertion that the contract agreed to by the other 14 organizations indeed constitutes a pattern, as understood in railroad labor negotiations. Nor does it contend that the pattern settlement is irrelevant to the resolution of this dispute. But it asserts, as discussed above, that the pattern is only one factor to

be considered and the terms of the pattern settlement must be evaluated according to traditional wage determinants, including comparable wages on other properties and the real wage growth resulting from the negotiated wage increases. To do otherwise, the Organization argues, would deprive it of its right to bargain on behalf of its membership.

We therefore begin our inquiry with the question of the pattern and its effect. We agree with both parties that there is indeed a pattern. Following many months of bargaining, the contract was agreed to on September 25, 2021, by eight of the organizations on the property, representing 55% of the workforce. By February 22, 2022, identical agreements had been reached with six other organizations. By that time, organizations representing 90% of the workforce had all agreed to the wage package. Throughout this same period, BLET continued to negotiate with the Carrier. When more than 50% of the workforce had ratified the agreement, however, the Carrier insisted that it was a pattern and that no deviation from the value of the contract would be acceptable.

We have reviewed the extensive PEB precedent discussing pattern bargaining in the railroad industry that has been submitted by both parties to the instant dispute. Many, if not all, of the arguments raised here have been raised by carriers and organizations over the past 67 or more years. Almost without exception, the Boards have given great weight to the importance of the pattern principle as essential to labor peace. For example, PEB 169 recommended a wage increase consistent with the pattern because "a higher settlement would probably nurture employee dissatisfaction and catchup demands and hamper collective bargaining and the negotiation of future contracts." (PEB 169 at 6)

Almost without exception, once finding a pattern, prior Boards have recommended the pattern's general wage and benefit agreements, or at least the fully monetized value thereof, to the organization(s) contesting the applicability of the pattern settlement, sometimes (but not always)

26

after an independent analysis of common wage determinants, sometimes (but not always) also making recommendations on or remanding for further negotiation unique craft-specific concerns.

The language used by the various Boards cited by the Parties is instructive. In its Report, PEB 231 considered the BLET argument that wage increases and equity adjustments were necessary to achieve parity with the wage rate received by engineers who work for other commuter railroads. As here, BLET noted that engineers working for NJTRO, Metro-North, and LIRR all received wages greater than engineers who worked for SEPTA, the carrier in that dispute. The carrier there asserted that the wage increase it offered the organization adhered to a pattern settlement that existed on its property and that issues of external parity were irrelevant, in light of the guidance from PEB 196 that wages should be based upon local conditions. In recommending that wages be increased consistent with the internal pattern of settlement followed by all other organizations on the carrier's property, the Board wrote:

> [T]he Board finds persuasive the Authority's argument that the internal pattern of wage settlements during this round of negotiations should be given controlling weight. There is extensive testimony and evidence in the record concerning the importance of adhering to an internal pattern of wage settlement. The breaking of an internal pattern of wage settlement by the last Organization in a long line of settlements could indeed adversely impact upon SEPTA's relationship with its other bargaining units. Were the Board here to recommend a wage increase consistent with that sought by BLE, and were that increase granted by the Authority, one of two consequences, or a combination thereof, would likely occur. Morale of employees represented by other Unions and Organizations would be negatively impacted by realization that BLE members had achieved a result better than that which they had achieved and/or other bargaining units would use the BLE settlement as a springboard to seek increased benefits during the next round of negotiations. Other Unions and Organizations would also make compelling external parity arguments. These results, however, would adversely affect the continuity and stability of employment and the public interest.

(PEB 231 at 8)

That Board recognized the organization's argument that it should receive wage increases in excess of the internal pattern to eliminate the negative external comparisons with engineers on

27

other commuter railroads, but concluded that "these considerations [were] on balance an insufficient reason for now breaking the rigid pattern of wage settlements agreed to by all other Unions on the Authority's property." (Ibid. at 8) In reaching this conclusion, the Board cited several factors, i.e. that the internal pattern of wage increases was "not a meager one" and that it did not include any major loss of benefits for the organization's members. The Board also noted that it was "beyond dispute" that the carrier suffered from severe economic difficulties. Finally, the Board commented that its adherence to the pattern of wage settlements did not preclude economic adjustments in other areas.

In PEB 246, the parties agreed that the internal pattern already established by 15 of the 17 unions representing SEPTA employees should be given controlling weight, disagreeing only on which proposal most closely followed and fully monetized the pattern. In applying the general wage increase agreed to by the majority of the organizations, the Board also reflected on when deviations from a pattern would be appropriate:

> The finding of pattern does not mean that deviations may not be recommended or bargained when appropriate. In fact, the parties have cited instances in which one or more unions representing SEPTA's workers have proposed a different economic distribution of the wage benefits for a new collective bargaining agreement. Moreover, as PEBs have recognized, there are times when one craft or another is subject to new legal obligations which may warrant a departure from the pattern. Neither of those circumstances applies in this instance, however.

(PEB 246 at 13)

The Organization here cites the recommendation in PEB 243 as an example of a PEB not following a pattern. The Board there declined to characterize as a pattern the earlier UTU settlement relied on by the carriers, a settlement with a single union involving a minority of the unionized workforce, and instead analyzed the proposals on their merits. Its ultimate

recommendation, however, did in fact follow the full value of the UTU contract. As the Board wrote:

> As for the variance between the wages that we recommend and those provided by the UTU settlement, we find that the Carriers' proposal failed to appropriately adapt and fully monetize certain integral parts of the overall bargain reflected therein….For the two bargains to be comparable as fair and appropriate resolutions, the costs to the Carriers and the benefits to the affected members as a group need not be exact, but should be roughly equivalent.

(PEB 243 at 22)

Taking into consideration the many years of PEB precedent, we agree with the Carrier that a strong pattern such as the one here must be given great if not controlling weight. Stability and predictability in railroad labor relations are of paramount importance. As PEB 176 described in its report, we recognize the frustration of the Organization at being required to accept a general wage increase negotiated at a table at which they were not represented. However, as characterized by PEB 186, "The Board does believe that maintenance of coordinated bargaining in this industry not only is in the public interest, but is essential to the welfare of employees and carriers alike. To revert back to the days of continual crisis bargaining between the Carriers and thirteen or more unions, each seeking to piggy-back and improve upon the gains made by others, is unthinkable." (PEB 186 at 8-9) If the Organization here were granted the significant increase it is demanding, there can be no question that the impact on the other organizations would be immediately and profoundly disruptive. At the very least, it could be argued that such an agreement could result in the reopening of most of the other collectively bargained agreements pursuant to their "me, too" agreements.

Given our conclusions discussed below that the Organization has failed to prove that the pattern settlement is not reasonable, we do not need to decide whether the NJTRO could afford the adjustment urged by the Organization. In short, however, we observe that granting the increase

could have an unsustainable fiscal impact on the Carrier, both in and of itself and particularly in light of the potential claims of all of the other organizations for a similar increase. As a public corporation, NJT's expenses must be paid for through a combination of public funding—both state and federal—and fares, tolls, and other operating income. Adopting the BLET proposal would increase NJTRO's labor costs over the NJTRO proposal by $31.1 million for the period from FY21 and FY25, most payable retroactively, not including the potential reopening of the other organizations' contracts. NJT does not have either surplus or discretionary funding to cover this additional cost, nor does it have borrowing authority for this type of additional expense. There is no question that such an unanticipated expense could lead to fare increases and serious service reductions, with possible resultant job loss.

As discussed by PEB 243 when considering the applicability of the wages agreed to by the UTU, "The UTU Agreement is plainly entitled to weight as a benchmark of what constitutes one fair and appropriate bargain." (PEB 243 at 23) That Board noted that UTU was the largest organization, representing around 30% of the unionized workforce; there was hard bargaining that led to the agreement; the agreement was ratified by the UTU membership; the agreement was reached at the same time that the organizations and the carriers before that PEB were bargaining; the issues of productivity and profitability were the same; the issues regarding real wage growth and inflation were the same; the weight accorded to settlements being reported from collective bargaining agreements bargained elsewhere in the industry and other relevant trends were also the same; and the employees represented by the UTU were much more closely related to the employees represented by the other freight rail organizations than to employees who work at Amtrak, commuter rail carriers, or other employers in and outside the transportation industry. For all those same reasons, we find that the pattern settlement agreed to by the other 14 organizations

at NJTRO is plainly entitled to great weight as a benchmark of what constitutes a fair and appropriate bargain here, not merely a factor co-equal with the other factors raised by the Organization.

We do not simply apply the pattern lockstep without further analysis, however, because we find that the Organization has failed to successfully rebut the presumption that the pattern is a fair and appropriate settlement, with an exception as discussed below.

The Organization advances two primary arguments as to why the pattern should not be imposed, one of which applies primarily, but not uniquely, to its craft and one of which applies equally to all employees at NJTRO. The first argument is that the engineers at NJTRO are paid significantly and increasingly less than their counterparts at the other major commuter railroads in the country. It is not disputed that unionized employees at NJTRO—engineers and the other crafts—are paid generally less than at many of the major commuter railroads, particularly Caltrain and Metrolink in California and MARC in Maryland. They are also paid generally more than employees at some other railroads, such as SEPTA in Philadelphia. As did PEB 248, we find that to the extent that any comparators outside of NJTRO are relevant, those in the Northeast close to New Jersey (PATH, LIRR, Metro-North, and SEPTA) are clearly the most relevant.

Even among those properties, it is difficult to draw conclusions from the disparity in base wage rates. It is obvious that the value of a contract to its covered employees will vary according to the cost of living in the relevant area. The Carrier has submitted evidence that the cost of living in Long Island, for example, is much higher than that in New Jersey, particularly southern New Jersey. In view of the limited evidence in the record before us, we cannot reach any clear conclusions as to how the base wage of the engineers in New Jersey compares in its purchasing power with, for example, the base wage of engineers on LIRR, PATH, or Metro-North.

31

There is some record evidence that the wages and benefits for engineers at NJTRO are now sufficient to entice applicants for engineer positions, despite higher base wages being offered at other nearby properties. We note that the Organization, in its first letter to the NMB asking to be released from mediation, wrote that the Carrier was having trouble recruiting engineers because of the relatively lower wages paid to engineers at NJTRO. The evidence presented at the hearing, however, suggested that NJTRO is no longer experiencing such difficulty and in fact has what it described as a "deep bench" of applicants awaiting training and eventual employment as engineers. Thus, any disparity between the base wages paid by NJTRO and those paid by comparable regional commuter railroads does not now seem to be resulting in a reluctance of prospective employees to apply for NJTRO engineer jobs. As the Board in PEB 231 held, "[I]t is not clear that there currently exists a marketplace need for wage adjustments beyond the pattern in this round of negotiations." (PEB 231 at 8)

Another challenge we encountered in evaluating the Union's disparity argument is that comparing only base wages does not give a full picture of the full value enjoyed by the workers under the collective bargaining agreements. The value of pension benefits; health and welfare plans; holidays, vacation and other paid time off; and myriad work rules can obviously have a large impact on how much a contract is worth to its covered employees and how much a contract costs its carrier. Neither party here provided any analysis of the full cost and value of the agreement at NJTRO compared to those at the other commuter railroads. As a result, our ability to determine the extent to which NJTRO engineers may be undercompensated relative to their counterparts at other regional commuter railroads is limited.

With those caveats, we have considered the evidence submitted by the Organization to show that the base wages for engineers at NJTRO have lagged behind those of engineers elsewhere

and that this disparity has grown. According to the Organization, under NJTRO's proposal, its engineers would fall short of the average base wage rates of eight other major rail commuter lines by $6.70 or 14.5% as of July 2024, and by July 2025, the gap would grow to more than 15.2% or $7.20 per hour. When comparing NJTRO engineer wages only with the average base wage rates of the four regional commuter railroads, however, it appears from the exhibits submitted by the Organization that the NJTRO engineers would fall short of the average by $3.78 per hour or 7.57% as of July 2024, and by July 2025, the gap would grow to 7.87% or $4.06 per hour. Thus, it appears that when compared within the region, the disparity, while present, may not as be large nor increasing as quickly as the Organization contends.

The Organization urges this Board to also consider recent settlements reached at Caltrain, MBTA, Keolis (operator of Virginia Railways Express), and Amtrak. For the same reasons noted above, we find that these comparisons are less relevant than the regional commuter rail wages and settlements. In addition, most of the contracts cited had amendable dates two or three years after the amendable date here. Further, the exhibits presented by the Organization do not include needed details about other contract provisions that could affect the value of the contracts to the covered employees and the cost to the carriers. More relevant are wage increases for engineers at PATH, (2.5% for Contract Year (CY) 2020, 2.5% for CY 2021, 3% for CY 2022 and 2.5% for CY 2023), SEPTA (2% for CY 2020, 3% for CY 2021, and 3.5% for CY 2022), and LIRR (2.25% for CY 2020, 2.5% for CY 2021, and 3.57% for CY 2022).

It is clear from the record that this disparity between NJTRO engineer wages and the wages at other regional commuter railroads is not new. The evidence submitted by the Organization reflects a disparity going back at least to 2003. Interestingly, the exhibits presented by the Organization seem to show that, over the past 20 years, the engineers at NJTRO have gained more

in wages, as a percentage, than the engineers at PATH, LIRR, and MNCR. Engineer wages at NJTRO increased 85% from 2003 to 2025 (using the current management proposal) while engineer wages at PATH increased 76%, engineer wages at LIRR increased 83%, and engineer wages at MNCR increased 82%. (Engineer wages at SEPTA increased 95% over that same period, more than at NJTRO, but remain the lowest in the region.)

In addition, the argument regarding the disparity between NJTRO wages and comparator wages also applies, and has applied at least since 2003, to some degree to all the other organizations on this property, even with the pattern increases. In 2022, for instance, SMART base wages were almost 10% lower than the average at the other major commuter rails (compared with BLET's being almost 14% lower). There is no evidence in the record about the disparity between the SMART base wages at NJTRO and the four regional commuter railroads to compare with the 7.5% disparity in 2024 between the NJTRO engineer wages and those same regional railroads. Therefore, we do not conclude that the disparity argument is one that is unique to BLET such that it justifies a deviation from a pattern so clearly established.

The Organization also argues that the pattern should not be applied here because it would result in a loss of real wages over the life of the contract. In calculating the wage gain or loss, the Organization uses the nationwide CPI-W and concludes that, when adjusted for inflation, under the BLET's proposal, engineers' real wages would climb by 7.5% over the 7½-year term of the Agreement or 1.0% per year. By contrast, the Organization argues, NJTRO proposes to cut real pay by 6.4% or 0.9% per year of the contract. The Carrier, on the other hand, argues that it would be more appropriate to assess NJTRO wages in light of the regional New York-Newark-Jersey City-Pennsylvania CPI-W index, pursuant to which the real wage loss over the 7½ years would be 3.8%, not 6.4%.

Organization witness Thomas Roth, President of the Labor Bureau, Inc., in his argument as to why the regional CPI-W is not valid, testified that unless it can be "demonstrate[d] that locomotive engineers [at NJTRO] are exposed to those changes in the cost of living in areas where we don't live [i.e. the NYC boroughs, Long Island, Westchester]," then the NY consolidated metropolitan fiscal area CPI is invalid. He later acknowledged, however, that neither the national nor the regional CPI-W better estimates the impact of inflation on the engineers who live in New Jersey.

We agree with the Carrier that the regional inflation index would come closer to reflecting the economic reality for NJTRO's employees than would the nationwide index. We think it reasonable to assume that NJTRO's employees shop and drive and rent and go to the doctor close to where they live, which is not going to be in California or Florida or Illinois, but could be in New York City and its environs as well as in New Jersey. While even the NY-Newark-Jersey City-Pennsylvania index is imperfect, it is the most relevant index in the record before us.

Prior PEBs have generally considered whether the pattern terms agreed to by other unions would have disparate or inequitable effect on the members of the union(s) before them. Here, it is undisputed that the Carrier's proposals, whether for a 4½-year or a 7½-year contract, would result in a real wage loss for all the employees, not just the engineers. Much of the high inflation that led to this result came in the fiscal/contract year July 2021-July 2022, when the regional CPI-W increased by 6.8%. This spike and the inflation that was to follow were largely unknown to the organizations that accepted the Carrier's proposal in November 2021. BLET now has the benefit of hindsight in knowing what happened to prices during the period from 2020 to 2024. If the Organization here is given an increase that would cover the increase in the cost of living that was unknown to the other organizations when they received their increases, would the other

organizations be entitled to a greater catch-up increase in the next contract than would this Organization?

We are reluctant to recommend a pattern-breaking increase in this contract based on factors unknown to the other organizations at the time they accepted the Carrier's proposal. Such a recommendation could have the future effect of encouraging organizations to delay reaching agreement so as to ensure an agreement that, in hindsight, outpaced inflation. We are also reluctant, however, to recommend a contract that leads to a loss in real wages for the engineers. PEB 248 noted the importance of basing its recommended wage increase on the goal of providing "for sensible growth in real wages that is not significantly in excess of the projected rate of inflation" and noted that the parties had not agreed to a contract that resulted in real wage loss at least over the previous seven bargaining cycles.

To resolve this dilemma, we recommend the acceptance of the pattern agreement general wage increases in the Carrier's July 25, 2023 proposal, but further suggest that the Parties agree now on a 6% increase to be effective after the amendable date of the 7½-year contract, an increase designed to partly ameliorate the 3.8% loss in wages in the previous years in addition to providing an increase to respond to ongoing inflation. We craft this recommendation based on a similar recommendation made by PEB 243. This increase would be optional in the sense that it may be elected by the Organization or not. If the July 1, 2027 6% GWI is elected, then we recommend that the Agreement contain the following language in a Side Letter:

> This will confirm our understanding that if disposition of the 2027 Bargaining Notices is referred to any third party (including but not limited to a Presidential Emergency Board or arbitration board), this Letter may be provided to such body to confirm the parties' mutual understanding that acceptance of the July 1, 2027 6% general wage increase was intended to constitute a complete resolution of the compensation adjustment issue for contract year 2027-2028.

36

As in PEBs 237 and 246, we also recommend that the engineers receive a cents per hour increase over and above the pattern settlement, retroactive to the effective date of this contract, if necessary to maintain the 10.4% differential between the conductor and the engineer rates that has been agreed to by the Parties for over 40 years pursuant to the Letter of Agreement dated December 29, 1982 and modified June 18, 2018.

In addition, we recommend that the wage proposal be applied with full retroactivity, calculated and paid in accordance with the usual practices of the Parties.

In light of the length of time that has elapsed since the other organizations began to receive the general wage increases and the retroactivity payments and the corresponding period of time in which they, and NJTRO, have had use of the money, we recommend that BLET members receive an additional $3000, payable in two lump sums. In making this recommendation, we have taken particular cognizance of the delays in the negotiation and mediation process and the number of times the Organization requested release from mediation, only to have the request objected to by the Carrier, even though the Carrier's position on the main issue in dispute was unwavering. Thus, this recommendation is based on circumstances unique to this Organization and this round of bargaining. The detail regarding payment of the lump sum payments and eligibility therefor should be governed by the usual practice and custom of the parties regarding eligibility for and payment of similar lump sum payments.

We also recommend that the Parties continue to meet to discuss whether any work rule concessions on the part of the Organization could be used to increase their base wages without breaking the pattern. In its Report, PEB 246 noted that SEPTA acknowledged that a union might negotiate terms in addition to the pattern settlement if the union chose to make concessions or find ways to fund other contract terms that SEPTA and the union could agree upon. PEB 176 wrote:

This conclusion [i.e. adherence to the pattern], however, only emphasizes the need for further bargaining with regard to wages increases which, because they would be based on factors peculiar to the shopcrafts, would not break the established pattern. One such avenue to special increases lies in the negotiations now in progress in the work rule area… To the extent and degree mutually satisfactory modifications of rules are negotiated, appropriate wage adjustments could be made. Wage increases justified by modifications in rules which, through improved organization of work, contribute to efficiency, productivity, and cost reduction would not be incompatible with earlier wage settlements.

(PEB 176 at 8)

PEB 186 wrote:

In light of the views there expressed, the Board cannot accept the substantial increases over the "pattern" which BRAC proposes for its members. It does not follow, however, that the precise pattern formula must be slavishly adhered to in order to safeguard the pattern principle. What matters here is not the precise formula, but the maintenance of the principle that the members of one organization, viewed as a whole, shall not be treated more advantageously than the members of the other organizations, viewed as a whole, who have established the pattern. Thus, if BRAC prefers to breakdown the 5% across-the-board increase of October 1, 1975, into a flat $0.31 per hour increase for all of its members, instead of asking, say, for a $0.35 per hour increase for some higher-rated members and a $0.25 per hour increase for other lower-rated members, as would be the case with a straight percentage increase, it may do so without breaking the pattern, provided the cost is the same.

(PEB 186 at 10)

Here, too, we recommend that the Parties continue to seek to find such areas of agreement that could lead to wage increases not inconsistent with the pattern.

## VI. SUMMARY OF RECOMMENDATIONS

**General Wage Increases**

| Effective Date | Increase |
|:---:|:---:|
| 7/1/2020 | 2.00 % |
| 7/1/2021 | 2.25 % |
| 1/1/2022 | 2.25 % |
| 7/1/2022 | 2.50 % |
| 7/1/2023 | 3.00 % |
| 7/1/2024 | 3.00 % |
| 7/1/2024 | Lump Sum $1500 |
| 1/1/2025 | Lump Sum $1500 |
| 7/1/2025 | 3.00 % |
| 7/1/2026 | 3.00 % |
| Amendable Date: July 1, 2027 | |
| 7/1/2027* | 6.0 % |

\* Notwithstanding the 6% increase to take effect on July 1, 2027, wages for 2027 after the amendable date are an open subject for bargaining, but if wages for 2027 after July 1 are ultimately not resolved, then the Parties agree to provide a letter to the neutral body (including any interest arbitration or any subsequent PEB) to confirm the mutual understanding of the Parties that the 6% wage increase was intended to resolve completely the compensation adjustment issue for July 1, 2027 to June 30, 2028.

Nominal wage rate increase of 21%, uncompounded, over a 7½-year term, plus an additional 6% increase effective July 1, 2027.

**Retroactivity**

Retroactive to the effective date of the Agreement, January 1, 2020. Two $1500 lump sums.

**Conductor/Engineer Differential**

Cents per hour increase if necessary to maintain the 10.4% differential between the engineers' rate and the conductors' rate.

**Work Rules**

Parties to meet to discuss other possible work rule changes that could result in increases to the engineer base wage rate.


## VII. CONCLUSION

In closing, the Board gratefully acknowledges the counsel and professional assistance rendered by Angela Heverling and Andres Yoder of the National Mediation Board throughout this process.

Respectfully submitted,

_____
Elizabeth C. Wesman, Chairman

_____
Barbara C. Deinhardt, Member

_____
Lisa Salkovitz Kohn, Member

Appendix A

EXECUTIVE ORDER

- - - - - - -

ESTABLISHING AN EMERGENCY BOARD TO INVESTIGATE
A DISPUTE BETWEEN NEW JERSEY TRANSIT RAIL OPERATIONS
AND ITS LOCOMOTIVE ENGINEERS REPRESENTED BY THE
BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN

A dispute exists between the New Jersey Transit Rail Operations and its Locomotive Engineers represented by the Brotherhood of Locomotive Engineers and Trainmen.

The dispute has not heretofore been adjusted under the provisions of the Railway Labor Act, as amended, 45 U.S.C. 151- 188 (RLA).

A party empowered by the RLA has requested that the President establish an emergency board pursuant to section 9A of the RLA (45 U.S.C. 159a).

Section 9A(c) of the RLA provides that the President, upon such request, shall appoint an emergency board to investigate and report on the dispute.

NOW, THEREFORE, by the authority vested in me as President by the Constitution and the laws of the United States, including section 9A of the RLA, it is hereby ordered as follows:

Section 1. Establishment of Emergency Board (Board). There is established, effective 12:01 a.m. eastern daylight time on July 25, 2024, a Board composed of a chair and two other members, all of whom shall be appointed by the President to investigate and report on the dispute. No member shall be pecuniarily or otherwise interested in any organization of railroad employees or any carrier. The Board shall perform its functions subject to the availability of funds.

Sec. 2. Report. The Board shall report to the President with respect to the dispute within 30 days of its creation.

Sec. 3. Maintaining Conditions. As provided by section 9A(c) of the RLA, for 120 days from the date of the

41

Appendix A

2

creation of the Board, no change in the conditions out of which the dispute arose shall be made by the parties to the controversy, except by agreement of the parties.

Sec. 4. Records Maintenance. The records and files of the Board are records of the Office of the President and upon the Board's termination shall be maintained in the physical custody of the National Mediation Board.

Sec. 5. Expiration. The Board shall terminate upon the submission of the report provided for in section 2 of this order.

THE WHITE HOUSE,

    July 24, 2024.

42

# EXHIBIT E

NOVEMBER 21, 2024

# Executive Order on Establishing a Second Emergency Board to Investigate a Dispute Between New Jersey Transit Rail Operations and Its Locomotive Engineers Represented by the Brotherhood of Locomotive Engineers and Trainmen

A dispute exists between the New Jersey Transit Rail Operations and its Locomotive Engineers represented by the Brotherhood of Locomotive Engineers and Trainmen.

The dispute has not heretofore been adjusted under the provisions of the Railway Labor Act, as amended, 45 U.S.C. 151-188 (RLA).

An emergency board to investigate and report on the dispute was established on July 25, 2024, by Executive Order 14125 of July 24, 2024 (Establishing an Emergency Board to Investigate a Dispute Between New Jersey Transit Rail Operations and Its Locomotive Engineers Represented by the Brotherhood of Locomotive Engineers and Trainmen). That emergency board terminated upon submission of its report to the President. Subsequently, its recommendations were not accepted by the parties.

A party empowered by the RLA has requested that the President establish a second emergency board pursuant to section 9A of the RLA (45 U.S.C. 159a).

Section 9A(e) of the RLA provides that the President, upon such request, shall appoint a second emergency board to investigate and report on the dispute.

NOW, THEREFORE, by the authority vested in me as President by the Constitution and the laws of the United States, including section 9A of the RLA, it is hereby ordered as follows:

Section 1.  Establishment of a Second Emergency Board (Board).  There is established, effective 12:01 a.m. eastern standard time on November 22, 2024, a Board composed of a chair and two other members, all of whom shall be appointed by the President to investigate and report on the dispute.  No member shall be pecuniarily or otherwise interested in any organization of railroad employees or any carrier.  The Board shall perform its functions subject to the availability of funds.

Sec. 2.  Report.  As provided by section 9A(f) of the RLA, within 30 days after the creation of the Board, the parties to the dispute shall submit to the Board final offers for settlement of the dispute.  As provided by section 9A(g) of the RLA, within 30 days after the submission of final offers for settlement of the dispute, the Board shall submit a report to the President setting forth the Board's selection of the most reasonable offer.

Sec. 3.  Maintaining Conditions.  As provided by section 9A(h) of the RLA, from the time the request to establish the Board is made until 60 days after the Board submits its report to the President, the parties to the controversy shall make no change in the conditions out of which the dispute arose except by agreement of the parties.

Sec. 4.  Records Maintenance.  The records and files of the Board are records of the Office of the President and upon the Board's termination shall be maintained in the physical custody of the National Mediation Board.

Sec. 5.  Expiration.  The Board shall terminate upon the submission of the report to the President provided for in section 2 of this order.

JOSEPH R. BIDEN JR.

THE WHITE HOUSE,

November 21, 2024.

# EXHIBIT F



# NATIONAL MEDIATION BOARD
## WASHINGTON, D.C. 20572

(202) 692-5000

September 13, 2024

Regine C. Grice
Director, Labor Relations
New Jersey Rail Operations, Inc. (NJT)
One Penn Plaza East
Newark, NJ  07105

Thomas F. Haas
General Chairman
Brotherhood of Locomotive Engineers (BLET)
200 W Webster Avenue, Apt. C8
Roselle Park, NJ 07204

Michael D. Phillips
P.O. Box 15943
Chevy Chase, MD, 20825

RE:    Special Board of Adjustment No. 940 New New Jersey Rail Operations, Inc.
(NJT) and Brotherhood of Locomotive Engineers and Trainmen (BLET)
(Cases 397-400)

Dear Ms. Grice and Mr. Haas and Mr. Phillips:

The Office of Arbitration Services of the National Mediation Board (NMB) has
received your request to allow Arbitrator Michael D. Phillips to work on the above
listed cases.  The request is approved.

The cases will be placed in the Arbitrator Workspace for selection by the arbitrator.

The parties and the arbitrator are notified that within sixty (60) days of the
assignment of the cases, one of the following actions must have occurred:

1.  The cases have been decided and awards submitted;
2.  The cases have been heard by the arbitrator; or
3.  The cases have been scheduled for a hearing.

It is the responsibility of the arbitrator to enter the hearing date in the Arbitrators' Workspace Space (AWS).  The actual date of the hearing must be within 120 days of the date of the assignment.  This means that the parties and the arbitrator must conduct the hearing within 120 days of the date of assignment.  Once the cases have been heard, the arbitrator must render the awards within 90 days of the hearing.

If no action has been taken by the arbitrator within 60 days, the cases will be unassigned.  Due to the large number of cases and limited staff, this is the only communication that you will receive concerning this matter.  Arbitrators are encouraged to check their caseload in the AWS on a daily basis.

Any questions must be directed to Elijah Crayton at 202-692-5055 or arb@nmb.gov.

Sincerely,

Terri D. Brown
Director, Office of Arbitration Services

cc: Denise Murdock, Office of Fiscal Services, NMB

# EXHIBIT G

# JacksonLewis

**Jackson Lewis P.C.**
200 Connell Drive
Suite 2000
Berkeley Heights, NJ 07922
Phone: 908-795-5200
jacksonlewis.com

DOUG E. SOLOMON
EMAIL: DOUG.SOLOMON@JACKSONLEWIS.COM
DIRECT LINE: (908) 795 2970

September 17, 2024

**VIA EMAIL**
Loren E. Sweatt
Chair, National Mediation Board
Washington, DC 20572
E-mail: loren.sweatt@nmb.gov

      Re:      <u>SBA No. 940 (Case #397) – NJTRO and BLET (10.4% Grievance)</u>

Dear Chairman Sweatt,

        I am Counsel to NJ Transit Rail Operations, Inc., ("Carrier") in the above-referenced proceeding. On behalf of the Carrier, the purpose of this correspondence is to respectfully request that Case No. 397 be held in abeyance pending the resolution of a major dispute that is pending between the parties.

        The collective bargaining agreement ("CBA") between the parties became renewable on January 1, 2020, and the negotiation of a successor agreement has not yet been resolved. The parties were engaged in mediation seeking to resolve the dispute, but in June 2024 the National Mediation Board ("NMB") served notice on the parties that they were released from mediation under Section 5, First of the Railway Labor Act ("RLA"). At the request of the Carrier, President Biden created Presidential Emergency Board ("PEB") No. 251 effective July 25, 2024. PEB 251 held hearings and issued a Report to the President dated August 23, 2024. A copy of the Report of PEB 251 is attached for your review.

        To date, the parties have not reached an agreement and are scheduled for a public hearing on Friday, September 20, 2024 at the National Mediation Board in Washington, DC. Should this dispute not be resolved, the parties will be the subject of a second PEB (PEB 252) later this year. Given the goals of the Railway Labor Act and the current status of this as a major dispute, the Carrier respectfully requests that any arbitration of the BLET's dispute over the 10.4% grievance be held in abeyance until the issues addressed in PEB 251 (and the subjects likely to be at issue in PEB 252) are resolved. The 10.4% differential between the conductor and engineer rates is one of those issues.

        Carrier notes that one of the recommendations of PEB 251 expressly relates to the 10.4% differential that is at issue in Case No. 397. On page 39 of the Report to the President, PEB 251 directly addresses the "Conductor/Engineer Differential" and recommends: "Cents per hour increase if necessary to maintain the 10.4% differential between the engineers' rate and the conductors' rate." To the extent that this is part of the settlement recommended by PEB 251, it is a continuing subject of negotiations between the parties as they try to resolve this major dispute

# JacksonLewis

without a work stoppage.  On September 16, 2024, the NMB e-mailed the parties suggesting continued mediation with the NMB to try to resolve this major dispute.  Having an arbitration decision that relates directly to one of PEB 251's recommendations for settlement could have a detrimental impact on the mediation efforts of the parties.

Alternatively, the arbitration should be held in abeyance because the dispute itself is a Major dispute that is inappropriate to be heard by an Arbitration Board.  The dispute seeks to have Carrier change the status quo during the pendency of a Major dispute.  The parties are in the midst of a very crucial part of the Major dispute.  PEB has already issued a Report, and the parties are likely headed to a second PEB as they seek to resolve the dispute over the CBA.  Not only does the BLET's 10.4% grievance unlawfully seek to require Carrier to make a change to the status quo during the crucial portion of this major dispute in violation of the RLA, but the grievance itself is a component of the major dispute (See page 39 of PEB 251, which lists the 10.4% differential as one of the components of the PEB's proposed resolution to the dispute).  Moreover, the grievance is precluded from arbitration by Rules 45(k) and 45(l) of the parties CBA (attached).  Accordingly, the dispute itself is not appropriate for SBA 940 or any Arbitration Board.

For the reasons set forth herein, we respectfully request that the NMB hold the arbitration of this dispute (Case No. 397) in abeyance pending resolution of the major dispute between the Carrier and the BLET in accordance with the collective bargaining process specifically prescribed in the Act.  Having this dispute potentially crater the possibility of resolving the major dispute over the CBA is contrary to the purposes of the RLA, as is having a major dispute be subject to the jurisdiction of an Arbitration Board.  We thank you for your consideration of this request.

Respectfully submitted,
JACKSON LEWIS P.C.


s/ *Doug Solomon*
Doug Solomon

Enclosure

Cc:    D. Hamilton, NMB Board Member
       L. Puchala, NMB Board Member
       C. Beebe, Director of Mediation Services, NMB
       T. Brown, Director of Arbitration Services, NMB
       K. Dowling, General Counsel, NMB
       T. Haas, General Chairman, BLET GCA
       D. Murdock, Office of Fiscal Services, NMB
       M. Phillips, Neutral Chair, SBA 940

# EXHIBIT H



# NATIONAL MEDIATION BOARD
### WASHINGTON, D.C. 20572

(202) 692-5000

September 19, 2024

**VIA EMAIL**
Doug E. Solomon
Jackson Lewis P.C.
200 Connell Drive, Ste. 200
Berkeley Heights, NJ 07922

Re: SBA No. 940 (Case #397) – NJTRO and BLET (10.4% Grievance)

Mr. Solomon:

Thank you for your September 17, 2024 letter.  The Board has asked me to respond to your request that the National Mediation Board (NMB) hold Case No. 397 of Special Board of Adjustment No. 940 in abeyance pending the resolution of the dispute between New Jersey Transit Rail Operations (NJTRO) and the Brotherhood of Locomotive Engineers (BLET). It is my understanding that this case was funded on September 13, 2024.

The NMB's role under Section 3 of the Railway Labor Act (RLA) is a ministerial one.  Unlike its statutory authority to investigate representation disputes or its exhaustive power over mediation, its authority over Section 3 is limited to docketing cases, creating Public Law Board (PLBs) and Special Boards of Adjustment (SBAs) upon the parties' request and compensating the neutral arbitrators. It also has the authority to make certain appointments to the National Railroad Adjustment Board (NRAB), and to select arbitrators in some situations. *Radin v. National Mediation Board*, 699 F.2d 681, 685 (4th Cir. 1983). The NMB does not determine whether cases are appropriate for particular boards and most matters related to appealing minor disputes are addressed in the agreements establishing PLBs and SBAs.

The appropriateness of a case for a particular board is a matter for the parties to the agreement establishing that board. Additionally, issues related to a resolution or remedy in a case are best left to the members of the board.

For these reasons, the NMB does not have the authority to grant your request to hold Case No. 397 in abeyance.

Sincerely,

Marie-Kate Dowling
General Counsel

# EXHIBIT I

| | |
|---|---|
| **From:** | Solomon, Douglas E. (Berkeley Heights) |
| **Sent:** | Friday, September 20, 2024 3:47 PM |
| **To:** | michaeldphillipsarb@gmail.com |
| **Cc:** | Tom Haas; Mcgreal, Patrick J. (CROPPJM) |
| **Subject:** | SBA No. 940 (Case #397) – NJTRO and BLET (10.4% Grievance) |
| **Attachments:** | 09-19-24 NMB Response - Hold 10.4 in Abeyance.pdf; 09-17-24 Letter to NMB - hold arbitration in abeyance.pdf |

Dear Arbitrator Phillips,

I am Counsel for NJ Transit Rail Operations, Inc. ("Carrier") in the above-referenced proceeding. As you are aware, on September 17, 2024, Carrier sent the attached correspondence to the National Mediation Board ("NMB") seeking to have Case No. 397 be held in abeyance pending resolution of a major dispute that is pending between the parties. Our reasoning for seeking to have the matter held in abeyance is fully set forth in the attached letter to the NMB.

Yesterday, the NMB responded to Carrier's request and indicated that it is not the appropriate entity to make the determination as to holding the proceeding in abeyance given the limited role that the NMB has pursuant to Section 3 of the Railway Labor Act ("RLA"). A copy of the letter from the NMB is attached hereto. To be clear, the NMB did not reject or rule upon the substance of Carrier's request. Rather, the NMB indicated that issues such as this one "**are best left to the members of the board**." Accordingly, the Carrier turns to you, as the neutral member of SBA No. 940 to respectfully request that Case No. 397 be held in abeyance pending resolution of the major dispute between the parties in accordance with the collective bargaining process specifically prescribed in the Act. The other members of SBA 940 (Thomas Haas and Patrick McGreal) are copied on this e-mail.

Carrier repeats and reiterates all of the bases for holding this proceeding in abeyance that were fully set forth in the September 17, 2024 correspondence to the NMB. Having this dispute potentially disrupt or destroy a possible resolution of the major dispute over the CBA is contrary to the purposes of the RLA, as is having a major dispute be subject to the jurisdiction of the Arbitration Board.

Thank you for your consideration of this very impactful and important request. If you have any questions, I am glad to jump on a phone call with you to discuss the matter and can be reached at (917) 502-4713.

# EXHIBIT J

**Subject:**                    SBA 940_BLET Available Dates

**From:** Michael Phillips <michaeldphillipsarb@gmail.com>
**Sent:** Sunday, October 6, 2024 3:49:17 PM
**To:** Louis, Jim <louis@ble-t.org>
**Cc:** McGreal, Patrick J. (CROPPJM) <PMcgreal@njtransit.com>
**Subject:** Re: FW: SBA 940_BLET Available Dates

> **CAUTION:** This e-mail originated from outside of NJ TRANSIT. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good afternoon gentlemen - after reviewing the documentation previously submitted to the NMB, as well as the agreement provision pertaining to establishment of the board, I do not see anything that would justify deviation from the NMB rules for scheduling hearings.  If there is any dispute as to whether any of the cases on the docket are proper subjects for arbitration under Rule 45, the parties can address those matters in their written submissions and oral arguments.

In view of the availability of the Organization and me, I request that the parties promptly agree on a date in December other than December 4, 5, 6, 12 or between the holidays.  As soon as you advise me of that date, I will update the NMB system accordingly.

I prefer to receive the parties' written submissions 10 days prior to the hearing.  Unless one of the parties prefers a different platform, I will send out a Zoom invitation a week before the hearing.  I look forward to working with you both.  Thanks.  Mike Phillips

# EXHIBIT K

**Subject:**                    SBA 940_BLET Available Dates

**From:** Michael Phillips <michaeldphillipsarb@gmail.com>
**Sent:** Wednesday, October 9, 2024 1:19:18 PM
**To:** McGreal, Patrick J. (CROPPJM) <PMcgreal@njtransit.com>
**Cc:** Louis, Jim <louis@ble-t.org>
**Subject:** Re: SBA 940_BLET Available Dates

> **CAUTION:** This e-mail originated from outside of NJ TRANSIT. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Either of those dates work for me and they are within the NMB time lines.  Let's plan for January 9.  I am on Eastern time, but if Jim is on Central time, we can start at 9 Central.  Thanks.  Mike Phillips

On Wed, Oct 9, 2024 at 12:30 PM McGreal, Patrick J. (CROPPJM) <PMcgreal@njtransit.com> wrote:

Dear Mike,
I just got off the phone and discussed this with Jim.  Notwithstanding Carrier's objection that this forum is not the appropriate jurisdiction for deciding the major dispute in the Jim Brown (10.4%) claim and reserving all rights, I offer the following dates to hear the 4 cases which were funded by the NMB: Jan. 9 and Jan 10, 2025.  As the Organization knows, the Carrier is unavailable in December due to work on and attendance at PEB 252.  The PEB is projected to conclude hearings on 1/8/2025.
Pat


Get Outlook for iOS

# EXHIBIT L



# NATIONAL MEDIATION BOARD
### WASHINGTON, D.C. 20572
(202) 692-5000

November 29, 2024

**VIA EMAIL**

Rajiv D. Parikh, Esq.
Jennifer Roselle, Esq.
PEM Law LLP
One Boland Dr., Ste. 101
West Orange, NJ 07052
rparikh@pemlawfirm.com
jroselle@pemlawfirm.com

Joshua D. McInerney, Esq.
Christopher S. Peifer, Esq.
Wentz, McInerney, Peifer & Petroff, LLC
14 E. Gay St., Fl. 4
Columbus, Ohio 43215
jmcinerney@lawforlabor.com
cpeifer@lawforlabor.com

Re:     **Presidential Emergency Board 252**
        **Schedule and Ground Rules**

Dear Parties:

This letter establishes the schedule and ground rules set by Presidential Emergency Board (PEB or Board) 252.

**Preliminary Matters**

On December 18, 2024 and December 19, 2024, Chairman Jaffe will meet with the parties virtually for pre-hearing mediation. The start time for both days will be 9:00 AM ET. During the mediation sessions, the parties are expected to speak meaningfully about what their final offers will be. Chairman Jaffe will provide a Mediation Confidentiality Agreement before mediation begins to be signed by all who will participate.

**Final Offers**

Pursuant to §9a(f) of the Railway Labor Act, 45 U.S.C. §159a(f), the parties must submit final offers for settlement of the dispute to the Board by 5:00 PM ET on December 21, 2024. The parties should send their final offers in PDF format to all Board Members

November 29, 2024
Page 2

and Special Counsels, who will exchange the final offers for the parties. The decision to delay the start of the hearings to January was based upon the joint representations of Counsel that the final offers would be limited to the matters at issue in PEB No. 251 with the possible addition of items discussed during the pre-hearing mediation process.

## Communications with the Board

Preferred contact information for the Board Members, Special Counsels, and Counsel for the parties is attached.  All communications outside of hearings by parties to and from the Board will take place through Special Counsels and/or through the Chair.

## Hearing

Every effort will be made to schedule the hearings in New Jersey, with the precise hearing location to be provided to the parties upon confirmation. The hearing will be held January 5, 2025 through January 7, 2025. Parties should plan for the hearing to run each day from 8:30 AM ET to 5:00 PM ET—with a one-hour break for lunch, a 15-minute morning break, and a 15-minute afternoon break. Days may be extended to avoid meeting on January 7, 2025 or as otherwise necessary.

## Hearing Submissions and Deadlines

The parties have agreed to incorporate into the record in this case the entire record of proceedings before PEB No. 251, including copies of the transcript, the Report and Recommendations of that Board, and copies of the transcript of the parties' Public Hearing before the NMB following the issuance of the Report of PEB No. 251.

By January 2, 2025, 5:00 PM ET, the parties will send the Board and the Special Counsels electronic copies of their pre-hearing briefs, summaries of witness testimony, exhibits, and other demonstrative materials (in the appropriate electronic format); and exchange those documents with each other. No printed copies of any of the materials are needed by the Board, either for pre-hearing submissions or for use in the hearings themselves. PDF, Excel, or Word formats of these materials are acceptable.

By January 2, 2025, the parties will send the Board and the Special Counsels PDF copies of their proposed schedules, and exchange their proposed schedules with each other. The proposed schedules should identify witnesses and the expected times for their testimony. BLET will present its opening statement first, followed by NJT. BLET will then present its case, followed by NJT. The parties will be afforded an opportunity for rebuttal testimony at the January 5-7 hearings. The parties may request the opportunity to present further responsive evidence at the hearings after rebuttal. Written summaries of any rebuttal testimony should be submitted to the Board, to the Special Counsels, and to the opposing party in PDF format in advance. Following the introduction of evidence, the parties will be afforded an opportunity for closing statements with the BLET proceeding first, followed by NJT.

November 29, 2024
Page 3

By January 4, 2025 at 8:00 PM ET, the parties will send PDF copies of their opening statements to the Board and the Special Counsels, who will exchange the statements for the parties.

### Other Hearing Ground Rules

If any of the parties would like a witness to testify remotely during the hearing, they must make a request to the Board at least 24 hours before the witness is scheduled to testify,[1] along with a brief explanation of the reason for that testimony being presented remotely, and they must simultaneously notify the other side of the request.

The parties are limited to 20 attendees each, including attorneys, subject to available space. The hearing will be closed to the press. In addition, a ban on any audio and/or visual recording of any aspect of the hearing proceedings (other than as directed by the Board or required by the court reporter) will be strictly enforced.

Transcripts will be available from a court reporter. Additional information about transcripts will be provided as it becomes available. Efforts will be made to obtain next-day copy.

### Post-Hearing Matters

For two consecutive days between January 10, 2025 and January 12, 2025—with the exact dates to be determined—starting at 9:00 AM ET on each day, Chairman Jaffe will informally meet jointly and individually with each of the parties in person at the National Mediation Board's offices at 1301 K St., NW, Ste. 250E, Washington, DC 20005.

Please feel free to contact us should you have any questions.

Sincerely,

Angela Heverling
Special Counsel, PEB 252

Andres Yoder
Special Counsel, PEB 252

---

[1] Timely requests are critical for hearing equipment requirements and set-up.

November 29, 2024
Page 4


Copies to:
Ira F. Jaffe, Chair, PEB 252
Sidney S. Moreland, IV, Member, PEB 252
Thomas A. Pontolillo, Member, PEB 252

November 29, 2024
Page 5

## Contact Information

**PEB No. 252**

**Ira Jaffe**
11705 Roberts Glen Court
Potomac, Maryland 20854-2100
301-309-1441
irajaffe@gmail.com

**Sidney Moreland, IV**
1951 Cedardale Avenue
Baton Rouge, Louisiana 70808
225-343-8600
ArbitratorMoreland@icloud.com

**Thomas Pontolillo**
19032 Turkey Meadow Lane
Strongsville, Ohio  44136
440-212-3495
TPontolillo@labordisputesolutions.com

**NMB Special Counsels**

**Angela Heverling**
National Mediation Board
1301 K Street NW
Washington, DC 20005
202-695-9467
angela.heverling@nmb.gov

**Andres Yoder**
National Mediation Board
1301 K Street NW
Washington, DC 20005
202-738-6867
yoder@nmb.gov

**NJT**

**Rajiv D. Parikh**
PEM Law LLP
One Boland Dr., Ste. 101
West Orange, NJ 07052
973-585-5330
rparikh@pemlawfirm.com

**Jennifer Roselle, Esq.**
PEM Law LLP
One Boland Dr., Ste. 101
West Orange, NJ 07052
908-706-3213
jroselle@pemlawfirm.com

**BLET**

Joshua D. McInerney, Esq.
Wentz, McInerney, Peifer & Petroff, LLC
14 E. Gay St., Fl. 4
Columbus, Ohio 43215
614-312-0357
jmcinerney@lawforlabor.com

Christopher S. Peifer, Esq.
Wentz, McInerney, Peifer & Petroff, LLC
14 E. Gay St., Fl. 4
Columbus, Ohio 43215
937-307-9680
cpeifer@lawforlabor.com