Sanford R. Oxfeld
**OXFELD COHEN, P.C.**
60 Park Place, Suite 600
Newark, NJ 07102
Phone: (973) 642-0161
sro@oxfeldcohen.com

*Attorneys for Defendant BLET*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **NEW JERSEY TRANSIT RAIL OPERATIONS, INC.,** : | |
| : | **Civil Action No. 2:24-cv-11102** |
| : | **(CCC)(CLW)** |
| **Plaintiff,** : | |
| **v.** : | |
| : | |
| **BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN,** : | |
| : | |
| **Defendant.** : | |

## BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINTS AND <u>PRELIMINARY INJUNCTIVE RELIEF</u>

**TABLE OF CONTENTS**

INTRODUCTION..................................................................................................1

STATEMENT OF FATCS.....................................................................................1

ARGUMENT......................................................................................................10

I.  NJTRO CANNOT SUCCEED ON THE MERITS OF ITS CLAIM THAT BLET'S
    ATTEMPT TO ENFORCE ITS CURRENT CBA THROUGH THE MINOR DISPUTE
    PROCESS OF ARBITRATION UNDER THE RLA CONSTITUTES A MAJOR
    DISPUTE...............................................................................................10

    A.  "Major" and "Minor" Disputes Under the Railway Labor Act................................10

    B.  BLET Has, At Minimum, a Non-Frivolous Basis for its Interpretation of the CBA
        That the 10.4% Pay Differential Between Engineers and Conductors Must Be
        Maintained At All Times, Regardless of Whether the Parties Are in Negotiations
        Over Amendments to the CBA or
        Not.................................................................................................16

II. TO OBTAIN INJUNCTIVE RELIEF, NJTRO MUST SATISFY BOTH THE
    TRADITIONAL REQUIREMENTS AN INJUNCTION AND THE REQUIREMENTS
    OF THE NORRIS-LAGUARDIA ACT, WHICH IT CANNOT
    DO......................................................................................................23

    A.  The RLA and NLA Must Be Accommodated...............................................24

    B.  NLA Analysis....................................................................................25

    C.  Even When Accommodated to the RLA, the NLA Deprives the Court of
        Jurisdiction to Enjoin the 10.4% Pay Differential Arbitration........................26

    D.  Preliminary Relief Will Result in Greater Harm to the BLET and the Public Interest
        Disfavors Preliminary Relief.................................................................29

CONCLUSION....................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                                 <u>Page(s)</u>

*Airline Prof's. Ass'n v. ABX Air,* 400 F.3d 411 (6th Cir. 2005).......................................15

*Air Line Pilots Assoc., Int'l v. Eastern Air Lines, Inc.,* 869 F.2d 1518 (D.C. Cir. 1989)...............14

*Air Line Pilots Ass'n, Int'l v. Guilford Transp. Indus., Inc.,* 399 F.3d 89 (1st Cir. 2005)..............25

*Air Line Pilots Ass'n, Int'l v. UAL Corp.,* 897 F.2d 1394 (7th Cir. 1990).......................................1

*Akers Nat. Roll Co. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union,* 712 F.3d 155 (3d Cir. 2013)..................................................18

*Assoc. of Flight Attendants v. Mesa Air Group, Inc.,* 567 F.3d 1043 (9th Cir. 2009)....................14

*Ballew v. Cont'l Airlines, Inc.,* 668 F.3d 777 (5th Cir. 2012)....................................................11, 12

*Bhd. of Locomotive Eng'rs v. Atchinson, Topeka & Santa Fe Ry.,* 768 F.2d 914 (7th Cir. 1985)..13

*Bhd. of Locomotive Eng's & Trainmen v. Union Pac. R.R. Co.,* 879 F.3d 754 (7th Cir. 2017).....13

*Bhd. of Maint. of Way Emps. v. Atchison, Topeka & Santa Fe Ry.,* 138 F.3d 635 (7th Cir. 1997)........................................................................................13

*Bhd. of Maint. of Way Employes Div. v. Norfolk S. Ry. Co.,* 745 F.3d 808 (7th Cir. 2014)............14

*Bhd. of R.R. Trainmen v. Chicago R. & I.R.R. Co.,* 353 U.S. 30 (1957)................................24, 25

*Bhd. of R.R. Trainmen v. Howard,* 343 U.S. 768 (1952)...............................................................24

*Bhd. of R.R. Trainmen v. Toledo P. & W. RR,* 321 U.S. 50 (1944)................................................28

*Bhd. of Ry. Carmen v. Mo. Pac. R.R.,* 944 F.2d 1422 (8th Cir. 1991)..........................................15

*Bhd. of Ry. Carmen v. Norfolk & W. Ry. Co.,* 745 F.2d 370 (6th Cir. 1984)...........................11, 13

*Bidlack v. Wheelabrator Corp.,* 993 F.2d 603 (7th Cir. 1993)......................................................18

*Chicago & N.W. Transp. Co. v. Ry. Labor Execs. Ass'n,* 908 F.2d 144 (7th Cir. 1990)................15

*Chicago & N.W. R. Co. v. United Transp. Union,* 402 U.S. 570 (1971) ........................................24

*Consolidated Rail Corp. v. Ry. Labor Exec's Ass'n,* 491 U.S. 299 1989)..............................passim

*CSX Transp., Inc. v. Transp. Union Int'l*, 879 F.2d 990 (2d Cir. 1989)..........................15

*CSX Transp., Inc. v. United Transp. Union*, 395 F.3d 365 (6th Cir. 2005)....................13

*Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711 (1945).............................................10, 11

*Flight Options, LLC v. Int'l Bhd. of Teamsters, Local 1108*, 873 F.3d 540 (6th Cir. 2017)...........15

*Gen. Comm. of Adjust., United Transp. Union, W. Maryland Ry. Co. v. CSX R.R. Corp.*, 893 F.2d 584 (3d Cir. 1990)........................................................................................passim

*Int'l Ass'n of Machinists & Aerospace Workers v. U.S. Airways, Inc.*, 358 F.3d 255 (3d Cir. 2004)...............................................................................................................10, 11, 25

*Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. BNSF Ry. Co.*, No. 20 C 4220WL 2709143 (N.D. Ill. July 1, 2021)................................................................................14

*Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen Ass'n*, 457 U.S. 702 (1982).................23

*Lukens Steel Co. v. United Steelworkers of America*, 989 F.2d 668 (3d Cir. 1993)............................................................................23, 24, 25, 28, 29

*McQuestion v. New Jersey Transit Rail Operations, Inc. ("NJTRO")*, 30 F.3d 388 (3d Cir. 1994).......................................................................................13

*Miklavic v. USAir Inc.*, 21 F.3d 551 (3d Cir. 1994)........................................12, 15, 21

*Quick v. N.L.R.B.*, 245 F.3d 231 (3d Cir. 2001)................................................................18

*Ry. Labor Execs.' Assoc. v. Chesapeake W. Ry.*, 915 F.2d 116 (4th Cir. 1990).............................15

*Ry. Labor Execs.' Ass'n v. Pittsburgh & L. E. R.R.,* 845 F.2d 420 (3d Cir. 1988)............10, 16, 21

*Se. Pa. Transp. Auth. v. Bhd. of R.R. Signalmen,* 882 F.2d 778 (3d Cir. 1989)............................13

*Stanker & Galetto, Inc. v. New Jersey Reg'l Council of Carpenters of the United Bhd. of Carpenters and Joiners of Am.*, 2012 WL 5044593 (D.N.J. Oct. 17, 2012)............................26

*Slocum v. Delaware, Lackawanna & W. R.R.*, 339 U.S. 239 (1950)...........................................14

*Steris Corp. v. Int'l Union, United Automobile, Aerospace and Agric. Implement Workers of Am.*, 489 F.Supp.2d 501 (W.D. Pa. 2007).................................................................25, 29, 30

*Tejidos de Coamo, Inc. v. Int'l Ladies' Garment Workers' Union*, 22 F.3d 8, 15 (1st Cir. 1994)...............................................................................................................27, 28

*U.A.W. Local 1697 v. Skinner Engine Co.*, 188 F.3d 130 (3d Cir. 1999)......................................18

*Union Pac. R.R. v. Price*, 360 U.S. 601 (1959) ..........................................................................29

*Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89 (1978).................................................................13

*United Telegraph Workers, AFL–CIO v. Western Union Corp.*, 771 F.2d 699 (3d Cir. 1985).......23

*Virginian R. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515 (1937).........................................................24

*Wright v. Union Pac. R.R. Co.*, 990 F.3d 428 (5th Cir. 2021).................................................10, 12

## Arbitration Cases

*City of Cincinnati*, 122 BNA LA 622 (Imundo, Jr., 2006)............................................................19

*Girard Sch. Dist.*, 119 BNA LA 1476 (Franckiewicz, 2004).........................................................19

*Lackawanna Leather*, 113 BNA LA 603 (Pelofsky, 1999)...........................................................19

*MTA N. Metro R.R.*, 122 BNA LA 385 (Suntrup, 2006)...............................................................19

*Rock County, Wis.*, 80 BNA LA 1217 (Briggs, 1983)..................................................................19

## Statutes

29 U.S.C. § 101.............................................................................................................................23
29 U.S.C. § 107...............................................................................................................24, 25, 26
29 U.S.C. § 108.......................................................................................................................24, 28
29 U.S.C. § 113.......................................................................................................................23, 25

45 U.S.C. § 151a.....................................................................................................................10, 29
45 U.S.C. § 152.............................................................................................................................11
45 U.S.C. § 153.................................................................................................................10, 11, 12
45 U.S.C. § 155.............................................................................................................................11
45 U.S.C. § 156.............................................................................................................................11

## INTRODUCTION

The Brotherhood of Locomotive Engineers and Trainmen ("BLET" or "Union), a Division of the Rail Conference of the International Brotherhood of Teamsters, submits this Opposition to New Jersey Transit Rail Operations, Inc.'s ("NJTRO" or "Carrier") Motion for Temporary Restraints and Preliminary Injunctive Relief. As we demonstrate below, the dispute between BLET and NJTRO before this Court concerns the interpretation or application of a current collective bargaining agreement ("CBA") governed by the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 *et seq*. BLET's position as to the merits of that dispute is not "frivolous or obviously insubstantial." Therefore, this dispute is a "minor dispute" that is subject to mandatory arbitration under the RLA, and as to which this Court does not have authority to decide the merits nor enjoin the arbitration thereof, as is sought by NJTRO. *See Consolidated Rail Corp. v. Ry. Labor Exec's Ass'n*, 491 U.S. 299, 318-19 (1989) ("*Conrail*"). Accordingly, the Court should deny NJTRO's motion to enjoin and disrupt the RLA's minor dispute arbitration process.

## STATEMENT OF FACTS

NJTRO is a is a public rail carrier providing commuter rail service within the meaning of the Railway Labor Act ("RLA"), 45 U.S.C. § 151, First. (ECF Doc. 5, McGreal Dec. ¶ 8) BLET is the representative of the craft or class of locomotive engineers employed by NJTRO. (*Id.* ¶ 8) BLET and NJTRO are parties to a current collective bargaining agreement ("CBA"), which became amendable pursuant to the RLA on January 1, 2020. (Hass Dec. ¶ 3, Ex. 1) Notably and contrary to several specious assertions by NJTRO in its motion papers, the CBA became "amendable" on January 1, 2020, and has not expired, as contracts do not expire under the RLA. *See Air Line Pilots Ass'n, Int'l v. UAL Corp.*, 897 F.2d 1394, 1398 (7th Cir. 1990) ("But collective bargaining agreements governed by the Railway Labor Act do not expire on their expiration dates.

The Act abhors a contractual vacuum. If on the date of expiration the parties have not negotiated a replacement agreement . . ., the old agreement continues in force.") Rather, the CBA merely became amendable on January 1, 2020, pursuant to its terms, and it continues in full force and effect unless and until BLET and NJTRO negotiate amendments or changes to it. Any allegation by NJTRO that the CBA is expired or that any of its terms have become unenforceable because the parties are in negotiations under the RLA is utterly false. (Hass Dec. ¶ 3)

At issue in this case is a provision of the current CBA, that the parties are admittedly in negotiations over amendments to, requiring that the effective hourly rate of pay of engineers represented by the BLET be no less than 10.4% greater than the effective hourly rate of pay of conductors for identical time on duty. This 10.4% pay differential provision between engineers and conductors is found on page 139 of the CBA in the form of a current Letter of Understanding dated December 29, 1982, that states, in relevant part:

> This is to confirm the understanding reached during negotiations of the Agreement between New Jersey Transit Rail Operations, Inc. and the Brotherhood of Locomotive Engineers signed this date that the effective hourly rate of pay of the Engineer shall be no less than 10.4% greater than the effective hourly rate of pay of the Conductor for identical time on duty. The effective hourly rate of pay shall be determined by taking the total daily compensation, including payments for arbitraries and allowance, and dividing it by the actual daily hours on duty or held for duty less any hours not on duty including layovers.

(Hass Dec. ¶ 4-5, Exhibit 1 p. 5) This 10.4% pay differential provision of the parties' CBA requiring that the effective hourly rate of pay of engineers represented by the BLET be no less than 10.4% greater than the effective hourly rate of pay of a conductor for identical time on duty remained an unmodified part of the parties' CBA for 36 years after it was agreed to in 1982 until a dispute over it arose in 2016. (Haas Dec. ¶ 6)

On June 24, 2016, the International Association of Sheet Metal, Air, Rail and Transportation Workers – Transportation Division ("SMART-TD"), which is the union that

represents the conductors at NJTRO, reached a new collective bargaining agreement with NJTRO. The resulting NJTRO/SMART-TD agreement provided for a new conductor certification pay allowance that narrowed the pay gap between engineers represented by the BLET and conductors represented by SMART-TD to less than the 10.4 % pay differential stipulated in the BLET-NJTRO CBA in effect at that time. BLET determined that by not increasing engineer pay rates to maintain the minimum 10.4% pay differential **at the same time** conductors received an increase in pay violated the 1982 10.4 % pay differential Letter of Understanding, and it submitted claims, or grievances, over what it believed was a violation of the CBA by NJTRO. NJTRO denied it violated the CBA and denied BLET's claims. (*Id*. ¶ 7)

By a subsequent Letter of Understanding, dated June 18, 2018, the claims BLET filed in 2016 over NJTRO's failure to maintain a minimum 10.4% differential between engineers and conductors and the underlying contract interpretation dispute were settled to the mutual satisfaction of the BLET and NJTRO. That June 18, 2018, Letter of Understanding is also part of the parties' current CBA (Exhibit 1 p. 6) and states:

> This will reflect the parties' understanding to interpret Appendix 5 to the Agreement ("10.4% Differential") as follows, effective July 1, 2016.
>
> The parties agree that the calculation of the 10.4% differential shall be limited to 1) Engineer and Conductor straight time wages, 2) Engineer and Conductor certification allowances (20 minutes straight time each), and 3) the (i) newly created BLET 15 minutes straight time safety/speed control seal payments and ii) the Conductors' 15 minutes straight time report writing payments only. In the future, should the UTU (SMART-TD) negotiate with Carrier for additional or increased arbitrary or allowance payments, or payments in lieu of those payments listed above, the BLET and Carrier will likewise confer to assure that the 10.4% differential is maintained. The 10.4% payments will be allowed on the same basis as the certification payments as outlined in Rule 56 (FRA Certification) the June 22, 2016 letter pertaining to FRA Certification payment.

The 1982 and 2018 Letters of Understanding combined are hereafter referred to as the "10.4% LOUs." (Haas Dec. ¶ 8, Exhibit 1 pp. 5-6)

A little over three years later, on September 25, 2021, SMART-TD entered into another collective bargaining agreement with NJTRO covering its conductors. In this 2021 agreement several general wage increases were included, which adjusted the pay rate for conductors upward and once again narrowed the pay gap between engineers represented by the BLET and conductors represented by SMART-TD to less than the 10.4 % differential stipulated in the current BLET/NJTRO CBA. As previously done in 2016, BLET contacted NJTRO to seek an adjustment to the wages of engineers to maintain compliance with the wage differential required by the 10.4% LOUs that are an essential part of the BLET's current CBA. However, NJTRO declined and has continued to decline to make any adjustment. (Haas Dec. ¶ 9)

As a result of NJTRO's failure to comply with the 10.4% LOUs/CBA requirement that the effective hourly rate of pay of engineers represented by the BLET be no less than 10.4% greater than the effective hourly rate of pay of a conductor for identical time on duty, BLET General Chairman Thomas Haas, Jr. filed a claim with NJTRO on or about October 28, 2021, over NJTRO's violation of the CBA ("10.4% claim") (Haas Dec. ¶ 10, Exhibit 2). Mr. Haas filed the 10.4% claim in accordance with Rule 46 – Presentation of Claims for Compensation of the CBA. (*Id.*, Exhibit 1 pp. 2-4). The 10.4% claim states:

> Allow eight hours pay for all engineers, per day, from July l, 2020 to October 27, 2021 account Carrier violation of NJT / BLET Agreement by refusal to implement the 12/19/1982 Agreement revised effective 6/18/2018 in regard to Appendix 5 of the Agreement.

(*Id.*, Exhibit 2) This process was no different than the claims process initiated by the BLET in 2016 when conductor pay was increased and BLET filed claims when NJTRO refused to comply with the CBA and 10.4% LOUs at that time.

The basis of the 10.4% claim filed by General Chairman Haas was communicated to NJTRO during the processing of the claim. During that process, BLET informed NJTRO that its

interpretation of the CBA is that **any time** the effective hourly rate of a conductor becomes greater than 10.4% less than an engineer for identical time on duty, then the parties' current CBA, through the application of and compliance with the plain language of the 10.4% LOUs, requires that the engineer hourly pay rate be adjusted immediately to maintain the required 10.4% pay differential. The BLET's interpretation is based on the fact that the 10.4% LOUs plainly state, "the effective hourly rate of pay of the Engineer shall be no less than 10.4% greater than the effective hourly rate of pay of the Conductor for identical time on duty," and then go on only to identify how the hourly rate of pay is determined and what pay factors go into the calculation of the 10.4% pay differential. (Haas Dec. ¶ 11, Exhibit 1 pp. 5-6)

BLET further informed NJTRO that it was BLET's interpretation of the CBA that the requirement to maintain a 10.4% pay differential and the requirement to comply with the current CBA does not become suspended or unenforceable by the BLET if the BLET and NJTRO are in negotiations under the RLA over amendments to the CBA because every single provision in the CBA, including but not limited to the 10.4% LOUs, remains in full force and effect until the parties agree to amendments or changes to the CBA. BLET bases this interpretation of the CBA – that the 10.4% LOUs and NJTRO's contractual obligation to maintain that 10.4% wage differential does not become suspended during negotiations – on the plain language of the 10.4% LOUs because they make no mention of suspending their application while the parties are in negotiations over amendments to the CBA. Thus, the plain language of the 10.4% LOUs supports the BLET's interpretation of them and the CBA. (Haas Dec. ¶ 12)

NJTRO denied the BLET's 10.4% claim on January 7, 2022. (Haas Dec. ¶ 13, Exhibit 3) In its denial, NJTRO claims that BLET previously acquiesced to its interpretation of the 10.4% LOUs as not requiring that the 10.4% differential be maintained while BLET and NJTRO were in

negotiations until a final agreement over amendments to the CBA was reached. In essence, NJTRO argues that the parties' past practice has modified the plain language of the 10.4% LOUs to prevent their application while the parties are in negotiations under the RLA, and, therefore, the *status quo* between the parties is a suspension of the 10.4% LOUs while the parties are in negotiations. (Haas Dec. ¶ 13)

BLET, obviously, denies that it has ever acquiesced to any modification of the plain language of the 10.4% LOUs and the requirement to maintain the 10.4% pay differential between engineers and conductors **at all times**, whether the parties are in negotiations or not. BLET further maintains that, to the extent it ever chose not file claims over similar past violations of the CBA, its decision to not pursue claims in prior rounds of negotiations if conductors' pay was increased such that the 10.4% pay differential was not maintained was not acquiescence to the NJTRO's interpretation of the CBA, but rather was the product of internal union decisions based on the facts and circumstances present each time the 10.4% differential was not maintained. (Haas Dec. ¶ 14)

With respect to the remedy sought by BLET in the 10.4% claim for NJTRO's violation of the CBA and contrary to claims made by NJTRO, BLET further denies that, in seeking 8 hours of pay for each engineer for each day that NJTRO fails to comply with the plain language of the CBA and 10.4% LOUs, it is seeking any undue windfall for engineers. Rather, this penalty claim for 8 hours of pay is based upon standard practice in the railroad industry for such penalty claims of a basic day's pay when there is a contract violation found but there is no penalty for non-compliance set forth in a contract. (Haas Dec. ¶ 15)

An example of such a penalty claim and acknowledgement of its standard practice in the railroad industry is contained in Special Board of Adjustment ("SBA") 894 Award No. 99, which awarded 8 hours of penalty pay for each day the railroad violated the contract and states, "It is

customary in the industry to grant a basic day's pay when no penalty is defined for breach of contract." (Haas Dec. ¶ 16, Exhibit 4). This SBA 894 Award is but one of many examples of penalty payments consisting of a day's pay throughout the rail industry.

Another example of an 8hour penalty claim in the railroad industry is National Railroad Adjustment Board ("NRAB") Award No. 26302. (Haas Dec. 17, Exhibit 5) In that Award, the NRAB held, "this Board has the discretion to fashion a remedy even though the rule does not provide for one." (Haas Dec., Exhibit 5 at 4) The NRAB went on to note:

> For more than half a century, this Division, as well as Special Boards of Adjustment and Public Law Boards, have wrestled with the fact that the parties, for whatever reason, have never agreed upon the appropriate remedy for Agreement violations, except in a few cases. Obviously, the parties appear content to have this Board resolve such disputes on a case by case basis.

(*Id.*) (internal citation omitted). In awarding 8 hours of pay for the railroad's violation, the NRAB further explained:

> If this Board does not fashion an appropriate remedy in this case, our concern is that the Carrier will take a similar "... cavalier attitude ..." (Public Law Board No. 5916, Award 24, supra) in future cases where the engineer coming off duty is only seeking his contractual entitlements. In this particular case, we believe eight hours pay for the Claimant at the straight time rate will serve to prevent that approach to the obligation to provide lodging in a timely manner in the future and will serve as an incentive to the Carrier follow the rule as written.

(Haas Dec., Exhibit 5 at 5) Thus, there is nothing extraordinary or unusual in the remedy sought by BLET in its 10.4% claim for NJTRO's continuing violation of the CBA. Rather, BLET is simply seeking an appropriate remedy that compensates engineers for NJTRO's violation of the CBA and that will serve as an incentive in the future for NJTRO to comply with the 10.4% LOUs and maintain the 10.4% pay differential between engineers and conductors **at all times**.

Turning back to the processing of the 10.4% claim, on January 17, 2022, ten days after NJTRO denied the claim, BLET appealed the denial of the claim to arbitration before Special Boad

of Adjustment 940 ("SBA 940"). (Hass Dec. ¶ 18, Exhibit 6). The appeal of the 10.4% claim to

arbitration before SBA 940 was made in accordance with Rule 46(g) of the CBA, which states:

> The decision of the highest officer of the NJT Rail designated to handle claims will
> be final and binding unless, within 60 days after the date of that decision, the
> claimant or his duly authorized representative submits a written request for
> arbitration to the BLE Special Board of Adjustment with a copy to NJT Rail.
> Arbitration shall be held as soon as practicable at a time agreed upon by the parties,
> or, if they cannot agree, at a time determined by the Board or Impartial Arbitrator
> upon at least five (5) calendar days notice to the parties. Arbitration shall be held in
> Newark, New Jersey at a public building (except NJT Rail property) unless
> otherwise determined by the Board.

(Haas Dec. ¶ 19, Exhibit 1 p. 4) The arbitration hearing between BLET and NJTRO over the 10.4%

claim that NJTRO is in violation of the CBA and the 10.4% LOUs is now scheduled for February

21, 2025, before SBA 940. (Haas Dec. ¶ 20)

Turning now to some of the specious factual allegations of NJTRO in its motion papers,

contrary to the allegation of Patrick McGreal in Paragraph 40 of his declaration (ECF Doc. 5),

proceeding with the arbitration before SBA 940 will have no impact on the likelihood of a strike

by engineers once NJTRO and BLET are both free to resort to self-help in accordance with the

RLA's negotiation procedures. Rather, the sole issue that will increase or decrease the likelihood

of a strike by engineers or NJRTO resorting to its own self-help, such as locking out engineers or

imposing new contract terms on them, is whether the parties are able to come to agreement on

amendments and changes to the current CBA or not before the date that self-help becomes legally

permissible. (Haas Dec. ¶ 21)

Further, in Paragraph 42 of his declaration, Mr. McGreal states, "if Engineers receive

significant compensation and/or retroactive and prospective wage increases from SBA 940, they

have little or no incentive to compromise with NJTRO to resolve the dispute over the terms of the

successor CBA." (McGreal Dec. ¶ 42). This statement by Mr. McGreal reveals the true motivation

of NJTRO in seeking to enjoin the arbitration over the BLET's claim that NJTRO is in violation of the current CBA and 10.4% LOUs. That motivation laid bare by Mr. McGreal is to try and force BLET to address NJTRO's violation of the CBA in negotiations where NJTRO believes it has more leverage, as opposed to in arbitration. Whereas, if BLET prevails on its interpretation of the CBA in arbitration before SBA 940, NJTRO will lose the leverage in negotiations it believes it has by refusing to comply with the plain language of the 10.4% LOUs and maintain the 10.4% wage differential between engineers and conductors as is required by the CBA regardless of whether or not the parties are in negotiations over amendments to the CBA or not. (Haas Dec. ¶ 22)

Finally, in various paragraphs of Mr. McGreal's declaration, he claims that requiring NJTRO to comply with the 10.4% LOUs and maintain the 10.4% wage differential between engineers and conductors violates the RLA's *status quo* requirement. His claims on this issue are false and contrary to law. Rather, it is the position of BLET communicated to NJTRO many times that its failure to maintain the 10.4% wage differential is itself a violation of the *status quo* if the BLET's interpretation of the CBA and 10.4% LOUs is correct because the terms of the CBA are what establishes the basis of the *status quo*. If, on the other hand, NJTRO prevails at arbitration based on its interpretation of the CBA, then all that will occur is that BLET's 10.4% claim will be denied. In either case, the proper forum under the RLA for determining whether BLET's or NJTRO's interpretation of the CBA is correct and whether NJTRO is in violation of the current CBA is in arbitration before SBA 940. (Haas Dec. ¶ 23)

## ARGUMENT

**I.    NJTRO CANNOT SUCCEED ON THE MERITS OF ITS CLAIM THAT BLET'S ATTEMPT TO ENFORCE ITS CURRENT CBA THROUGH THE MINOR DISPUTE PROCESS OF ARBITRATION UNDER THE RLA CONSTITUTES A MAJOR DISPUTE.**

### A.    "Major" and "Minor" Disputes Under the Railway Labor Act

Congress enacted the RLA with the following stated purposes:

(1) To avoid any interruption of commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon the freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules or working conditions.

45 U.S.C. § 151a. To achieve these ends, the RLA establishes mandatory procedures to govern disputes over the negotiation of collective bargaining agreements and disputes over the meaning or application of such agreements. 45 U.S.C. § 153.

There are two classes of disputes under the RLA, major disputes and minor disputes. "The difference between the two types of disputes is that major disputes seek to create contractual rights, while minor disputes seek to enforce them." *Int'l Ass'n of Machinists & Aerospace Workers v. U.S. Airways, Inc.*, 358 F.3d 255, 260 (3d Cir. 2004).

Thus, "[m]ajor disputes 'look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past . . ..'" *Gen. Comm. of Adjust., United Transp. Union, W. Maryland Ry. Co. v. CSX R.R. Corp.*, 893 F.2d 584, 589 (3d Cir. 1990) (quoting *Ry. Labor Execs.' Ass'n v. Pittsburgh & L. E. R.R.,* 845 F.2d 420 (3d Cir. 1988), *rev'd,* 491 U.S. 490 (1989)); *see also Wright v. Union Pac. R.R. Co.*, 990 F.3d 428, 435 (5th Cir. 2021) (quoting *Elgin, J. & E. Ry.*

*Co. v. Burley*, 325 U.S. 711, 723 (1945)) (holding major disputes "concern 'the formation of collective agreements or efforts to secure them …. They look to acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.") Such disputes are subject to "a lengthy and involved dispute resolution process during which the parties are obligated to maintain the status quo." *Conrail*, 491 U.S. 299, 302-03 (1989) ("*Conrail*"); *see also* 45 U.S.C. §§ 152, Seventh, 155 and 156.

A "minor dispute," by contrast, "contemplates the existence of a collective agreement already concluded" and "the dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." *Conrail*, 491 U.S. at 303 (quoting *Burley*, 325 U.S. at 723). *See also U.S. Airways*, 358 F.3d at 260 ("minor disputes arise out of grievances or out of the interpretation or application of existing collective bargaining agreements"); *CSX*, 893 F.2d at 589 ("minor disputes involve disagreements over the interpretation or application of specific provisions within existing agreements."); *Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777, 782-83 (5th Cir. 2012) ("A minor dispute concerns grievances or the interpretation or application covering rates of pay, rules, or working conditions")*; Bhd. of Ry. Carmen v. Norfolk & W. Ry. Co.*, 745 F.2d 370, 374-75 (6th Cir. 1984) (minor disputes involve "interpretation of an existing agreement"). The characterization of a dispute as a "minor dispute" does not reflect the importance or value of the dispute. Rather, the term "minor dispute" reflects that the nature of the dispute is one over the interpretation or application of an existing agreement, rather than a dispute over the formation of, or changes to, an agreement. *Conrail*, 491 U.S. at 303-05.

Section 3 of the RLA created the NRAB and assigned the four Divisions of the NRAB jurisdiction over minor disputes involving specific crafts or classes of employees in the rail industry. 45 U.S.C. § 153, First (h). Disputes between railroads and the labor organizations

representing "train and yard service employees," including locomotive engineers, are assigned to the First Division of the NRAB. 45 U.S.C. § 153, First (h). Section 3, Second of the RLA allows railroads and labor organizations to establish arbitration panels known as "Public Law Boards" ("PLBs") or "Special Boards of Adjustment" ("SBAs") to decide disputes which are "otherwise referable" to the NRAB. 45 U.S.C. § 153, Second; *Conrail*, 491 U.S. at 303. Arbitration awards issued by the NRAB (or a PLB or SBA) are "final and binding" on the parties. 45 U.S.C. §§ 153, First (m) and Second.

The NRAB, or PLB or SBA as the case may be, "has exclusive jurisdiction over minor disputes." *Conrail*, 491 U.S. at 304; *Miklavic v. USAir Inc.*, 21 F.3d 551, 553 (3d Cir. 1994) ("Minor disputes must be resolved through arbitration in a grievance proceeding or before a system board of adjustment."); *Wright*, 990 F.3d at 435; *Ballew*, 668 F.3d at 783 ("the RLA requires minor disputes that cannot be settled through internal grievance procedures to be resolved through a mandatory, exclusive, and comprehensive resolution process before a claims adjustment board establish by the employees' union and the employer through the CBA"). The Supreme Court has emphasized that Congress intended for minor disputes to be resolved through the RLA's mandatory arbitration procedures, and not through federal court litigation:

> Congress endeavored to promote stability in labor-management relations in this important national industry by providing effective and efficient remedies for the resolution of railroad-employee disputes arising out of the interpretation of collective bargaining agreements. The Adjustment Board was created as a tribunal consisting of workers and management to secure the prompt, orderly and final settlement of grievances that arise daily between employees and carriers regarding rates of pay, rules and working conditions. ***Congress considered it essential to keep these so called "minor" disputes within the Adjustment Board and out of the courts.***

*Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 94 (1978) (emphasis added) (internal citations omitted); *see also McQuestion v. New Jersey Transit Rail Operations, Inc. ("NJTRO")*, 30 F.3d 388, 391 (3d Cir. 1994) (following *Sheehan)*.

Thus, Congress charged the federal courts with a limited role under this regime. *See Bhd. of Locomotive Eng's & Trainmen v. Union Pac. R.R. Co.*, 879 F.3d 754, 757 (7th Cir. 2017). Courts are to "sort labor disputes into two piles, major or minor." *Bhd. of Maint. of Way Emps. v. Atchison, Topeka & Santa Fe Ry.*, 138 F.3d 635, 638 (7th Cir. 1997). In making the determination whether a dispute is minor, a court's role is limited to determining whether the party's position is "arguably justified" by the CBA. *See Conrail*, 491 U.S. at 307; *CSX Transp., Inc. v. United Transp. Union*, 395 F.3d 365, 368-69 (6th Cir. 2005). The burden in this respect is "relatively light"; so long as the party's position on the merits of the dispute is not "frivolous or obviously insubstantial," the dispute is minor. *Conrail*, 491 U.S. at 307; *Se. Pa. Transp. Auth. v. Bhd. of R.R. Signalmen,* 882 F.2d 778, 783 (3d Cir. 1989); *BRC*, 745 F.2d at 375; *CSX*, 395 F.3d at 369.

The court does not decide the ultimate merits of the disputed labor contract provision, but solely whether the dispute can be categorized as one involving interpretation of a labor contract. *CSX,* 395 F.3d at 370; *BRC*, 745 F.2d at 376-77 ("where a railroad asserts that its action is justified by the terms of an agreement, courts are called upon to determine only whether the railroad's contention is arguable, not to determine whether that contention is correct"). Because one of the key purposes of the RLA is to avoid interruptions to interstate commerce, the test for distinguishing a major dispute from a minor dispute is deliberately tilted toward finding a minor dispute; if any doubt exists as to whether the dispute is major or minor, courts will deem it to be minor. *See NJTRO*, 30 F.3d at 391 ("Whenever there is doubt as to whether a particular dispute is a 'major' or a 'minor' one, courts will construe the dispute to be 'minor.'"); *Bhd. of Locomotive Eng'rs v.*

*Atchinson, Topeka & Santa Fe Ry.*, 768 F.2d 914, 920 (7th Cir. 1985) ("when in doubt, the courts construe disputes as minor").

Sound policy reasons support the limited role of federal courts in minor disputes: "[r]eferring arbitrable matters to the Board will help to 'maintain agreements' by assuring that collective-bargaining contracts are enforced by arbitrators who are experts in 'the common law of [the] particular industry.'" *Bhd. of Maint. of Way Employes Div. v. Norfolk S. Ry. Co.*, 745 F.3d 808, 815 (7th Cir. 2014) (quoting *Conrail*, 491 U.S. at 310) (bracketed text in original). Arbitration panels in the railroad industry are uniquely qualified to interpret railway labor agreements, and Congress made a "considered effort" to establish such panels to provide "a desirable degree of uniformity in the interpretation of agreements throughout the nation's railway systems." *Slocum v. Delaware*, *Lackawanna & W. R.R.*, 339 U.S. 239, 243 (1950) (railroad arbitrators "understand railroad problems and speak the railroad jargon").

Therefore, as a general rule, courts do not have jurisdiction to issue *status quo* injunctions with respect to minor disputes. Rather, in seeking to resolve minor disputes, the parties must take their grievances to binding arbitration, and each is free to act under its interpretation of the collective bargaining agreement until the arbitrator rules otherwise. *See Assoc. of Flight Attendants v. Mesa Air Group, Inc.*, 567 F.3d 1043, 1047 (9th Cir. 2009)*; Air Line Pilots Assoc., Int'l v. Eastern Air Lines, Inc.*, 869 F.2d 1518, 1520- 21 (D.C. Cir. 1989)*.* That is because the pendency of demands for *changes* in agreements – or the fact that the parties are in the midst of discussing such changes – has no bearing on whether a railroad has the right to take action under its *existing* agreements or whether the railroad may refuse to take actions that are mandated by the *existing* agreement. *See, e.g.*, *Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. BNSF Ry. Co.*, No. 20 C 4220, 2021 WL 2709143, at *7-8 (N.D. Ill. July 1, 2021) (rejecting argument by SMART-TD that the

submission of a particular issue to bargaining necessarily means that the dispute is no longer minor) (collecting cases).[1]

Hence, the mere fact that the parties are in negotiations does not transform or recast otherwise minor disputes into major disputes. *See CSX,* 893 F.2d at 594 ("Because a minor dispute is involved, § 6's bargaining and status quo requirements are inapplicable and the arguments made by the Union on the nature of these requirements are not pertinent."); *Miklavic*, 21 F.3d at 555 (holding that it is "settled law governing post-expiration disputes that the mere filing of a section 6 notice does not turn a minor dispute into a major one"); *Flight Options, LLC v. Int'l Bhd. of Teamsters, Local 1108*, 873 F.3d 540, 544 (6th Cir. 2017) ("the district court assumed the parties' dispute was major simply because the union served a Section 6 notice. But that assumption was incorrect. …The proper inquiry is whether the existing collective-bargaining agreement 'control the controversy'"). *See also CSX Transp., Inc. v. Transp. Union Int'l*, 879 F.2d 990, 1000 (2d Cir. 1989) ("assuming that a minor dispute is in fact presented, the service of Section 6 notices by the appellant unions would have no transforming or alchemizing effect upon that situation"); *Chicago & N.W. Transp. Co. v. Ry. Labor Execs. Ass'n*, 908 F.2d 144 , 158 (7th Cir. 1990) ("Filing a Section 6 notice may kick off a major dispute; it does not transform a minor dispute into a major dispute"); *Bhd. of Ry. Carmen v. Mo. Pac. R.R.*, 944 F.2d 1422, 1427 (8th Cir. 1991) ("Several circuits, including this one, have held that the service of a section 6 notice by the union does not transform a major dispute into a minor one.").

---

[1] *See also Ry. Labor Execs.' Assoc. v. Chesapeake W. Ry.*, 915 F.2d 116, 120 (4th Cir. 1990) ("The Achilles' heel of the Unions' argument is that the railroad's actions are 'arguably justified' by existing agreement. The service of a section 6 notice and the beginning of bargaining over the proposed change does not convert a minor dispute into a major one."); *Airline Prof's. Ass'n v. ABX Air,* 400 F.3d 411, 415 (6th Cir. 2005) (rejecting the notion that "every dispute arising under a CBA that is being renegotiated is a major dispute").

Accordingly, and as explained in more detail *infra*, even if NJTRO is bargaining with BLET over what a *future* 10.4% CBA provision may look like, it remains the case that NJTRO has an obligation to comply with the *current* CBA's language regarding maintenance of the 10.4% pay differential between engineers and conductors. Thus, the pendency of bargaining under the RLA does not alter the conclusion that the parties are engaged in a minor dispute over the 10.4% differential dispute under the parties' existing CBA.

### B. BLET Has, At Minimum, a Non-Frivolous Basis for its Interpretation of the CBA That the 10.4% Pay Differential Between Engineers and Conductors Must Be Maintained At All Times, Regardless of Whether the Parties Are in Negotiations Over Amendments to the CBA or Not.

BLET's position on the merits of its 10.4% claim is not "frivolous or obviously insubstantial." Therefore, the 10.4% claim presents a minor dispute subject to the exclusive jurisdiction of SBA 940 before which arbitration is currently pending. *Conrail*, 491 U.S. at 304, 307. It is a minor dispute over the terms of the existing BLET/NJTRO CBA and 10.4% LOUs because BLET is not seeking to change any provision of the parties' CBA through its 10.4% claim or obtain any future rights, rather it is seeking to enforce the current CBA, which through operation of the 10.4% LOUs, requires that the effective hourly rate of pay of engineers be no less than 10.4% greater than the effective hourly rate of pay of conductors for identical time on duty **at all times**. *CSX*, 893 F.2d at 590, quoting *Ry. Labor Execs.' Ass'n v. Pittsburgh & L. E. R.R.,* 845 F.2d 420 (3d Cir. 1988), *rev'd,* 491 U.S. 490 (1989). ("Major disputes 'look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past'; in minor disputes, 'the claim is to rights accrued, not merely to have new ones created for the future.'")

BLET bases its interpretation of the CBA on the plain language of the 10.4% LOUs, which contain no limitation on their application during the time frame in which BLET and NJTRO are in negotiations over amendments to the current CBA. Indeed, BLET has repeatedly informed NJTRO

while processing its 10.4% claim since 2021 that its interpretation of the CBA is that **any time** the effective hourly rate of a conductor becomes greater than 10.4% less than an engineer for identical time on duty, then the parties' current CBA, through the application of and compliance with the plain language of the 10.4% LOUs, requires that the engineer hourly pay rate be adjusted immediately to maintain the 10.4% pay differential required by the CBA. This is because the 10.4% LOUs plainly state, "the effective hourly rate of pay of the Engineer shall be no less than 10.4% greater than the effective hourly rate of pay of the Conductor for identical time on duty," and then go on only to identify how the hourly rate of pay is determined and what pay factors go into the calculation of the 10.4% pay differential. (Haas Dec., Exhibit 1 pp. 5-6) Thus, it is BLET's position that when NJTRO increased conductor pay on September 25, 2021, thereby reducing the pay differential between engineers and conductors to less than a 10.4% differential, NJTRO was required by the parties' current CBA to adjust engineer pay to remain in compliance with the CBA. A position that is not only arguably justified, but which the BLET submits is the correct interpretation of the CBA.

Clearly, NJTRO disputes BLET's interpretation of the 10.4% LOUs as requiring that the 10.4% pay differential be maintained at all times. To support its contrary interpretation of the CBA, NJTRO argues that the parties' past practice in regard to the 10.4% wage differential has been to ignore the differential if it dips below 10.4% while the parties negotiated wages and then an adjustment to wages, if any, retroactive to the effective date of an amended CBA. (*Plaintiff's Memo in Support of Injunctive Relief*, ECF Doc. 4, p. 11). The basis of this argument is the claim that BLET has acquiesced to the *status quo* concerning the 10.4% wage differential during prior rounds of negotiations. (Haas Dec., Exhibit 3 p. 3) The principles of contract interpretation and

application, however, do not support NJTRO's argument or claim of BLET's acquiescence to its position on the proper interpretation of the 10.4% LOUs.

The Third Circuit has stated that "extrinsic evidence of 'past practice' [may] be admitted, if at all, only to resolve an ambiguity in the CBA." *Akers Nat. Roll Co. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 712 F.3d 155, 161-162 (3d Cir. 2013), quoting *Quick v. N.L.R.B.*, 245 F.3d 231, 247–248 (3d Cir. 2001). In *Quick,* the Court of Appeals elaborated on this standard of contract interpretation, which had included a quote from an opinion of the Seventh Circuit:

> Although extrinsic evidence is admissible to show that a written contract which looks clear is actually ambiguous, perhaps because the parties were using words in a special sense, ... there must be either contractual language on which to hang the label of ambiguous or some yawning void ... that cries out for an implied term. Extrinsic evidence should not be used to add terms to a contract that is plausibly complete without them.

*Quick* at 247-248, citing to *U.A.W. Local 1697 v. Skinner Engine Co*., 188 F.3d 130, 146 (3d Cir. 1999), quoting *Bidlack v. Wheelabrator Corp*., 993 F.2d 603, 608 (7th Cir. 1993).

However, the 10.4% LOUs make no mention of suspending their application while the parties are in negotiations over amendments to the CBA, or for that matter, provide for any temporal limitation on the application of the LOUs at all. (Haas Dec., Ex. 1, pp. 5, 6). Thus, there is no label of ambiguity for NJTRO on which to hang its hat nor is there a yawning void that cries out for an implied term. Rather, the application of the 10.4% LOUs is temporally constant. That is clear from the 1982 LOU which states "…that the effective hourly rate of pay of the Engineer *shall* be no less than 10.4% greater than the effective hourly rate of pay of the Conductor…," and the 2018 LOU that states that the 10.4% differential will be "maintained." (*Id.)* (emphasis added).

Further, the alleged acquiescence of BLET claimed by NJTRO does not make for a past practice that bars BLET from enforcing its current CBA. This is because the decision of a party to

a collective bargaining agreement to not exercise a right contained in the agreement, does not amount to a sort of negative past practice and thus become a forfeiture when disputed by the other party. *See City of Cincinnati*, 122 BNA LA 622, 628 (Imundo, Jr., 2006) (union did not forfeit any right under the collective bargaining agreement merely by not exercising it); *Girard Sch. Dist.*, 119 BNA LA 1476, 1480 (Franckiewicz, 2004) (union did not forfeit its right to insist on future compliance with terms of agreement by not pursuing meritorious grievances in past). Indeed, a party retains the right to police the agreement at any point.  *See MTA N. Metro R.R.*, 122 BNA LA 385, 391 (Suntrup, 2006) (either party can police their contract at any point, absent having done so in the past). We cite solely to labor arbitration awards and not to any case law because it appears the courts have not ventured into this area of collective bargaining interpretation. BLET offers, however, that labor arbitration awards are the preeminent source in regard to the interpretation of collective bargaining agreements considering the frequency with which labor arbitrators interpret those agreements.

A related rule is that a party's failure to file claims, or grievances, or to protest past violations of a clear contract rule does not bar that party from insisting on compliance with the clear contract requirement in future cases. *Lackawanna Leather*, 113 BNA LA 603 (Pelofsky, 1999) (that a union may elect not to process a grievance does not eternally bar the union from enforcing a collective bargaining agreement; the union may elect to not process a grievance for reasons other than the merits of the dispute); *Rock County, Wis.*, 80 BNA LA 1217, 1220 (Briggs, 1983) ("[t]he failure of a party to enforce the clear language of an agreement does not constitute a waiver of its right to expect future enforcement of the language."). Therefore, NJTRO's argument that because BLET failed to file claims in past instances when the 10.4% pay differential was not maintained while BLET and NJTRO were in negotiations, does not bar the BLET from insisting

19

on compliance with the 10.4% LOUs at this time. On this point, NJTRO presents no evidence as to why BLET may have chosen to forego prior claims, but it was not acquiescence to the NJTRO's interpretation of the CBA. Rather, the decision to file claims when the 10.4% pay differential was not maintained, as in 2016, or not in other instances was the product of internal union decisions based on the facts and circumstances present each time the 10.4% differential was not maintained. (Haas Dec. ¶ 14)

The principles of contract interpretation and application simply do not support NJTRO's argument that there is a binding past practice that precludes the BLET from enforcing the current 10.4% LOUs. They are "clear and unambiguous" in that neither include any temporal provisions, let alone their suspension during contract negotiations that NJTRO is attempting to read into them. Further, if extrinsic evidence is to be considered in this matter, that extrinsic evidence does not make for a sort of negative past practice as alleged by NJTRO because BLET has the right to seek enforcement of the 10.4% LOUs based on its arguably justified and not obviously insubstantial interpretation of them and is doing so with the 10.4% claim filed in 2021 now pending before SBA 940. *CSX*, 893 F.2d at 591("If it is an arguably justifiable and not obviously insubstantial interpretation of the existing agreements, then the dispute is minor under the RLA.")

As for NJTRO's assertion that it would be a violation of the *status quo* to adjust engineers' rates of pay while the parties are in negotiations over amendments to the CBA, this argument is without merit when adjustment of pay is what is required by the existing CBA itself. This is because it is at least the express terms of the existing CBA that establishes *status quo* along with those objective working conditions that are not addressed one way or the other in the CBA. *CSX*, 893 F.2d at 591 ("As the Supreme Court also made clear in *Conrail*, both express and implied provisions of a collective bargaining agreement must be considered when determining whether

20

action is 'arguably justified' by the terms of the agreement."). The Third Circuit addressed this issue directly in *Miklavic*, where it held, it is "settled law governing post-expiration disputes that the mere filing of a section 6 notice does not turn a minor dispute into a major one." 21 F.3d at 555; *see also CSX*, 893 F.2d at 594 ("The Union's § 6 notice seeking certain changes in the existing collective bargaining agreements does not change this minor dispute over the proposed sale of the York line into a major one. The Union's § 6 notice does not serve to short-circuit the arbitration process Congress specifically designed to resolve minor disputes.")

Consider for one moment the alternative. Under NJTRO's theory of the case, if a CBA clearly and unequivocally required yearly 5% wage increases on every January 1, then it would be free to begin denying those contractually mandated wage increases as soon as the parties entered negotiations and served Section 6 notices under the RLA to initiate those negotiations. Or, suppose that a CBA provided for annual 5% increases in employees' health insurance premium contributions, then under NJTRO's theory, increases in premiums would be frozen for the period of negotiations. NJTRO cannot cite a single case supporting this treatment of existing CBA requirements while the parties are in negotiations and required to maintain the *status quo* under the RLA because none exist.

Indeed, the Third Circuit held, "[m]aking major dispute status automatic when the collective bargaining agreement expires and a section 6 notice is filed would be especially problematic because collective bargaining agreements in the transportation industry often take several years to negotiate." *Miklavic*, 21 F.3d at 554. Rather, the case law is clear that BLET may pursue its arguably justified 10.4% claim in arbitration before SBA 940 because the dispute over whether 10.4% LOUs apply during periods of negotiations between the parties is a matter of contract interpretation subject to the exclusive jurisdiction of the SBA, and in no way is an effort

to secure *future* rights that do not presently exist. *Conrail*, 491 U.S. at 304, 307. Furthermore, "when a minor dispute arises, the parties are not precluded from changing the status quo; management is free to implement its interpretation of the agreement, unless and until the interpretation is held invalid by the Adjustment Board." *CSX*, 893 F.2d at 590, quoting *Ry. Labor Execs.' Ass'n v. Pittsburgh & L. E. R.R.,* 845 F.2d 420 (3d Cir. 1988), *rev'd,* 491 U.S. 490 (1989). In this case, NJTRO's interpretation of the 10.4% LOUs as not requiring them to be adhered to while the parties are in negotiations is precisely the type of minor dispute that is exempt from the *status* quo requirements of the RLA and that is subject to the exclusive jurisdiction of SBA 940.

Turning lastly to NJTRO's assertion that BLET is seeking through arbitration of the 10.4% claim to change the *status quo* and impose penalties against it for not raising its members wages while those wages are the subject of collective bargaining, this assertion is false. Rather, BLET is seeking payment of what the CBA requires through application of the existing 10.4% LOUs and penalties against NJTRO for not complying with the existing CBA. In this regard, BLET is not seeking anything that is not presently required by the CBA, which establishes the *status quo* that must be maintained, and is seeking from SBA 940 the appropriate remedy for NJTRO's violation of that CBA. Further, the claim for 8 hours of pay is based upon standard practice in the railroad industry for such penalty claims of a basic day's pay when there is a contract violation found but there is no penalty for non-compliance set forth in a contract. (Haas Dec. ¶ 15, Exhibits 4 and 5)

Thus, for the reasons stated above, NJTRO cannot succeed on the merits of its claim that BLET's attempt to enforce its current CBA through the minor dispute process of arbitration under the RLA constitutes a major dispute or that such arbitration may be enjoined by this Court. Rather, the appropriate forum for the parties' 10.4% pay differential minor dispute and determination of an appropriate remedy, if any, is in arbitration under RLA.

## II.    TO OBTAIN INJUNCTIVE RELIEF, NJTRO MUST SATISFY BOTH THE TRADITIONAL REQUIREMENTS FOR AN INJUNCTION AND THE REQUIREMENTS OF THE NORRIS-LAGUARDIA ACT, WHICH IT CANNOT DO.

Because the matter before the Court is a labor dispute between the parties, the Norris-LaGuardia Act ("NLA"), 29 U.S.C. §§ 101 *et seq.*, applies. Section 1 of the NLA states:

No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

29 U.S.C. § 101. In turn, Section 13 of the NLA, 29 U.S.C. § 113, defines a "labor dispute" as follows:

(c) The term "labor dispute" includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

29 U.S.C. § 113. In refining that definition, the Supreme Court explained that the issue is whether "the employer-employee relationship [is] the matrix of the controversy." *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen Ass'n*, 457 U.S. 702, 712-713 (1982). In *Jacksonville,* the Court found: "In this case, the Employer and the Union representing its employees are the disputants, and their dispute concerns the interpretation of the labor contract that defines their relationship. Thus, the employer-employee relationship is the matrix of this controversy." *Id.*

That the instant matter before this Court is a "labor dispute" within the definition of the NLA is made all the more clear by the findings of the Third Circuit in *Lukens Steel Co. v. United Steelworkers of America*, 989 F.2d 668 (3d Cir. 1993). In *Lukens*, the court observed that interpretation of the term "labor dispute" in *Jacksonville* "furthers the 'intentionally broad' scope of the NLA." 989 F.2d at 676, quoting *United Telegraph Workers, AFL–CIO v. Western Union*

*Corp.*, 771 F.2d 699, 704 (3d Cir. 1985). In finding that the matter before it was a "labor dispute," the Third Circuit held an action to enjoin arbitration involves or grows out of a labor dispute, and an injunction to block an arbitration under a collective bargaining agreement is fully subject to the strictures of the NLA. *Lukens*, 989 F.2d at 676. It further held, "[t]his conclusion is also supported by the language of Section 8 of the NLA which provides that no injunction 'shall be granted to any complainant ... who has failed to make every reasonable effort to settle [the] dispute ... by ... arbitration.'" *Id.* at 676; *see also* 29 U.S.C. § 108.

As in *Lukens*, the matter before this Court is NJTRO's attempt to enjoin an arbitration in a labor dispute, and, therefore, it is a "labor dispute" within the definition of and subject to the structures the NLA. NJTRO must therefore satisfy, in addition to the Third Circuit's requirements for the issuances of injunctive relief, the procedural and substantive requirements of the NLA. This Court respectfully is without jurisdiction to issue any temporary restraining order or preliminary injunction, if NJTRO fails to satisfy those requirements of the NLA.

### A.     The RLA and NLA Must Be Accommodated

The NLA is not applied alone in matters dealing with railway labor disputes. *See Virginian R. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 563 (1937); *Bhd. of R.R. Trainmen v. Chicago R. & I.R.R. Co.*, 353 U.S. 30, 39-40 (1957). Because the RLA is also implicated in railway labor disputes, there must be an accommodation of the NLA and the RLA so that the purposes in the enactment of each is preserved, with the balance favoring the RLA, which is more specific than the NLA and legislated later in time than the NLA. *Id.; see also Chicago & N.W. R. Co. v. United Transp. Union*, 402 U.S. 570, 582–83, n. 18 (1971). Therefore, "the specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris-LaGuardia

Act." *Chicago R. & I.R.R. Co*., 353 U.S. at 41-42, citing *Bhd. of R.R. Trainmen v. Howard*, 343 U.S. 768, 774 (1952).

The provisions of the NLA that do not conflict with the RLA, however, remain. In particular, one of the provisions of the NLA that remains is the requirement for an evidentiary hearing and specific findings pursuant to Section 7 of the NLA. 29 U.S.C. § 107; *see Air Line Pilots Ass'n, Int'l v. Guilford Transp. Indus., Inc*., 399 F.3d 89, 105 (1st Cir. 2005) (finding that Section 7 of the NLA Section "applies in connection with injunctions issued under the RLA"). Because the Court has scheduled an in-person hearing on January 29, 2025, this requirement will be met. However, we do note that a hearing is only required to issue injunctive relief, not to deny it.

## B.    NLA Analysis

The Third Circuit has a four-step analysis to determine whether the NLA deprives a court jurisdiction to issue injunctive relief in a labor dispute:

> We employ a four-step analysis to determine whether the NLA divested the district court of such jurisdiction. First, we must ascertain whether this action involves a "labor dispute" as that term is used in the NLA. *See* 29 U.S.C. § 113(c). Second, we must decide whether the relief fashioned by the district court involves one or more injunctions as that term is used throughout the NLA. *See id.* §§ 101–115. Third, if we answer the first two questions affirmatively, we must then determine whether the district court complied with the procedural requirements of the NLA. *See id.* §§ 107–109. Fourth, if the district court did not comply with the NLA's procedural requirements, we must determine whether the dispute falls within a judicially-carved exception to the NLA.

*Lukens,* 989 F.2d at 675-676 (3d Cir. 1993); *see also Steris Corp. v. Int'l Union, United Automobile, Aerospace and Agric. Implement Workers of Am.*, 489 F.Supp.2d 501, 506-507 (W.D. Pa. 2007). This four-part analysis essentially requires a determination of whether a court complied with the strictures and procedural requirements of the NLA.

**C.**     **Even When Accommodated to the RLA, the NLA Deprives the Court of Jurisdiction to Enjoin the 10.4% Pay Differential Arbitration**

Section 7 of the Norris-LaGuardia Act, 29 U.S.C. § 107, states, in part:

No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as defined in this chapter, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court, to the effect-

(a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;
(b) That substantial and irreparable injury to complainant's property will follow;
(c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;
(d) That complainant has no adequate remedy at law; and
(e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

First, BELT submits that NJTRO is unable to meet the first of the findings required under § 7 of the NLA, that "unlawful acts have been threatened and will be committed unless restrained," because it cannot succeed on the merits of its claim that BLET's efforts to enforce its current CBA and 10.4% LOUs through the RLA's minor dispute process constates an unlawful act. *See* Part I, *supra.*

Second, with respect to the second required finding before an injunction may issue in a labor dispute, in *Stanker & Galetto, Inc. v. New Jersey Reg'l Council of Carpenters of the United Bhd. of Carpenters and Joiners of Am.*, 2012 WL 5044593, *6 (D.N.J. Oct. 17, 2012), this Court noted that it could find no Third Circuit case explaining the difference between the traditional "irreparable harm standard" for injunction and the NLA-specific standard of "substantial and irreparable injury to ... property." It did, however, cite to a First Circuit case that "found there to

26

be a significant distinction: '[u]nder ordinary standards for injunctive relief, irreparable injury is nominally required but courts are often generous where the complainant's claim on the merits is very strong or unanswerable. Under section 7 [of the NLA], however, there is no such generosity." *Id.*, quoting *Tejidos de Coamo, Inc. v. Int'l Ladies' Garment Workers' Union*, 22 F.3d 8, 15 (1st Cir. 1994).

The Court further found, "[g]iven the choice by Congress in drafting the NLA to add an additional modifier, 'substantial,' to the traditional 'irreparable injury' standard for injunctive relief, the Court is inclined to agree with the First Circuit that the inquiry for purposes of the [Norris-LaGuardia] Act must be more rigorous than it would be for purposes of an ordinary request for injunctive relief." *Id.* Finally, the Court found that the "short time and slight expense involved in the typical arbitration ... would scarcely qualify as irreparable injury." *Id.* It made this finding because "arbitration awards are not self-executing; to have any binding effect on an unwilling party, the award must be enforced in federal court." *Id.* Thus, if an employer can successfully demonstrate at the enforcement proceeding that arbitration award is contrary to law, "the court will not enforce the award, and therefore the employer will suffer no actual harm." *Id.*

Applying these principles to the instant matter, NJTRO cannot show that it will suffer "substantial and irreparable injury to [its] property" absent and injunction stopping the arbitration of the 10.4% claim. It will not suffer "substantial and irreparable injury" because even if BLET prevails in arbitration on the 10.4% claim, it will still need to enforce the award if NJTRO is unwilling to comply. Thus, NJTRO will suffer no "substantial and irreparable injury." On this point, Mr. McGreal's declaration is instructive, as the only "substantial and irreparable injury" that NJTRO actually alleges it will suffer is its perceived loss of bargaining leverage over BLET by its continued refusal to abide by the terms of the current CBA while the parties negotiate amendments

27

to it. (McGreal Dec. ¶ 42; Haas Dec. ¶ 22) That loss of perceived bargaining leverage is not a "substantial and irreparable injury" to NJTRO's property, and, therefore, the NLA deprives this Court of jurisdiction to enjoin the arbitration.

Third and lastly, in addition to those requirements in §7 of the NLA, § 8 requires that a moving party come to a court with clean hands having made every reasonable effort to settle such dispute, including by voluntary arbitration.[2] A party that has not made every reasonable effort under the statute prior to seeking injunctive relief has not complied with the NLA's clean hands requirement. *Bhd. of R.R. Trainmen v. Toledo P. & W. RR*, 321 U.S. 50, 60 (1944). In addition to incorporating the traditional equitable requirement that a party seeking injunctive relief have "clean hands," this provision "makes it a condition precedent that every remedy must be exhausted to settle" the labor dispute in question before injunctive relief may be granted. *Id.* at 59, fn. 16.

In this case, rather than attempt to resolve its dispute over whether the 10.4% LOUs apply during the period that BLET and NJTRO negotiate amendments to their agreement in arbitration, it seeks to have this Court enjoin that arbitration to ensure it can use that minor dispute as leverage in the negotiations. As noted in *Lukens*, an injunction barring arbitration of a labor dispute "would be contrary to the NLA's Section 8 requirement that disputants make every effort to settle their disputes through, inter alia, arbitration before seeking injunctions." 989 F.2d at 768. *See also Tejidos de Coamo,* 22 F.3d at 12 (holding that a suit to enjoin a labor arbitration does not fall within any recognized exceptions to the NLA and noting that "[i]t requires no argument to show that [a]

---

[2] Section 8 of the NLA, 29 U.S.C. § 108, provides:

> No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.

stay of arbitration ... is not a step fostering arbitration"); *Steris*, 489 F.Supp.2d at 509 ("[m]indful of the strong federal policy favoring arbitration, we conclude that Steris' refusal to arbitrate the [grievance] frustrates that policy, and that the Defendants, as the party against whom injunctive relief is sought in this case, actually further that policy by seeking to arbitrate the [grievance].").

Accordingly, because NJTRO has not made every reasonable effort to settle the 10.4% differential dispute through arbitration, the NLA deprives this Court of jurisdiction to enjoin the arbitration pending before SBA 940.

### D.    Preliminary Relief Will Result in Greater Harm to the BLET and the Public Interest Disfavors Preliminary Relief

NJTRO acts as if BLET may receive in negotiations a benefit BLET does not have, if there were preliminary relief. The BLET, however, has already the negotiated benefit of the 10.4% LOUs. (Haas Dec. ¶ 8, Exhibit 1 pp. 5-6) The BLET has also already negotiated with NJTRO the dispute resolution provisions in the CBA. Preliminary relief, then, would actually deprive the BLET of its negotiated benefits, both for the provision of a 10.4% pay differential in the LOUs and the enforcement of the 10.4% pay differential benefit by means of the dispute resolution provisions. The BLET would be harmed by preliminary relief, contrary to the statements of NJTRO.

It is indeed in the public interest for federal laws, such as the RLA, to be upheld. NJTRO offers selected references from 45 U.S.C. § 151a to support this statement in its motion. That RLA provision, however, also includes that a purpose of the statute is "to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules or working conditions." *Id.*

The public is interested in the resolution of disputes between railway parties without the disruption of that railway system. *See Union Pac. R.R. v. Price*, 360 U.S. 601, 609-616 (1959)

(detailing the history, and purpose, of the "minor dispute" resolution procedures in the RLA); *see also Lukens*, 989 F.2d at 678, *Tejidos de Coamo*, 22 F.3d at 12 and *Steris*, 489 F.Supp.2d at 509 (detailing, in relation to the NLA, the public policy that favors the arbitration of disputes amongst labor parties.)

The arbitration of disputes serves that public interest. Preliminary relief may do the opposite as is complained in NJTRO's motion. If this matter was made a part of the major dispute between the parties, it may be a part to any self-help by the parties. The public, and the courts, are interested in the resolution of disputes, not the opposite. The arbitration in this matter serves that purpose.

## CONCLUSION

For all the reasons stated above, BLET respectfully requests that this Court deny NJTRO's Motion for Temporary Restraints and Preliminary Injunctive Relief.

January 15, 2025                              Respectfully Submitted,

                                             */s/ Sanford R. Oxfeld*
                                             Sanford R. Oxfeld, Esq.
                                             OXFELD COHEN, P.C.
                                             60 Park Pl., Suite 600
                                             Newark, NJ 07102
                                             Phone: (973) 642-0161
                                             sro@oxfeldcohen.com

                                             Joshua D. McInerney (*Pro Hac Vice*)
                                             WENTZ, MCINERNEY,
                                             PEIFER & PETROFF, LLC
                                             14 E. Gay Street, FL 4
                                             Columbus, Ohio 43215
                                             Phone: (614) 756-5566
                                             jmcinerney@lawforlabor.com

                                             *Attorneys for Defendant BLET*